# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ORLANDO ACOSTA, *et al.*, | : | Civil Action No. 2:17-cv-01462-JHS |
| Plaintiffs, | : | |
| v. | : | |
| DEMOCRATIC CITY COMMITTEE, *et al.*, | : | |
| Defendants. | : | |

|  |  |  |
|---|---|---|
| LUCINDA LITTLE, *et al.*, | : | Civil Action No. 2:17-cv-01562-JHS |
| Plaintiffs, | : | |
| v. | : | |
| THE HON. EMILIO A. VAZQUEZ, *et al.*, | : | |
| Defendants. | : | |

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THE MOTIONS TO DISMISS THE COMPLAINT FILED BY REP. VAZQUEZ, DEMOCRATIC CITY COMMITTEE, AND THE WARD LEADER DEFENDANTS

Marni Jo Snyder, Esq.
Law Offices of M.J. Snyder, LLC
Land Title Building
100 South Broad Street, Suite 1910
Philadelphia, PA 19110
marni@snyderlawyer.com
Tel: (215) 515-3360
*Counsel for Philadelphia City Democratic Committee*

Adam C. Bonin
The Law Office of Adam C. Bonin
30 South 15th Street, 15th Floor
Philadelphia, PA 19102
Telephone: (215) 864-8002
adam@boninlaw.com
*Attorney for St. Rep. Emilio Vazquez*

Anthony Kyriakakis, Esquire
Dilworth Paxson, LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: (215) 575-7149
akyriakakis@dilworthlaw.com
*Counsel for Ward Leader Defendants*

# TABLE OF CONTENTS

**Page**

I.   PLAINTIFFS' FAILURE TO AVAIL THEMSELVES OF STATE LAW
     REMEDIES COUNSELS TOWARD DISMISSAL OF THEIR FEDERAL
     CLAIMS ................................................................................................................. 1

II.  DEFENDANTS CITY COMMITTEE, VAZQUEZ, AND THE WARD
     LEADERS WERE NOT STATE ACTORS..................................................... 8

III. DEFENDANTS CANNOT BE HELD VICARIOUSLY LIABLE FOR § 1983
     VIOLATIONS ALLEGED TO HAVE BEEN COMMITTED BY OTHERS................ 12

IV.  PLAINTIFFS' CLAIMS ALSO FAIL BECAUSE THE ELECTION RESULTS
     WERE NOT CLOSE .......................................................................... 14

V.   CONCLUSION........................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268 (3d Cir. 1999) ...................................... 10

Appeal of Lord, 41 A.2d 661 (Pa. 1945) ..................................................................................... 2

Ashcroft v. Iqbal, 556 U.S. 662 (2009)...................................................................................... 12

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ............................................................... 11, 13

Benn v. Universal Health System, Inc., 371 F.3d 165 (3d Cir. 2004) ......................................... 10

Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001)............. 8, 9

Burton v. Wilmington Parking Auth., 365 U.S. 715 (1961) ......................................................... 9

Ciambriello v. County of Nassau, 292 F.3d 307 (2d Cir. 2002)................................................. 14

Curry v. Baker, 802 F.2d 1302 (11th Cir. 1986)........................................................................ 16

Gold v. Feinberg, 101 F.3d 796 (2d Cir. 1996) ........................................................................... 5

Griffin v. Burns, 570 F.2d 1065 (1st Cir. 1978) ................................................................... 14, 15

In re Havrilla, 29 A.2d 45 (Pa. 1942) ......................................................................................... 2

In re Illegal Distribution of Stamps, Civ. Action No. 170302036 (Phila C.P. Mar. 21, 2017) ...... 7

In re Matter of the 2016 Presidential Election, 659 M.D. 2016 (Pa. Commw. 2016) ................... 4

Jackson v. Metro. Edison Co., 419 U.S. 345 (1974)..................................................................... 8

Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir. 1994)............................. 10

Leshko v. Servis, 423 F.3d 337 (3d Cir. 2005)................................................................... 8, 9, 10

Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994) ........................................................................... 15

Max v. Republican Comm. of Lancaster County, 587 F.3d 198 (3d Cir. 2009) .............. 10, 13, 14

Olshansky v. Montgomery County Election Bd., 412 A.2d 552 (Pa. 1980) .................................. 3

Parkell v. Danberg, 833 F.3d 313 (3d Cir. 2016) ......................................................... 12

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)................................................... 12

Pennsylvania v. Bd. Of Dir. of City Trusts of Philadelphia; 353 U.S. 230 (1957)........................ 9

Pfuhl v. Coppersmith, 253 A.2d 271 (Pa. 1969)........................................................... 4

Reasonover v. St. Louis County, 447 F.3d 569 (8th Cir. 2006) ................................... 14

Reese v. Bd. of Elections of Lancaster County, 308 A.2d 154 (Pa. Commw. 1973) ................. 2

Roe v. Alabama, 43 F.3d 574 (11th Cir 1995)............................................................. 15

Scheer v. City of Miami, 15 F. Supp.25 1338 (S.D. Fla. 1998) .................................... 5

Shannon v. Jacobowitz, 394 F.3d 90 (2d Cir. 2005)................................................. 5, 16

West v. Atkins, 487 U.S. 42 (1988)........................................................................ 9

## STATUTES

25 P.S. § 2687 ...................................................................................................... 11

25 P.S. § 2779 ...................................................................................................... 11

25 P.S. § 3046 ........................................................................................................ 6

25 P.S. § 3244 ........................................................................................................ 9

25 P.S. § 3402 ........................................................................................................ 1

25 P.S. § 3404 ........................................................................................................ 2

25 P.S. § 3456 ........................................................................................................ 1

25 P.S. § 3457 ........................................................................................................ 1

25 P.S. § 3459 ........................................................................................................ 3

25 P.S. § 3467 ........................................................................................................ 3

42 U.S.C. § 1983................................................................................................ passim

**RULES**

Fed. R. Civ. P. 12(b)(5)...........................................................................................................1

Fed. R. Civ. P. 12(b)(6)...........................................................................................................1

Defendants St. Rep. Emilio Vazquez and Philadelphia Democratic City Committee, along with defendants Carlos Matos, Elaine Tomlin, Jewell Williams, Dwayne Lilley, Shirley Gregory, and El Amor Brawne Ali (the "Ward Leader Defendants"), jointly file this supplemental memorandum of law following this Court's hearing on their motions to dismiss.[1]

## I. PLAINTIFFS' FAILURE TO AVAIL THEMSELVES OF STATE LAW REMEDIES COUNSELS TOWARD DISMISSAL OF THEIR FEDERAL CLAIMS

During oral argument, this Court asked for clarification as to Plaintiffs' rights under Pennsylvania state law. The Pennsylvania Election Code has a procedure which would have been well-suited for the allegations here—the election contest—a full-scale opportunity to review all allegations of fraud or misconduct around an election, and not a mere recounting of the ballots. Moreover, state law requires that election court be open and empowers it to address infractions throughout the day. Plaintiffs, however, did not avail themselves of this opportunity to seek immediate relief.

Under Section 1756 of the Election Code, 25 P.S. § 3456, such matters shall be filed within twenty days after the day of the primary or election, and "shall concisely set forth the cause of complaint, showing wherein it is claimed that the primary or election is illegal, and after filing may be amended with leave of court, so as to include additional specifications of complaint." Twenty registered electors of the district must file the contest, per Section 1742 of the Election Code, 25 P.S. § 3402, and under Section 1757 of the Election Code, 25 P.S. § 3457,

---

[1] As part of their motion to dismiss the Acosta Complaint, the Ward Leader Defendants originally argued that an additional ground for dismissal arose under Rule 12(b)(5) for insufficient service of process. However, since the filing of their motion, the Ward Leader Defendants agreed to voluntarily waive service of the Acosta Complaint. Accordingly, the Ward Leader Defendants hereby withdraw their argument for insufficient service of process, and they instead respectfully request that the Court grant their motion for dismissal pursuant to Rule 12(b)(6).

the affidavits verifying an election contest petition must contain a statement that the affiant believes "the primary or election was illegal and that the return thereof was not correct." As the Pennsylvania Supreme Court has noted, "The contest of an election is a remedy given to the people when the expression of their choice of a public officer has been frustrated by fraud or mistake." Appeal of Lord, 41 A.2d 661, 662 (Pa. 1945).

And unlike this matter, which requires that the malefaction be caused by state actors, in an election contest the acts of *private citizens* are also properly before the tribunal. "To the extent that the petition alleges any fraud or other wrongdoing on the part of election officials *or others* in the casting, computation or return of the vote … these are subjects which are peculiarly for an election contest." Reese v. Bd. of Elections of Lancaster County, 308 A.2d 154, 158 (Pa. Commw. 1973) (emphasis added). "The legislature by § 1711 provided a complete and comprehensive remedy in the form of a contest whereby ***all matters*** may be examined that affect the conduct of the election and the rights of the candidates at such election." In re Havrilla, 29 A.2d 45, 46 (Pa. 1942) (emphasis added). Indeed, for this reason the Election Code empowers the Court "to subpoena and to compel the attendance of any officer of the primary or election complained of, and of any person capable of testifying concerning the same, and also to compel the production of all books, papers, tally lists, ballots, ballot boxes, voting machines and all documents which may be required at such hearing, in like manner, and to the same extent as in other cases litigated before such court;  to take testimony and to proceed without delay, postponing for the purpose, if necessary, all other business, to the hearing and determination of such contest."[2] 25 P.S. § 3404.

---

[2]	Moreover, these proceedings are deemed so important that in trials of election contests, "no person shall be permitted to withhold his testimony upon the ground that he may incriminate

*(cont'd next page…)*

The statute also includes a bond requirement. As part of filing an election contest, Plaintiffs would have been required to post a bond "signed by at least five of the said petitioners in such sum as … said court shall designate, with two or more individual sureties or a corporate surety to be approved by the said officer or court or judge, conditioned for the payment of all costs which may accrue in said contested nomination or election proceeding, in case the said petitioners by decree shall be adjudged liable to pay said costs." 25 P.S. § 3459. If the bond is not filed, the contest must be dismissed. Id.

The Pennsylvania Supreme Court has noted that full compliance with the statutory bonding requirements is a means by which the General Assembly "has protected the elective franchise from dilatory and costly disruptions which would gravely injure the elective process." Olshansky v. Montgomery County Election Bd., 412 A.2d 552, 554 (Pa. 1980). Accordingly, the Court in Olshansky dismissed an election contest action in which the bond suffered multiple deficiencies, having not been signed by at least five petitioners (or any); and the amount of the bond was not designated by the court (nor was the court asked to set an amount), the corporate surety was not approved by the court (nor was such approval ever sought); and the bond was not conditioned for the payment of all costs which could have accrued in the contest. Id.

This Court has asked for information as to how the bond amount is set. (Transcript at 85.) As noted above, the statute requires that it be set by the court in an amount "conditioned for the payment of all costs which may accrue in said contested nomination or election proceeding, in case the said petitioners by decree shall be adjudged liable to pay said costs." 25 P.S. § 3459. The statute does not go into further detail. However, we know that in Plaintiffs' last foray into

---

himself, or subject himself to public infamy, but such testimony shall not afterwards be used against him in any judicial proceedings, except for perjury in giving such testimony." Section 1767 of the Election Code, 25 P.S. § 3467.

the election contest arena, <u>In re Matter of the 2016 Presidential Election</u>, 659 M.D. 2016 (Pa. Commw.), the Green Party petitioners had asked in their complaint for the bond to be set at $25,000; the Republican respondents demanded it be set at $10,000,000 as part of their motion to dismiss. The Commonwealth Court entered a *per curiam* order setting the amount at $1,000,000, while noting that "[u]pon good cause shown, the amount of the bond may be modified by the Court"[3]

What does that tell us for the bond cost in this matter? Insofar as Pennsylvania has 203 state representative districts, each of approximately equal population, one could estimate that a bond in the amount of $5,000.00 may be all which would have been required in this matter, dividing the statewide costs by 200. Perhaps closer to the mark, in <u>Pfuhl v. Coppersmith</u>, 253 A.2d 271 (Pa. 1969), an election contest regarding one of Pennsylvania's 50 state senate districts, the Court set the bond amount at $100,000. <u>Id.</u> at 273. One-fourth that amount, reflecting the relative number of state representative districts, would be $25,000, and adjusted for 2017 dollars would yield a bond in the low six figures. Insofar as one generally deposits 5-15% for a surety bond, this would have been a manageable amount for the Republican and Green Party plaintiffs.[4]

---

[3]     The Order is attached as Exhibit A.

[4]     Plaintiffs certainly could have afforded any reasonable bond.

This Court can take judicial notice of the fact that the Green Party candidate raised up to $5,957,251.13 in pursuit of a federal recount in 2016 (See Jill Stein for President, FEC Post-General Report filed 12/9/2016, available online at http://docquery.fec.gov/cgi-bin/forms/C00581199/1134336/ ), while Friends of Cheri Honkala itself raised $98,568.66 for this campaign. (https://www.campaignfinanceonline.pa.gov/Pages/CFAnnualTotals.aspx?Filer=20170056)

While Friends of Lucinda Little only raised $17,846.42 for her race (https://www.campaignfinanceonline.pa.gov/Pages/CFAnnualTotals.aspx?Filer=20170051), plaintiff Philadelphia Republican City Committee has raised $109,437.20 so far this year (https://www.campaignfinanceonline.pa.gov/pages/CFAnnualTotals.aspx?Filer=7900281), and

*(cont'd next page…)*

This Court further inquired as to the relevance of the availability of state-law remedies as to Plaintiffs' ability to pursue relief under 42 U.S.C. § 1983. (Transcript at 18-19). As the Second Circuit explained in Gold v. Feinberg, 101 F.3d 796 (2d Cir. 1996):

> [W]here there exists ... a state law remedy to the election irregularities that is fair and adequate, human error in the conduct of elections does not give rise to the level of a Fourteenth Amendment constitutional violation actionable under § 1983 in the absence of willful action by state officials intended to deprive individuals of their constitutional right to vote.

Id. at 802. A decade later, the Second Circuit affirmed this principle in a case involving an outcome-determinative negligent machine malfunction:

> Absent a clear and unambiguous mandate from Congress, we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts. That is especially true in this case where there was no intentional discrimination or deprivation of the right to vote, where our own case law indicates that there is no due process violation, and where a state law remedy exists but plaintiffs refused to test it.

Shannon v. Jacobowitz, 394 F.3d 90, 96 (2d Cir. 2005). Similarly, in Scheer v. City of Miami, 15 F. Supp.25 1338 (S.D. Fla. 1998), the district court was forced to address massive absentee voter fraud conducted by a panoply of private actors, a scheme which in the state trial court's eyes "literally and figuratively, stole the ballot from the hands of every honest voter in the City of Miami," and even there relief under § 1983 was not to be had. "Florida courts for the past sixty years have constructed a means of dealing with absentee voter fraud. It is not this Court's province to upset this remedy as it has been well thought out by the state courts." Id. at 1344.

---

plaintiff Republican State Committee of Pennsylvania has raised $1,379,371.26 in 2017. (https://www.campaignfinanceonline.pa.gov/pages/CFAnnualTotals.aspx?Filer=7900597),

The Seventh Circuit echoed similar words in <u>Hennings v. Grafton</u>, 523 F.2d 861 (7th Cir. 1975), another case involving allegations of state election officials who "failed to exercise proper supervisory oversight," with the Court focusing on who actually runs elections on the ground in determining that deference to state procedure was appropriate:

> Except for the overall supervision of the county clerk, or his counterpart, and appointed subordinates, the work of conducting elections in our society is typically carried on by volunteers and recruits for whom it is at most an avocation and whose experience and intelligence vary widely. Given these conditions, errors and irregularities, including the kind of conduct proved here, are inevitable, and no constitutional guarantee exists to remedy them. <u>Pettengill v. Putnam County R-1 School Dist.</u>, 472 F.2d 121 (8th Cir. 1973); <u>Powell v. Power</u>, 436 F.2d 84 (2d Cir. 1970); see also <u>Means v. Wilson</u>, 383 F.Supp. 378 (D.S.D. 1974). Rather, state election laws must be relied upon to provide the proper remedy.

<u>Id.</u> at 868.

Even beyond the election contest, Plaintiffs had available to them the immediate remedies available via recourse to election court under the law of the Commonwealth, as required by 25 P.S. § 3046:

> The court of common pleas of each county of the Commonwealth or a judge or judges thereof, shall be in continuous session at the courthouse of said county, or, in judicial districts composed of more than one county, at the courthouse of the county in which such judge or judges reside, on the day of each primary and election from 7 o'clock A.M. until 10 o'clock P.M. and so long thereafter as it may appear that the process of said court will be necessary to secure a free, fair and correct computation and canvass of the votes cast at said election. … During such period said court shall act as a committing magistrate for any violation of the election laws; shall settle summarily controversies that may arise with respect to the conduct of the election; shall issue process, if necessary, to enforce and secure compliance with the election laws; and shall decide such other matters pertaining to the election as may be necessary to carry out the intent of this act.

The Republican Plaintiffs in fact took advantage of this procedure before noon on Election Day to secure an order ensuring that stamps being used to cast write-in votes were not

left by voters on the sign-in tables where the judge of elections and inspectors sat. See In re Illegal Distribution of Stamps, Civ. Action No. 170302036 (Phila C.P. Mar. 21, 2017). But that was the extent of the relief against misconduct that any Plaintiff sought from the Court on Election Day, despite all the allegations collected for their Complaint.

This matters not only in terms of the appropriateness of state law for remedy here, but also pertains to Plaintiffs' concern that "no one regulates Election Day and no one has the responsibility to supervise Election Day, and no one had the responsibility to stop misconduct on Election Day, other than criminal prosecution after the fact." (Pl. Supp, Brief at 7.)  Election court regulates Election Day and, in conjunction with the district attorney and other arms of law enforcement, work to stop it, but the election court cannot exercise its powers absent allegedly injured parties bringing their claims before it. As Benjamin Field ably stated for the City Commissioners during oral argument, "There's an election court, and an entire section of the Election Code is set up to address what happens on Election Day. There's an election court all day long where routinely questions of electioneering information, improper activities at the polls, and other things are addressed. There's a system in the Election Code for the parties and the candidates to have monitors in the polling place so that those issues can be raised with the court, the court can make—provide orders, the sheriff can serve orders, and these things can be addressed. There is no allegations that any of those things were done here. Rather, there is an effort to convert allegations about what happened at individual polling places on an Election Day into liability for the City Commissioners in federal court."[5]

---

[5]      Tr. at 31. Indeed, Counsel for the City Democratic and Republican Parties, as well as the City Commissioners, District Attorney, the Sheriff and others regularly participate in pre- and post-election meetings convened by the Presiding Judge of the Court of Common Pleas of Philadelphia to review and perfect election day procedures to ensure that Philadelphia's elections

*(cont'd next page…)*

In sum: Plaintiffs could have pursued relief via state election contest procedure and could have afforded the statutorily-required bond, but did not; they could have raised these claims in election court on Election Day, but did not; and federal courts have uniformly held that state law is the proper avenue for such allegations, absent allegations that state actor defendants willfully violated constitutional rights.

## II.     DEFENDANTS CITY COMMITTEE, VAZQUEZ, AND THE WARD LEADERS WERE NOT STATE ACTORS

During oral argument, this Court requested further argument in regards to the essential element of the § 1983 claim—that the person or entity which has allegedly violated a constitutional right is a state actor. None of the co-signers to this brief are state actors—not Democratic City Committee, not the ward leaders selected by their committee people to represent them on City Committee, and not (at the time of the election) the candidate, Emilio Vazquez.

In order to sustain a claim under § 1983, Plaintiffs must show that the Defendants were either state actors or acting under color of state law, and that the Defendants violated their rights under the Constitution or federal law. Leshko v. Servis, 423 F.3d 337 (3d Cir. 2005). The question is not whether the actors are regulated by the government, as the Plaintiffs insist, but whether there is "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) quoting Jackson v. Metro. Edison Co., 419 U.S. 345 (1974).

---

are well-run and any election-day issues resolved promptly. Such a meeting was held on February 6, 2017, before Judge Woods-Skipper specifically to address any looming issues regarding the March 21 special election.

One category of cases involving state action is activity "significantly encouraged" by the state or where the state acts as a joint participant. Leshko, 423 F.3d 337, 340. "Determining state action in such cases requires tracing the *activity* to its source to see if that source fairly can be said to be the state. The question is whether the fingerprints of the state are on the *activity* itself." Id. (emphasis added). No such allegations are present here.

The second category of cases is that in which an "actor is controlled by the state, performs a function delegated by the state, or is entwined with government policies or management." Id. (citing Pennsylvania v. Bd. Of Dir. of City Trusts of Philadelphia; 353 U.S. 230 (1957), West v. Atkins, 487 U.S. 42, 56 (1988); Brentwood Acad. v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 298 (2001); Burton v. Wilmington Parking Auth., 365 U.S. 715 (1961)). "Determining state action in this category of cases consists of asking whether the actor is so integrally related to the state that it is fair to impute to the state responsibility for the action. The question here is whether the state so identifies with the individual (or entity) who took the challenged action that we deem the state's fingerprints to have been on the action." Leshko, 423 F.3d at 340.

This category, too, is unhelpful to Plaintiffs, who have made much hay of the claim that City Committee registers with the Department of State, is given privileges based upon such registration, and therefore must be considered a state actor. (See Plaintiffs' Supplemental Brief at 6-10, Tr. at 60-66). This argument both strains credulity and is contrary to law.

Obviously, all groups which collect contributions and make expenditures to influence elections must file certain paperwork with the Secretary of State (25 P.S. § 3244), but this hardly converts every subject of regulation into a state actor. The Philadelphia Democratic City Committee is not the state, or a state organization like a municipal authority, school district, or

regulatory agency. It is a private political organization with voluntary membership. The only "nexus" that exists between City Committee and the Commonwealth of Pennsylvania is the Election Code, which authorizes citizens to form a committee, recognizes City Committee as a political organization, and requires it to make certain failings. The Third Circuit has rejected findings that a person or entity is a state actor solely because the person or entity is recognized by state law or permissively may take certain actions pursuant to state law. See Leshko, 423 F.3d at 340; Benn v. Universal Health System, Inc., 371 F.3d 165 (3d Cir. 2004); Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268 (3d Cir. 1999); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir. 1994).[6]

Indeed, the case so heavily relied upon by Plaintiffs, Max v. Republican Comm. of Lancaster County, 587 F.3d 198 (3d Cir. 2009), actually undercuts their position. The Max plaintiff's fundamental argument was that "defendants are state actors under §1983 because the Commonwealth of Pennsylvania has delegated to the Republican party the authority to decide 'who will appear on the Commonwealth's general election ballot.'" Id. at 200. To that, the Court responded that "nothing in the record here suggests that Pennsylvania delegated authority to defendants with the intention of violating the constitutional rights of Max or anyone else. Max cannot plausibly assert that 'the fingerprints of the state' are on the alleged infringement of her rights." Id. at 201, citing Leshko, 423 F.3d at 340.

Instead, the Court in Max followed the law to analyze whether private actors were engaged in official activity, whether delegated by or in conspiracy with actual state actors. And

---

[6]     Under the logic of Plaintiff's argument, each and every corporation in the Commonwealth of Pennsylvania, insofar as it must register with the state, would gain "state actor" status by the mere act of complying with the state's registration requirements. Such a result would be absurd.

on this, neither City Committee nor the Ward Leaders nor the candidate performed a function delegated by the state on Election Day. To the extent that political parties can name poll watchers to monitor polling places (25 P.S. § 2687), such watchers do not exercise any state delegated authority, power, or function in relation to the election and, more crucially, City Committee was denied the ability to name poll watchers for the Special Election because it had no candidate on the ballot. Neither City Committee nor its chosen Ward Leaders were intertwined with the government on Election Day any more than any other group that is involved in politics.[7]

Accordingly, none of the activity alleged in Plaintiffs' Complaints constitutes state action by the undersigned defendants, and thus § 1983 liability does not apply. To the extent that the Complaints raise claims against the election board workers, who are elected by the public to perform election-day duties, Plaintiffs nowhere allege that any of the undersigned Defendants conspired with them or directed their activity with the level of specificity required under Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).[8] As for the named ward leaders and then-candidate Emilio Vazquez, nothing in the complaints indicates that they engaged in any particular acts whatsoever.  They were not state actors, and they are not alleged to have conspired with or directed any state actors. Accordingly, their motions to dismiss should be granted.

---

[7]     A political committee may have a role in a special election regarding nominations of candidates for special elections, 25 P.S. § 2779, but under state law that role is reserved to the *state* Democratic Party, pursuant to its bylaws, not City Committee. Moreover, the nomination process was concluded well before the Special Election, and Plaintiffs do not allege their rights were infringed in a process in which the Democratic Party in fact nominated no candidate who appeared on the ballot.

[8]     See next section.

**III.   DEFENDANTS CANNOT BE HELD VICARIOUSLY LIABLE FOR § 1983 VIOLATIONS ALLEGED TO HAVE BEEN COMMITTED BY OTHERS.**

During the hearing, the Court raised several questions about whether the defendants named in this action could be liable for violations of § 1983 alleged to have been committed by other unnamed individuals, such as election board officials and poll workers. More specifically, the Court inquired whether Defendant Vazquez could be held responsible for the actions of poll workers (Tr. 16), the Court asked whether the doctrine of *respondeat superior* may apply here with respect to an election board (Tr. 29), and the Court expressed interest in further examining the current state of the law when dealing with supervisory liability under § 1983 (Tr. 41). As explained below, the law is abundantly clear that Plaintiffs' claims under § 1983 cannot properly be premised upon any such theories of vicarious liability.

In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Supreme Court explained that "vicarious liability is inapplicable … to § 1983 suits," and for that reason, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." <u>Id.</u> at 676 (emphasis added). Thus, even if the City Committee and its individual Ward Leaders were deemed "state actors" (which they clearly were not), none of them could be held vicariously liable for the actions of the unnamed election board officials and poll workers alleged by the plaintiffs to have engaged in misconduct. <u>See id.</u> at 677 ("In a § 1983 suit or a <u>Bivens</u> action—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); <u>see</u> <u>also</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986) (holding that because governmental officials are not vicariously liable for the misconduct of their subordinates under § 1983, recovery under a theory of *respondeat superior* is barred); <u>Parkell v. Danberg</u>, 833 F.3d 313, 330 (3d Cir. 2016)

(observing that a plaintiff cannot predicate liability on her § 1983 claims on a *respondeat superior* basis).

Indeed, the Third Circuit held in <u>Max</u> that the defendants, which included the Republican Committee of Lancaster County, could not be held liable under § 1983 for the activities of poll workers during an election. <u>Id</u>. at 203 ("Even if we accept the premise that pollworkers are state actors while guarding the integrity of an election, the defendants here, unlike those in <u>Tiryak</u>, are not the poll-watchers. Defendants here are private parties."). That is exactly the case here for Defendants City Committee, Vazquez, and the Ward Leaders. None of them were poll workers, poll watchers, or otherwise involved in administering the special election. They were private parties, and they cannot be held liable under § 1983 for the alleged misconduct of any election workers.

Moreover, the complaints filed in this action are devoid of any allegations which would even come close to establishing that the named defendants participated in a "conspiracy" with poll workers or other state actors to deprive the plaintiffs of their constitutional rights. The Acosta/Lloyd Complaint goes as far as to allege that "Defendant Emilio Vazquez, Ward Leaders, Committeepeople, Agents, Election Poll Workers, Judges all worked together to intimidate voters, other poll workers of other write-in candidates, tamper with votes and prevent a 'Fair Election.'" (Acosta Complaint, ¶ 5.) However, as the Supreme Court made clear in <u>Twombly</u>, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." 550 U.S. at 556-67.

Here, plaintiffs fail entirely to allege any agreements between the unnamed workers and the named defendants, which are essential elements to any conspiracy, including for purpose of §

1983. See, e.g., Reasonover v. St. Louis County, 447 F.3d 569, 582 (8th Cir. 2006) (Section 1983 conspiracy claim requires plaintiff to "allege with particularity and specifically demonstrate material facts that the defendants reached an **_agreement_**") (emphasis added); Ciambriello v. County of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) ("complaints containing only conclusory, vague, or general allegations that defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct"). Thus, just as in the Max case, the complaints here fall woefully short of alleging a joint conspiracy with state officials to deprive plaintiffs of their rights. See Max, 587 F.3d at 203 ("Although a private party can be liable under § 1983 if he or she willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right, . . . this is not such a case.").

For all these reasons, the Court should reject Plaintiffs' arguments premised upon the theory that private defendants, such as City Committee, Vazquez, or the individual Ward Leaders, can be vicariously liable for the alleged misconduct of election board officials, poll workers, or any other unnamed individuals. Accordingly, the Court should grant Defendants' motions to dismiss Plaintiffs' Complaints.

## IV.    PLAINTIFFS' CLAIMS ALSO FAIL BECAUSE THE ELECTION RESULTS WERE NOT CLOSE

This Court asked at oral argument whether it mattered that the election results were not close. (Tr. at 22-24). It does. Since the end of widespread _de jure_ and _de facto_ segregation in the American South, all the cases in which Plaintiffs have successfully persuaded federal courts to intervene and call for new elections have involved outcome-determinative, willful state action. It is abundantly clear, going back to Griffin v. Burns, 570 F.2d 1065 (1st Cir. 1978), and explicitly throughout the cases reviewed in St. Rep. Vazquez's initial memorandum of law in support of

his motion to dismiss, that Plaintiffs must not only prove fundamental unfairness and willful conduct by state actors, but also that the unfairness and misconduct affected a "potentially controlling number of the votes cast." Griffin, 570 F.2d at 1080.

Here, even if each and every one of Plaintiffs' allegations were true, that would not nearly come close to eliminating the near-1,700 vote gap between Vazquez and his nearest rival, Cheri Honkala, let alone Lucinda Little. As the Griffin decision explained:

> While the "outcome" test provides a sensible guideline for determining when federal judicial invalidation of an election might be warranted, it is not a principle requiring mathematical certainty. In cases of outrageous racial discrimination some courts have chosen not to apply it at all, but to invalidate the election simply for its lack of integrity. And when applied, different formulations of the test have been proposed: the irregularity "could have altered the out-come;" the outcome "would not have been affected;" an altered outcome should be "found readily where there is a serious violation and close election." Here, the closeness of the election was such that, given the retroactive invalidation of a potentially controlling number of the votes cast, a new primary was warranted.

Id. at 1080 (internal citations omitted). In Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994), so heavily relied upon by Plaintiffs, the Third Circuit treated the closeness of the election as crucial, relying on Griffin's language that an outcome-based test provided "a sensible guideline for determining when federal judicial invalidation of an election might be warranted" and that federal intervention was warranted if "it was not feasible to establish who would have won a properly conducted election." Id. at 888, quoting Griffin, 570 F.2d at 1080. And in that case, the trial court determined that there had been more illegal votes cast for Stinson by unregistered voters under the absentee voting scheme than his margin of victory, and for that reason ordered Marks's certification as the winner.

In Roe v. Alabama, 43 F.3d 574 (11th Cir 1995), the Eleventh Circuit addressed a change in practice which upset expectations for absentee voters, resulting in disenfranchisement. Relief

was granted with the candidates 200-300 votes apart, with as many as 2,000 contested absentee ballots at issue.[9]

To be clear, even when the number of votes in dispute could have been outcome-determinative, that by itself it is not sufficient to create a constitutional violation. In Curry v. Baker, 802 F.2d 1302 (11th Cir. 1986), the Court of Appeals reversed a trial court's ordering of a new election when "massive illegal voting" had allegedly taken place, holding that it was not the role of the federal courts to "oversee the administrative details of a local election." Id. at 1315. Curry involved approximately 14,168 Alabamans who had voted in the 1986 Republican gubernatorial primary and then illegally were permitted to vote in the subsequent Democratic runoff primary for the same office, which was decided by 8,756 votes. Id. at 1305-07. The Eleventh Circuit reversed a district court injunction requiring a new runoff election, determining both that no "patent and fundamental unfairness" existed which rose to the level of Griffin and that there was "no evidence that plaintiffs lacked an adequate remedy in the state courts." Id. at 1316-17.

---

[9]    Similarly, in Shannon v. Jacobowitz, 394 F.3d 90 (2d Cir. 2005), the Second Circuit reversed a trial court's ordering of a new election in which a malfunctioning voting machine failed to record votes for one of two candidates in a contested race. Candidate David Jacobowitz had been unofficially declared the winner over Matthew Shannon, 2,936 to 2,911; however, a machine malfunction meant 139 would-be Shannon voters' selections had not been recorded. Id. at 91. Even though the error in question was "outcome determinative" and "of unquestioned importance to the people of Whitestown," that was not enough to warrant federal intervention absent "purposeful state conduct directed at disenfranchising a class or group of citizens." Id. at 96.

## V.     <u>CONCLUSION</u>

For all the aforementioned reasons, in addition to those previously stated in Defendants'

motions to dismiss and accompanying memoranda of law, Defendants request that this honorable

court enter an order dismissing Plaintiffs' Complaints with prejudice.

Respectfully submitted,

By: _____

Adam C. Bonin
Attorney ID #80929
LAW OFFICE OF ADAM C. BONIN
30 S. 15th Street, 15th Floor
Philadelphia, PA 19102
adam@boninlaw.com
(215) 864-8002
Attorney for Rep. Emilio Vazquez

/s/ Marni Jo Snyder
Marni Jo Snyder, Esq.
Law Offices of M.J. Snyder, LLC
Land Title Building
100 South Broad Street, Suite 1910
Philadelphia, PA 19110
marni@snyderlawyer.com
Tel: (215) 515-3360
*Counsel for Philadelphia City Democratic Committee*

/s/ Anthony Kyriakakis
Anthony Kyriakakis, Esquire
Dilworth Paxson, LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: (215) 575-7149
akyriakakis@dilworthlaw.com

*Counsel for Ward Leader Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 20th day of November, 2017, I served a true and correct copy of the foregoing Supplemental Memorandum of Law to all counsel via CM/ECF, and to Mr. Acosta and Mr. Lloyd via first-class mail.

Adam C. Bonin