IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ORLANDO A. ACOSTA, et al.,

Plaintiffs,

v.

DEMOCRATIC CITY COMMITTEE, et al.,

Defendants.

CIVIL ACTION
NO. 17-1462

**OPINION**

Slomsky, J.                                                   **January 22, 2018**

I.      INTRODUCTION ................................................................................................................ 3

II.     BACKGROUND ................................................................................................................. 7

   A.   Pennsylvania Elections .................................................................................................... 7

   B.   Factual Background ........................................................................................................11

        1.   The Special Election and the Participants.................................................................11

        2.   Alleged Voter Coercion, Intimidation, and Other Misconduct that Occurred
             During the Special Election ....................................................................................... 12

             a. Actions of Government Actors .............................................................................. 12

             b. Actions of Democratic Party Actors ..................................................................... 14

             c. Actions of Other Unidentified Actors ................................................................... 17

        3.   Alleged Tampering with Materials, Malfunctioning of Voting Machines,
             and Improper Chain of Custody Procedures for Voting Equipment .......................... 20

        4.   Results of the Special Election ................................................................................. 21

   C.   Procedural History ........................................................................................................ 22

III.    STANDARD OF REVIEW ............................................................................................... 24

IV.     ANALYSIS ...................................................................................................................... 26

A.  Plaintiffs' Claims Are Not Moot ............................................................................ 27

B.  Plaintiffs Were Not Required to Bring Their Claims in State Court First ....................... 30

C.  Eleventh Amendment Immunity ............................................................................ 30

   1.  The Eleventh Amendment Bars Suit Against the Pennsylvania Department
       of State on Constitutional and State Law Claims ......................................... 33

   2.  The Eleventh Amendment Does Not Bar Suit Against Secretary Cortés on
       Constitutional Claims, But It Does Bar Suit on State Law Claims ...................... 34

D.  Emilio Vazquez, the Democratic Committee, and the Six Ward Leaders Are Not
   State Actors and Cannot Be Subject to Liability Pursuant to 42 U.S.C. § 1983............... 36

   1.  Democratic Committee Is Not a State Actor................................................. 37

   2.  Six Ward Leaders Are Not State Actors ..................................................... 42

   3.  Emilio Vazquez, as a Write-In Candidate, Is Not a State Actor.................................. 46

E.  Speaker Turzai, Secretary Cortés, and the Individual City Commissioners Had No
   Personal Involvement in the Alleged Wrongful Conduct, and Plaintiffs Have Not
   Plausibly Pled a Claim for Failure to Train or Supervise by Cortés and the City
   Commissioners................................................................................................ 50

   1.  Claims Against Speaker Turzai Will Be Dismissed Because He Had No
       Personal Involvement in the Alleged Wrongful Conduct .......................................... 52

   2.  Claims Against Secretary Cortés Will Be Dismissed Because He Had No
       Personal Involvement in the Alleged Wrongful Conduct and Because Plaintiffs
       Have Not Plausibly Pled a Claim for Failure to Train or Supervise ........................... 53

   3.  Claims Against the Individual City Commissioners Will Be Dismissed
       Because They Had No Personal Involvement in the Alleged Wrongful Conduct
       and Because Plaintiffs Have Not Plausibly Pled a Claim for Failure to Train
       or Supervise .................................................................................. 54

F.  Claims Against the City Commissioners' Office Will Be Dismissed Because Plaintiffs
   Have Not Plausibly Pled a Policy or Custom of Failure to Train or Supervise ............... 57

G.  Plaintiffs' Claims for Violations of Their First and Fourteenth Amendment Rights ........ 61

H.  Plaintiffs Acosta and Lloyd Have Not Plausibly Pled a Violation
   of the Voting Rights Act.................................................................................... 68

I.  Election Board Workers and Election Officers Are Not Necessary
   or Indispensable Parties ................................................................................... 70

J.   Pennsylvania Election Code Claims Will Be Dismissed Without Prejudice .................... 73

K.   Claims Against the Committee of Seventy and Leslie Acosta Will Be Dismissed
     Without Prejudice ............................................................................................................. 75

L.   Plaintiffs Will Be Granted Leave to Amend the Complaints Against
     All Defendants Except Against the Pennsylvania Department of State .......................... 77

V.   CONCLUSION ....................................................................................................................... 79

## I.   INTRODUCTION

At the heart of this action is the integrity of a special election held on March 21, 2017 for Pennsylvania State Representative for the 197th Legislative District in Philadelphia.  The special election was ordered by Pedro Cortés, then Secretary of the Commonwealth of Pennsylvania,[1] after Leslie Acosta, the elected State Representative, was not seated in the General Assembly due to a prior felony conviction.   On March 31, 2017, after the official vote count in the special election was certified, Democratic write-in candidate, Emilio Vazquez, was declared the presumptive winner.

The instant litigation concerns two related lawsuits filed after Vazquez was declared the winner: Acosta et al. v. Democratic City Committee et al., Civil Action No. 17-1462, and Little et al. v. Vasquez et al., Civil Action No. 17-1562.  Plaintiffs in the first action ("Acosta action")

---

[1]   On October 11, 2017, Pedro Cortés resigned from his position as Secretary of the Commonwealth of Pennsylvania.  That same day, Robert Torres was designated to serve as Acting Secretary of the Commonwealth.

Federal Rule of Civil Procedure 25(d) provides in relevant part:

An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.

Fed. R. Civ. P. 25(d).  Pursuant to Rule 25(d), Torres is automatically substituted as a party for Secretary Cortés on the official capacity claims.  For individual capacity claims, Torres will not be substituted.

are defeated write-in candidates Orlando A. Acosta and Edward Lloyd, proceeding pro se.  (Doc. No. 11 ¶¶ 1-2.)  Plaintiffs in the second action ("Little action") are defeated Republican candidate Lucinda Little, defeated write-in Green Party candidate Cheri Honkala, Republican City Committee of Philadelphia, and the Republican Party of Pennsylvania ("Little Plaintiffs"). (Doc. No. 2 ¶¶ 1-5.)  On August 10, 2017, the actions were consolidated by Order of this Court. (Doc. No. 53.)

Plaintiffs allege that during the special election, numerous instances of coercion, intimidation, and misconduct occurred, which caused the election to be held in an unfair manner. To remedy these alleged injustices, Plaintiffs bring this action under 42 U.S.C. § 1983[2] against Vazquez and various parties, including state and local government officials and entities they claim were involved in the execution of the election.[3]  Plaintiffs allege that the manner in which the election was conducted violated the First and Fourteenth Amendments to the United States

---

[2]   42 U.S.C. § 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

[3]   Defendants named in both actions are former Secretary of the Commonwealth of Pennsylvania Pedro Cortés; the Department of State, Bureau of Commissions, Elections and Legislation; Philadelphia City Democratic Committee; Emilio Vazquez; and City Commissioners Anthony Clark, Lisa Deeley, and Al Schmidt. (No. 17-1462, Doc. No. 11; No. 17-1562, Doc. No. 2.)

Defendants named only in the Acosta action are Ward Leaders Carlos Matos, Elaine Tomlin, Jewell Williams, Dwayne Lilley, Shirley Gregory, and El-Amor Browne Ali; Pennsylvania Speaker of the House of Representatives Mike Turzai; the Philadelphia City Commissioners' Office and the Philadelphia County Board of Elections; the Committee of Seventy; and former State Representative Leslie Acosta.  (No. 17-1462, Doc. No. 11.)

Constitution, as well as the Pennsylvania Election Code.[4]  Plaintiffs seek declaratory relief that their First and Fourteenth Amendment rights of association, right to vote, and right to speech, as well as their Fourteenth Amendment right to fundamental due process[5] were violated.  Plaintiffs

---

[4]   Counts I and II appear to include claims for violations of the Pennsylvania Election Code and for violations of the First and Fourteenth Amendments.  Federal Rule of Civil Procedure 10(b) provides:

> **(b) Paragraphs; Separate Statements.** A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).  Given Plaintiffs' failure to plead the state law and the constitutional claims in separate Counts, the state law Pennsylvania Election Code claim can be treated in two ways.  It can be treated as part of the constitutional claim or it can be treated as a supplemental state law claim over which the Court has supplemental jurisdiction.  For the most part, the Court will treat it as a supplemental state law claim.

[5]   The Fourteenth Amendment provides in relevant part:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.  The Fourteenth Amendment "contains both substantive and procedural components." Steele v. Cicchi, 855 F.3d 494, 501 (3d Cir. 2017) (citing City of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  The Third Circuit explained these two components as follows:

> "The substantive component of the Due Process Clause limits what government may do regardless of the fairness of procedures that it employs," Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000), in order to "guarantee protect[ion] against government power arbitrarily and oppressively exercised," Lewis, 523 U.S. at 846, 118 S. Ct. 1708 (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L.Ed.2d 662 (1986)).  To maintain a substantive due process claim, Steele must have been deprived of a particular interest that "is protected by the substantive due process clause." Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).

* * * *

also seek a preliminary and a permanent injunction barring recognition of the validity of and

implementation of the election results.  They further request that this Court order a new special

election.  Defendants have filed Motions to Dismiss, which are now ripe for a decision.[6]  For

---

"To maintain a procedural due process claim, [plaintiff] must show that: (1) Defendants deprived him of an individual liberty interest that is encompassed within the Fourteenth Amendment's protection, and (2) the procedures Defendants made available to him did not provide due process of law."  Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006).

Id. at 501, 507.  In the election context, substantive due process rights are implicated where alleged election misconduct affects the fundamental fairness of an election and the right of citizens to vote in the election.  Afran v. McGreevey, 115 F. App'x 539, 544 (3d Cir. 2004) (per curiam) (stating that "a claim under § 1983 will . . . lie where state or local election infractions work a denial of substantive due process rights in violation of the Fourteenth Amendment" but concluding that plaintiffs' substantive due process rights were not violated (citing Bonas v. Town of N. Smithfield, 265 F.3d 69, 74 (1st Cir 2001)); see also Griffin v. Burns, 570 F.2d 1065, 1077 (1st Cir. 1978); Marks v. Stinson, 19 F.3d 873, 889 (3d Cir. 1994)).  Procedural due process rights, however, are not implicated where a system of voting "impinges on the fundamental right to vote."  League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 479 (6th Cir. 2008).

Here, Plaintiffs allege that their "fundamental due process" rights under the Fourteenth Amendment were violated but do not specify whether they are alleging substantive or procedural due process violations.  Plaintiffs' allegations center on claims of election misconduct by partisan and state actors, which affected the fundamental fairness of the special election.  Therefore, liberally construing Plaintiffs' claims, the Court will interpret the Fourteenth Amendment claim as a substantive due process claim.

[6]  Defendants named in both actions have filed nearly identical Motions to Dismiss.

Motions to Dismiss have been filed in the Acosta action under Civil Action No. 17-1462 by the following Defendants: Mike Turzai (Doc. No. 31); Pedro Cortés and the Department of State, Bureau of Commissions, Elections and Legislation (Doc. No. 32); City Commissioners Clark, Deeley, and Schmidt, the City Commissioners' Office, and the County of Philadelphia Board of Elections (Doc. No. 33); Emilio Vazquez (Doc. No. 37); Philadelphia City Democratic Committee (Doc. No. 38); and the Ward Leaders (Doc. No. 41).  Responses to the Motions to Dismiss were filed (Doc. Nos. 44, 51), as well as Reply Briefs (Doc. Nos. 45, 46, 47, 48).

Motions to Dismiss have been filed in the Little action under Civil Action No. 17-1562 by the following Defendants: Pedro Cortés and the Department of State, Bureau of Commissions, Elections and Legislation (Doc. No. 11); the City Commissioners (Doc. No.

reasons that follow, the Motions to Dismiss will be granted in their entirety, but Plaintiffs will be granted leave to file amended Complaints.

## II.     BACKGROUND

### A.     Pennsylvania Elections

To put in context the facts of this case, a brief background on the electoral process in Pennsylvania is required.  Elections in Pennsylvania are governed by the Pennsylvania Election Code.  See 25 Pa. Stat. §§ 2600 et seq.  An election in Pennsylvania can take the form of a general, municipal, primary, or special election. § 2602(f).  A special election is defined as any election other than a regular, general, municipal, or primary election. § 2602(v).  A special election is ordered when a vacancy occurs in either house of the Pennsylvania General Assembly. § 2778.  The presiding officer of the house issues a writ of election to the proper county board of election and the Secretary of the Commonwealth.  Id.

Under the Pennsylvania Election Code, the Secretary of the Commonwealth has numerous responsibilities. § 2621.  Among other duties, the Secretary must (1) determine "the forms of nomination petitions and papers"; (2) "examine and reexamine voting machines, and approve or disapprove them for use"; (3) "certify to county boards of elections for primaries and elections the names of candidates"; (4) and "develop a voluntary professional certification and poll worker training program for county election officials in consultation with county boards of elections." § 2621(a)-(c), (f.1).

---

13); Emilio Vazquez (Doc. No. 15); and Philadelphia City Democratic Committee (Doc. No. 16).  Responses to the Motions to Dismiss were filed (Doc. Nos. 23, 24, 25, 26), as well as Reply Briefs (Doc. Nos. 28, 29, 30).

In making a decision, the Court has considered each of these documents.  The Court also has considered the arguments of counsel for the parties at the September 14, 2017 hearing on the Motions to Dismiss and the Supplemental Briefing filed by the parties after the hearing (No. 17-1462, Doc. Nos. 68, 69, 70, 71, 72, 73, 75, 77; No. 17-1562, Doc. No. 34).

Candidates for special elections are nominated by political parties[7] through nomination certificates or by political bodies[8] through nomination papers, all filed with the Secretary of the Commonwealth.  § 2779.  Thereafter, the Secretary of the Commonwealth must certify to the proper county board the names, residences, and political parties or bodies of all candidates whose nomination certificates or papers have been filed with him.  § 2786.  All special elections must be held in accordance with the Pennsylvania Election Code, similar to any other election. § 2787.

Each political party is directed by a State committee, which is chosen in accordance with the party's rules.  § 2834.  Each political party's State committee may make rules for governing the party not inconsistent with law, and such rules are not effective until a certified copy has been filed with the office of the Secretary of the Commonwealth.  Id.  Each political party also may have a county committee, which makes rules for the party within that county.  § 2837.

Each county in Pennsylvania has a board of elections.  The board of elections has "jurisdiction over the conduct of primaries and elections in such county."  § 2641(a).  The county board of elections consists of the commissioners of that county "or any officials or board who are performing or may perform the duties of the county commissioners."  § 2641(b).  When an election occurs, the board has various responsibilities to ensure that the election is run according

---

[7]    A political party is defined as a group,

> one of whose candidates at the general election next preceding the primary polled in each of at least ten counties of the State not less than two per centum of the largest entire vote cast in each of said counties for any elected candidate, and polled a total vote in the State equal to at least two per centum of the largest entire vote cast in the State for any elected candidate . . . .

§ 2831(a).

[8]    A political body is a group that does not fit the definition of a political party but still nominates a candidate for an election.  § 2831(c).

to the Pennsylvania Election Code.[9]  Each county board of elections also may make regulations for conducting elections.  § 2644.

The county board of elections selects and fixes the polling places[10] within each election district.[11]  § 2726(a).  It also delivers the proper voting machines to the polling places, § 3012(a), and supplies each polling place with voting equipment and materials, § 2730(a).  Included in the materials are two sample ballots that represent the face of the voting machine and provide directions for voting on the machine.  § 3012(c)(2).  Sample ballots must be posted outside the booths inside the polling place.  Id.

Each election district has a district election board, which conducts elections for that district.  The district election board "consist[s] of a judge of election,[12] a majority inspector of

---

[9]  Among other duties, the board of elections must (1) "select and equip polling places"; (2) "issue certificates of appointment to watchers"; (3) "make and issue such rules, regulations and instructions, . . . for the guidance of voting machine custodians, elections officers, and electors"; (4) "instruct election officers in their duties, . . . and . . . inspect systematically and thoroughly the conduct of primaries and elections . . . to the end that primaries and elections may be honestly, efficiently, and uniformly conducted"; (5) "prepare and publish . . . all notices and advertisements in connection with the conduct of primaries and elections"; (6) "investigate frauds, irregularities and violations of this act, and to report all suspicious circumstances to the district attorney"; (7) "receive and determine . . . the sufficiency of nomination petitions, certificates and papers of candidates"; (8) "receive from district election officers the returns of all . . . elections, to canvass and compute the same"; and (9) "publicly announce by posting at its office the results of . . . elections."  § 2642.

[10]  A polling place is "the room provided in each election district for voting" at an election. § 2602(q).

[11]  An election district is "a district, division or precinct, established in accordance with the provisions of [the Election Code], within which all qualified electors vote at one polling place.  § 2602(g).

[12]  Each voting division has a judge of elections, elected every four years by voters from that division.  The judges of the election administer elections in each division.  See Office of the Phila. City Comm'rs, Becoming an Election Board Official, http://www.philadelphiavotes.co m/en/election-board-officials/working-on-the-election-board (last visited Jan. 19, 2018).

election and a minority inspector of election, assisted by clerks and machine inspectors in certain cases."  § 2671.  The judge and inspectors of election are elected by their district and hold office for four years.  Id.

Each candidate in an election is "entitled to appoint two watchers for each election district in which the candidate is voted for."[13]  § 2687(a).  And political parties that have nominated a candidate are permitted to have three poll watchers at each election district.[14]  Id. "Each watcher shall be provided with a certificate from the county board of elections, stating his name and the name of the candidate, party or political body he represents."  § 2687(b).  In Philadelphia, voting districts are divided into wards, created in conformity with the most recent census.  § 2742(a).

The polls open at 7:00 a.m. and close at 8:00 p.m.  § 3045.  In districts using voting machines, election officers must, with the aid of sample ballots, instruct each voter before he or she enters the voting booth how to operate the machine.  § 3056(a).  If a voter asks for further instruction on voting after entering a voting booth, an election officer may give him or her such instruction but shall not "in any manner request, suggest or seek to persuade or induce" the voter to vote for any particular candidate.  § 3056(b).  And no voter is permitted to receive assistance in voting unless a reason for needing assistance is recorded on his or her registration card. § 3058(a).  When the polls are closed and the last voter has voted, "the election officers shall immediately lock and seal the operating lever or mechanism of the machine, so that the voting and counting mechanism will be prevented from operation."  § 3066(a).

---

[13]   A poll watcher is a person appointed to observe election day procedures.

[14]   A party nomination is a political party's selection of a candidate for a public office authorized to be voted for at an election.  § 2602(o).

B.      **Factual Background**[15]

1.      **The Special Election and the Participants**

This case begins with a special election for the Pennsylvania State Representative seat for the 197th Legislative District in Philadelphia.  The seat was open because the Pennsylvania General Assembly would not seat the previously-elected State Representative, Leslie Acosta, due to a prior felony conviction.  (No. 17-1462, Doc. No. 11 ¶ 9; No. 17-1562, Doc. No. 2 ¶ 17.)  She therefore resigned, and Pedro Cortés, then Secretary of the Commonwealth of Pennsylvania, ordered the special election to be held on March 21, 2017.  (Id.)

Several write-in candidates ran in the special election, but the only duly nominated candidate was Plaintiff Lucinda Little, the Republican nominee.  (No. 17-1462, Doc. No. 11 ¶ 13; No. 17-1562, Doc. No. 2 ¶ 21.)  Write-in candidate Emilio Vazquez, the eventual winner, also participated in the special election and was purportedly sponsored and supported by the Philadelphia City Democratic Committee[16] ("Democratic Committee") as that organization's endorsed candidate.  (No. 17-1462, Doc. No. 11 ¶ 11; No. 17-1562, Doc. No. 2 ¶ 19.)  Plaintiffs allege that the Democratic Committee is the predominate political force in Philadelphia and is responsible for fielding and electing Democratic candidates.  (Id.)  Plaintiffs Orlando Acosta and Edward Lloyd also were write-in candidates.[17]  (No. 17-1462, Doc. No. 11 ¶ 13; No. 17-1562, Doc. No. 2 ¶ 21.)  Plaintiff Cheri Honkala, a Green Party write-in candidate, participated in the

---

[15]   The following facts have been taken from Plaintiffs Acosta and Lloyd's Second Amended Complaint (No. 17-1462, Doc. No. 11) and the Little Plaintiffs' Amended Complaint (No. 17-1562, Doc. No. 2).  They are set forth in the light most favorable to Plaintiffs, which is required at the motion to dismiss stage of litigation.

[16]   This entity is also referred to publicly as the Philadelphia Democratic City Committee.  In the court filings in this case, however, this entity refers to itself as the Philadelphia City Democratic Committee.

[17]   The Second Amended Complaint alleges that Plaintiff Lloyd is a Democrat and that Plaintiff Acosta is a Republican.  (No. 17-1462, Doc. No. 11 ¶ 13.)

election as well.  (Id.)  The Green Party of Pennsylvania supported Plaintiff Honkala in her write-in campaign.  (No. 17-1562, Doc. No. 2 ¶ 22.)

### 2.   Alleged Voter Coercion, Intimidation, and Other Misconduct that Occurred During the Special Election

On March 21, 2017, the special election was held.  During the special election, Plaintiffs allege that individuals at the polls engaged in voter coercion, intimidation, and other misconduct. These individuals can be divided into three categories: (a) government actors, (b) Democratic Party actors, and (c) other unidentified actors.

### a.   Actions of Government Actors

Plaintiffs allege that individuals acting on behalf of the local government during the special election engaged in various acts of misconduct.  During the election, Election Board workers at various polling places specifically told voters to vote for Vazquez.  (No. 17-1462, Doc. No. 11 ¶ 16(a); No. 17-1562, Doc. No. 2 ¶ 24(a).)  In addition, Election Board workers encouraged and permitted Democratic workers and Vazquez supporters to hand out literature and enter voting booths to help voters vote for Vazquez.  (No. 17-1462, Doc. No. 11 ¶ 16(b); No. 17-1562, Doc. No. 2 ¶ 24(b).)  Election Board workers threatened or intimidated voters if it appeared that the voter was going to vote for a candidate other than Vazquez.  (No. 17-1462, Doc. No. 11 ¶ 16(d); No. 17-1562, Doc. No. 2 ¶ 24(d).)  Plaintiffs Acosta and Lloyd contend that this coercion and intimidation was documented on the internet and live on the social media website, Facebook.[18]  (No. 17-1462, Doc. No. 11 ¶ 18(f).)

Plaintiffs Acosta and Lloyd also aver that voters were turned away if they attempted to vote for Lloyd, Little, or Honkala.  (Id. ¶ 16(b).)  For example, when Plaintiff Lloyd attempted to

---

[18]   Plaintiffs Acosta and Lloyd have not attached to the Second Amended Complaint this alleged documentation.

vote at his polling place, a judge of elections told him four times that he could not come in to vote. (Id.)  Plaintiff Lloyd responded he was at his correct polling location and showed the judge of elections his voter card and identification.  (Id.)  Ward Leader[19] Jeffrey Little witnessed this interaction and reported it to the Philadelphia City Commissioners' Office ("City Commissioners' Office"), the Philadelphia County Board of Elections ("Board of Elections"), the Philadelphia District Attorney's Office, and the Philadelphia Police Department.  (Id.)

Several judges of elections were seen handing out literature and stamps at polling places. (17-1462, Doc. No. 11 ¶ 19(b); No. 17-1562, Doc. No. 2 ¶ 26(k).)  These polling places included the Bethune School, the William H. Hunter School ("Hunter School"), and polling places in Ward 19, Section 11.  (No. 17-1562, Doc. No. 2 ¶¶ 26(k), 27(1).)  At the Hunter School, for example, a judge of elections confiscated a Hispanic voter's literature and Honkala stamp.  (Id. ¶ 27(p).)

At the Champion Learning Center in Ward 43, Section 24, a volunteer for Plaintiff Honkala observed a judge of elections giving voters a piece of paper with Vazquez's name on it so that the voters could spell it correctly. (No. 17-1562, Doc. No. 2 ¶ 27(m).)  Further, in Ward 19, Section 4, a judge of elections was heard explaining to a voter that because the voter was a

---

[19]   The website of the Committee of Seventy, which is a nonpartisan organization, describes the role of a Ward Leader as follows:

> Each ward is represented by a Republican and a Democratic ward leader, who are selected by their party's committee people soon after the committee people are elected. . . . Ward leaders serve as members of their respective political party organization's City Committee—sometimes called the County Committee— which supervises the organization and management of the party in all Philadelphia elections.

Ward System 101, Comm. of Seventy, http://www.seventy.org/tools/ward-leaders-committeepeople/ward-system-101 (last visited Jan. 19, 2018).

registered Democrat, he had to vote for a Democrat, even though the voter said that he wanted to vote for a write-in candidate unaffiliated with a political party.  (Id. ¶ 27(n).)

Plaintiffs allege that Election Board workers also impermissibly interacted with individuals from the Democratic Party.  For example, throughout the day at Rivera Head Start, a person associated with the Election Board would come out of the polling place, retrieve stamps from Democratic Committee people, and bring them to the voters inside the polling place.  (Id. ¶ 27(o).)  And at the Hartranft School, Vazquez sat and talked with the Election Board, even though he was a candidate.  (Id. ¶ 27(t).)  Plaintiffs Acosta and Lloyd also allege that Vazquez was seen inside polling places interacting with Election Board workers and voters when he was not permitted to do so.  (No. 17-1462, Doc. No. 11 ¶ 21.)

Finally, at the fire house in Ward 19, the Sheriff's Office confiscated partisan literature even though it had a handwritten disclaimer noting who had paid for the literature.  (No. 17-1562, Doc. No. 2 ¶ 27(s).)  The Sheriff's Office also took a Green Party bag containing election items that were never returned, even after it was ordered to do so.  (Id.)

### b.    Actions of Democratic Party Actors

Plaintiffs allege that individuals acting on behalf of the Democratic Party, including Democratic Committee people and Democratic poll workers, engaged in various forms of election misconduct.  This election misconduct took the form of impermissible dissemination of literature and information, improper assistance of voters, and intimidation of voters.

First, Plaintiffs allege that persons affiliated with the Democratic Party improperly disseminated literature, materials, and information.  Ward Leaders handed out literature even though they were not permitted to be at polling places.  (No. 17-1462, Doc. No. 11 ¶ 16(a).)  At the Pan American Clinic, Democratic Committee people handed out partisan materials inside the polling place.  (No. 17-1562, Doc. No. 2 ¶ 26(e).)   When a Honkala supporter asked a

Committee person about his actions, he said that he was an "elected" person.  (Id.)  At the same location, a woman told Honkala supporters that the only write-in option was Vazquez.  (Id. ¶ 27(h).)  And at a polling place at 17th Street and Lehigh Avenue, as voters checked in to vote, Democratic Committee people told them to vote for Vazquez.  (Id. ¶ 26(j).)

Democratic Committee people and Ward Leaders also told voters they could not use a pen to cast their votes.  (No. 17-1462, Doc. No. 11 ¶ 16(b).)  Instead, they told voters that they could use only a stamp to cast their votes and that the only stamp they could use was a Vazquez stamp.[20]  (Id. ¶ 16(b); No. 17-1562, Doc. No. 2 ¶ 24(c).)  These actions were taken within ten feet of the entrance to the polling location.  (No. 17-1562, Doc. No. 2 ¶ 26(c).)

Second, Plaintiffs allege that Democratic Party affiliates provided voters with impermissible assistance.  Throughout Election Day, Democratic Party representatives were seen going in and out of polling locations, even though they had no poll watcher credentials.[21]  (Id. ¶ 26(g).)  At times, as many as four individuals crowded into voting booths with voters.  (No. 17-1462, Doc. No. 11 ¶ 18(c); No. 17-1562, Doc. No. 2 ¶ 25(e).)

At the Welsh School, for example, Plaintiff Acosta witnessed Ward Leader Carlos Matos constantly going in and out of the polling place, influencing voters to vote for Vazquez.  (No. 17-

---

[20]   In Philadelphia, to vote for a write-in candidate, the voter first presses a large flashing red button at the top of the voting machine to open the write-in window.  See Office of the Phila. City Comm'rs, Using a Voting Machine, http://www.philadelphiavotes.com/en/voters/using-a-voting-machine (last visited Jan. 19, 2018).  Then, the voter may write in the name of the candidate or use a stamp to stamp the candidate's name on the exposed paper in the window.  Id.  The voter then pulls down the black shutter over the name he or she has entered, closing the window.  Id.  A single write-in window at the top is used for all write-in votes.  Id.

[21]   In Pennsylvania, poll watcher certificates are issued on behalf of a candidate or a political party.  "No more than two Poll Watcher Certificates may be issued for the same division on behalf of the same candidate."  See Office of the Phila. Comm'rs, Poll Watcher Certificate Requests & Candidate Authorization Forms, http://www.philadelphiavotes.com/en/candidates-a-campaigns/poll-watcher-certificates (last visited Jan. 19, 2018).

1462, Doc. No. 11 ¶ 18(e).)  Defendant Matos was stamping pink slips with Vazquez stamps and instructing voters what to do with the pink slips.[22]  (Id.)

At various polling locations, Democratic Ward Leaders Carlos Matos, Elaine Tomlin, and Dwayne Lilley were seen inside polling places, which Plaintiffs Acosta and Lloyd allege was not allowed because a Democratic candidate was not on the ballot.  (Id. ¶ 19(c).)  At Rivera Head Start, each time a voter went in to vote, they were told that they needed "assistance," which was provided by the same Democratic poll worker.  (No. 17-1562, Doc. No. 2 ¶ 27(f).)

Third, Plaintiffs allege that Democratic workers threatened, intimidated, and coerced voters.  At polling places, Democratic Committee people and Ward Leaders threatened or intimidated voters if it appeared that the voter was going to vote for a candidate other than Vazquez.  (No. 17-1462, Doc. No. 11 ¶ 16(d); No. 17-1562, Doc. No. 2 ¶ 24(d).)  This coercion and intimidation was documented on the internet and live on Facebook.[23]  (No. 17-1462, Doc. No. 11 ¶ 18(f).)

The Little Plaintiffs allege that inside one polling place, money was illegally exchanged between the son of a Democratic Ward Leader and other Democratic officials.  (No. 17-1562, Doc. No. 2 ¶ 25(a).)  In addition, Democratic workers intimidated an elderly Latina woman and told her that she had to vote for Vazquez.  (Id. ¶ 25(b).)  The woman stated that she was afraid for her safety and that she and other senior citizens were intimidated into voting for Vazquez.  (Id. ¶ 27(i).)  The exchanges of money and the acts of intimidation were caught on video.  (Id. ¶¶ 25(a)-(b), 27(b).)

---

[22]  A "pink slip" or a "pink sheet" is the official sample ballot at polling stations on Election Day.  It is used to demonstrate what the ballot will look like inside the voting booth.

[23]  See supra note 18.

At the entrance to the Hunter School, Democrats were heard saying: "This is where the Emilio voters vote." (Id. ¶ 27(c).)  These Democrats would not let a voter enter the polling place who intended to write in Honkala's name.  (Id.)  Honkala campaign treasurer Hillary Kane called the District Attorney's Office several times to complain about the conduct, and each time, she was told that someone would be sent out as soon as possible.  (Id. ¶ 27(d).)  Also at the Hunter School, a Hispanic woman was interested in voting for Plaintiff Honkala, but when she arrived at the polling place door, Vazquez campaign workers blocked the entrance and began to bully her. (Id. ¶ 27(p).)  The voter then left the site without voting.  (Id.)

At El Shaddai Church in Ward 43, Section 1, a Democratic election worker told a Honkala campaign poll worker that she was there to "assist voters" and instructed the Honkala worker to hand over her Honkala stamp.  (Id. ¶ 27(k).)  And similarly, after a Honkala poll worker gave a Honkala stamp to a voter, the voter told the Honkala poll worker that she had faced intimidation while inside the polling place.  (Id.)

At Congreso Center on American Street in Ward 19, Vazquez campaign workers and local Ward Leaders brought voters into the polling area with their arms around the voters, warding off anyone who tried to distribute literature to them.  (Id. ¶ 27(v).)  The workers and the Ward Leaders then pointed to the Vazquez literature, insisting that Honkala was a "Republican and outsider." (Id.)

### c.       Actions of Other Unidentified Actors

Plaintiffs allege that other individuals at the polls that day engaged in misconduct.  In this regard, Plaintiffs either have failed to plead facts revealing their identities or have failed to clearly allege whether the individuals are Democratic Party affiliates or government actors.  The alleged misconduct of these other individuals included impermissible dissemination of literature and information, improper assistance to voters, and intimidation of voters.

During the election, misleading literature and information was disseminated and improper assistance was provided to voters. Among the materials disseminated was information implying that Honkala, the Green Party write-in candidate, was an outsider and a Republican. (No. 17-1562, Doc. No. 2 ¶ 26(a).) Further, at a beauty school located at 2751 Germantown Avenue, poll workers for Honkala were told that they could not put up Honkala signs because it was a "Democrat district." (Id.¶ 26(b).) At the Barton School, a voter entered the polling place with a Honkala stamp and was told by election workers that she "had the wrong stamp." (Id. ¶ 27(a).)

And at Munoz Marin School, a table covered with literature for Vazquez was set up next to a voting machine, and voters were being told that the table had "what they need[ed] to vote." (Id. ¶ 26(i).) At one point, when a voter wanted to vote for Honkala, an African-American woman in her late fifties took the literature and the Honkala stamp from the voter and told her she was not allowed to have those items. (Id. ¶ 27(q).) Representatives from the District Attorney's Office as well as police officers witnessed this incident. (Id.)

At the PGW polling place, election workers confiscated stamps from voters who intended to vote for Honkala. (Id. ¶ 27(g).) These election workers told voters they could not bring stamps into the voting booth. (Id.) And at Ward 43, Section 22, voters were prevented from voting. (Id.) While inside the polls, an election worker gave a voter a Vazquez stamp and incorrect information about voting. (Id. ¶ 27(k).) After this conduct occurred, the voter said that she did not want to vote anymore. (Id.)

At the McKinley School in Ward 19, a voter said that she would like to vote for Honkala. (Id. ¶ 27(w).) The voter was given a Honkala stamp and a stamp pad and shown how to cast a write-in vote. (Id.) When the voter went into the polling place, an election worker followed her

inside the voting booth.  (Id.)  While in the booth, the election worker pushed the write-in button, handed the voter a Vazquez stamp, and told her: "This is the one you should use."  (Id.)  Then, the election worker closed the voting booth shutter.  (Id.)

At the Welsh School, Plaintiff Acosta saw poll workers passing out Vazquez stamps to voters.  (No. 17-1462, Doc. No. 11 ¶ 18(e).)  And at Bethune School, an election worker was seen inside the polling place with a Vazquez write-in stamp.  (No. 17-1562, Doc. No. 2 ¶ 26(h).)  At the Esperanza Health Center, a Honkala voter was asked by the election workers for whom she was voting.  (Id. ¶ 26(f).)

Plaintiffs also allege that voters were intimidated, harassed, and coerced at the polls.  A voter at the Hunter School was harassed as she tried to enter the polling place.  (Id. ¶ 27(e).)  She was told that her name was not on the voter rolls and therefore she could not vote even though she had voted in that voting division her whole life.  (Id.)  The voter was not offered a provisional ballot.  (Id.)  At the same location, a volunteer outside the polling place told voters that if they were Democrats, they could not vote for Honkala because she was not a Democrat.  (Id. ¶ 27(r).)  In contrast, Fred Ramirez, a Democrat who lives in Bucks County, Pennsylvania, voted under property that he owns in the 197th District even though Plaintiffs allege that he should not have been permitted to do so.  (No. 17-1462, Doc. No. 11 ¶ 19.)

The Little Plaintiffs allege that at West Kensington Ministry, an election worker was seen taking money from a Democratic poll worker while exiting the polling site.  (No. 17-1562, Doc. No. 2 ¶ 27(b).)

Plaintiffs allege that all of this conduct occurred because the Democratic Committee, Secretary Cortés, and the Department of State, Bureau of Commissioners, Elections and

Legislation ("Pennsylvania Department of State") failed to supervise the election.  (No. 17-1462, Doc. No. 11 ¶¶ 17, 23; No. 17-1562, Doc. No. 2 ¶¶ 24(g), 31.)

### 3.   Alleged Tampering with Materials, Malfunctioning of Voting Machines, and Improper Chain of Custody Procedures for Voting Equipment

Plaintiffs allege that voting materials and equipment were tampered with, voting machines malfunctioned, and improper chain of custody procedures were followed with respect to voting materials and equipment.

Plaintiffs claim that voting signs were tampered with so that it appeared that the City of Philadelphia was endorsing Vazquez.  Nonpartisan pink ballot sheets, prepared by the City Commissioners' Office and paid for by Philadelphia taxpayers, posted in polling places to illustrate the ballot, were doctored by Defendant Vazquez and Democratic Committee workers to instruct voters to write in Vazquez's name.  (No. 17-1462, Doc. No. 11 ¶ 18(a); No. 17-1562, Doc. No. 2 ¶ 25(c).)  In addition, Ward Leaders and Democratic Committee people set up tables in support of Vazquez.  (No. 17-1462, Doc. No. 11 ¶ 18(a).)  This conduct was observed at the Wyoming Branch Library.  (No. 17-1562, Doc. No. 2 ¶ 26(d).)  Plaintiffs allege that these actions gave voters the impression that the City of Philadelphia was specifically instructing voters to vote for Vazquez.  (No. 17-1462, Doc. No. 11 ¶ 18(a); No. 17-1562, Doc. No. 2 ¶ 25(c).)

In addition, materials of other candidates were removed.  For example, at several polling locations, poll workers for Plaintiff Lloyd were told that they could not hang his signs.  (No. 17-1462, Doc. No. 11 ¶ 18(d).)  And poll workers and Ward Leaders ripped down signs for Plaintiff Lloyd that had been hung on the outside of polling places.  (Id.)  The police, the District Attorney's Office, the Board of Elections, and the City Commissioners' Office were all notified of this conduct.  (Id.)

Voting machines, as well as the machines' write-in mechanism, frequently malfunctioned, and proper procedures for alternative ballots were not followed.  (Id. ¶ 18(b); No. 17-1562, Doc. No. 2 ¶ 25(d).)  Defendant Matos was seen going into voting booths and handling voting machines.  (No. 17-1562, Doc. No. 2 ¶ 26(g).)

Finally, proper chain of custody procedures for voting cartridges and election materials were not followed.  (No. 17-1462, Doc. No. 11 ¶ 16(e); No. 17-1562, Doc. No. 2 ¶ 24(e).) Plaintiffs believe that individuals other than the Philadelphia Police Department impermissibly picked up and delivered cartridges and election materials.  (Id.)  Plaintiffs Acosta and Lloyd also allege that voting slips were missing or damaged in several polling locations.  (No. 17-1462, Doc. No. 11 ¶ 16(e).)  In fact, on the night of the election, multiple individuals had custody of election materials.  (Id. ¶ 16(f); No. 17-1562, Doc. No. 2 ¶ 24(f).)  These individuals included workers from Defendant Vazquez's political party or other parties.  (Id.)  At the end of election night, election workers also were seen pulling the register tape from the voting machines.[24]  (No. 17-1562, Doc. No. 2 ¶ 27(u).)  After pulling the register tape, election workers were seen signing the middle of the tape in boxes where voters could write in a candidate.  (Id.)

Plaintiffs Acosta and Lloyd allege that these problems were caused by the Board of Elections, the City Commissioners, the Ward Leaders, the Committee of Seventy, and Pennsylvania Speaker of the House of Representatives Mike Turzai.  (No. 17-1462, Doc. No. 11 ¶ 22.)

### 4.  Results of the Special Election

On Friday, March 24, 2017, three days after the special election concluded, the official vote count began.  (Id. ¶ 15; No. 17-1562, Doc. No. 2 ¶ 23.)  Vazquez received 1,972 votes.  (Id.)

---

[24]  A register tape is paper tape produced by a voting machine, which contains the printed vote results for that machine.

Honkala received 286 votes, while Little received 201 votes.  (<u>Id.</u>)  Lloyd received 20 votes, and Acosta received two votes.  (No. 17-1462, Doc. No. 11 ¶ 15.)

On Friday, March 31, 2017, Vazquez was declared the putative winner of the special election.  (<u>Id.</u>; No. 17-1562, Doc. No. 2 ¶ 23.)  On April 3, 2017, the results of the special election were certified, and on April 5, 2017, Vazquez was sworn in as Pennsylvania State Representative for the 197th Legislative District.  (Hr'g Tr. 13:16-13:17.)

### C.    Procedural History

On March 31, 2017, Plaintiffs Orlando A. Acosta and Edward Lloyd instituted this action by filing an Emergency Petition for an injunction staying the certification of Vazquez as the special election winner.  (No. 17-1462, Doc. No. 1-3.)  That same day, by Order of the Honorable Paul S. Diamond of this Court, the Motion of Plaintiffs Acosta and Lloyd was denied.  (<u>Id.</u>, Doc. No. 4.)  Thereafter, Plaintiffs Acosta and Lloyd filed a Complaint against Defendants.  (<u>Id.</u>, Doc. No. 5.)  On April 4, 2017, they filed an Amended Complaint.  (<u>Id.</u>, Doc. No. 9.)  And on April 10, 2017, Plaintiffs Acosta and Lloyd filed a Second Amended Complaint, which is the operative Complaint in the Acosta action.  (<u>Id.</u>, Doc. No. 11.)  On April 6, 2017, the Little Plaintiffs filed their Complaint (No. 17-1562, Doc. No. 1), and on April 7, 2017, they filed an Amended Complaint (<u>Id.</u>, Doc. No. 2).

Plaintiffs in both actions bring similar claims for relief.  In Plaintiffs Acosta and Lloyd's Second Amended Complaint and the Little Plaintiffs' Amended Complaint (collectively, "Complaints"), they caption Count I as a claim for declaratory relief and Count II as a claim for preliminary and permanent injunctive relief.  (No. 17-1462, Doc. No. 11 at 25-26; No. 17-1562, Doc. No. 2 at 26-27.)  Plaintiffs bring both Counts pursuant to 42 U.S.C. § 1983, alleging that Defendants violated their First and Fourteenth Amendment rights of association, right to vote, and right to speech, as well as their Fourteenth Amendment fundamental due process right.  (<u>Id.</u>)

22

Plaintiffs also allege in both Counts that Defendants' wrongful conduct violated the Pennsylvania

Election Code.  (Id.)

In Count I, Plaintiffs request declaratory relief that their First and Fourteenth Amendment

rights were violated, that the special election was held in violation of the Pennsylvania Election

Code, and that the special election be declared null and void.  (No. 17-1462, Doc. No. 11 at 25;

No. 17-1562, Doc. No. 2 at 26.)  They allege as follows:

> The Defendants, due to lack of supervision and/or through the alleged pervasive
> misconduct, violated the Pennsylvania Election Code as noted above and, as a
> result, corrupted and undermined the election results and undermined the right of
> voters to vote for a candidate of their choice and for candidates to run and be
> voted for by persons.

(No. 17-1462, Doc. No. 11 ¶ 28; No. 17-1562, Doc. No. 2 ¶ 36.)

In Count II, Plaintiffs request preliminary and permanent injunctive relief that the Court

enjoin the special election results and the seating of Vazquez in the General Assembly, order a

new election to be held, order sanctions, and award counsel fees and costs.  (No. 17-1462, Doc.

No. 11 at 26-27; No. 17-1562, Doc. No. 2 at 27-28.)  Plaintiffs Acosta and Lloyd further request

that the Court bar Vazquez, Ward Leaders, Democratic Committee people, and poll workers from

participating in the requested new special election.  (No. 17-1462, Doc. No. 11 ¶ 38.)  And they

request that the Court bar Vazquez from running in the special election and all subsequent

elections for the next ten years.  (Id.)

In Count II, Plaintiffs allege that the special election was held in a manner that violated

their First and Fourteenth Amendment rights, as well as the Pennsylvania Election Code.  (No.

17-1462, Doc. No. 11 ¶ 32; No. 17-1562, Doc. No. 2 ¶ 39.)  They allege:

> There were numerous and repeated election violations and tampering with votes,
> which resulted in election results that were not accurate or fairly counted and the
> election should be declared null and void.

(No. 17-1462, Doc. No. 11 ¶ 33; No. 17-1562, Doc. No. 2 ¶ 40.)

On August 10, 2017, the Acosta action and the Little action were consolidated by Order of this Court.  (Id., Doc. No. 53.)  Defendants have filed Motions to Dismiss the claims against them.[25]  On September 14, 2017, a hearing was held on the Motions.  The Motions are now ripe for a decision.

## III.   STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (quoting Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no

---

[25]  All Defendants have filed Motions to Dismiss except for the Committee of Seventy and Leslie Acosta, who are Defendants only in the Acosta action.  Neither the Committee of Seventy nor Leslie Acosta has filed any response to Plaintiffs Acosta and Lloyd's Second Amended Complaint.  (No. 17-1462, Doc. No. 11.)  The Committee of Seventy, however, was never served with process in accordance with Federal Rule of Civil Procedure 4(m).  As discussed below, because Plaintiffs Acosta and Lloyd have not alleged sufficient facts against the Committee of Seventy and Leslie Acosta, they will be dismissed as Defendants without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim.

more than conclusions, are not entitled to the assumption of truth."   Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).  The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

When determining a motion to dismiss, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Where, the complaint is filed pro se, as is the Acosta Second Amended Complaint, the "complaint, 'however inartfully pleaded' must be held to 'less stringent standards than formal pleadings drafted by lawyers.'"  Fatone v. Latini, 780 F.3d 184, 193 (3d Cir. 2015) (quoting Haines v. Kerner, 404 U.S. 519, 520–21 (1972)).  It should be dismissed only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of [his] claim that would entitle [him] to relief."  Olaniyi v. Alexa Cab Co.,

239 F. App'x 698, 699 (3d Cir. 2007) (citing <u>McDowell v. Del. State Police</u>, 88 F.3d 188, 189 (3d

Cir. 1996)).

IV.    **ANALYSIS**[26]

Plaintiffs bring this action against Defendants pursuant to 42 U.S.C. § 1983.  As noted,

§ 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

§ 1983.  Section 1983 does not provide substantive rights but instead "authorizes a person to file

a private cause of action against state actors for a deprivation of rights protected by a federal

statute or the United States Constitution."  <u>Oh v. Phila. Cty. Bd. of Elections</u>, Civ. A. No. 08-

0081, 2008 WL 4787583, at *2 (E.D. Pa. Oct. 31, 2008) (citing <u>West v. Atkins</u>, 487 U.S. 42, 48

(1988)).  To recover under § 1983, a plaintiff must establish that defendants "acted under color of

state law to deprive the plaintiff of a right secured by the Constitution."  <u>Malleus v. George</u>, 641

F.3d 560, 563 (3d Cir. 2011) (quoting <u>West</u>, 487 U.S. at 48).  Plaintiffs allege that their First and

Fourteenth Amendment right to association, to vote, and to speech, and their Fourteenth

Amendment right to fundamental due process were violated as a result of the conduct that

allegedly took place during the special election.

Defendants argue in opposition that the Complaints should be dismissed in their entirety.

First, Secretary Cortés, the Pennsylvania Department of State, and Speaker Turzai assert that the

claims against them should be dismissed because they are moot.  Second, Secretary Cortés and

---

[26]    Defendants in both cases assert the same arguments for dismissal.  As noted above, all Defendants in the Little action also have been named in the Acosta action.  Thus, throughout the Analysis section of this Opinion, the Court will refer to Defendants' Motions using Docket No. 17-1462, which corresponds to the Acosta action.

the Pennsylvania Department of State argue that certain claims are barred by the Eleventh Amendment.  Third, Vazquez, the Democratic Committee, and the Ward Leaders argue that they are not state actors and therefore cannot be held liable under § 1983.  Fourth, all Defendants contend that the Complaints should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim because they did not violate Plaintiffs' constitutional rights under the First and Fourteenth Amendments.  The Court will address each argument for dismissal in turn.

### A.      Plaintiffs' Claims Are Not Moot

Defendants Secretary Cortés, the Pennsylvania Department of State, and Speaker Turzai assert that the claims against them are moot and should be dismissed because the special election results were certified on April 3, 2017, and Vazquez was sworn into office on April 5, 2017.  (No. 17-1462, Doc. No. 31-2 at 4-5, Doc. No. 32 at 17-19.)  They argue, therefore, that there is no live controversy, and that this Court could not afford Plaintiffs relief by undoing the election.  (Id., Doc. No. 31-2 at 4-5, Doc. No. 32 at 18.)  The Little Plaintiffs submit, to the contrary, that their Complaint was timely brought and that Defendants' conduct is capable of repetition.  (No. 17-1562, Doc. No. 24. at 7.)  For reasons that follow, Defendants' claims based on mootness are without merit.

Article III of the United States Constitution specifies that the judicial power extends only to cases and controversies.  Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 669 (2016) (citing U.S. Const. art. III, § 2).  It is not sufficient that a controversy exist at the time the complaint was filed, but rather, an actual controversy must be present at all stages of the case.  Id. (citing Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997)).  A case becomes moot when (1) "the issues presented are no longer 'live,'" or (2) "the parties lack a legally cognizable interest in the outcome."  Chafin v. Chafin, 568 U.S. 165, 172 (2013) (quoting Already, LLC v.

Nike, Inc., 568 U.S 85, 91 (2013)).  "[A] case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"  Id. (quoting Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam)).

The Third Circuit has recognized that there are exceptions to the mootness doctrine.  One such exception is when the conduct is capable of repetition yet evades review.  Merle v. United States, 351 F.3d 92, 95 (3d Cir. 2003).  For this exception to apply, a plaintiff must establish that "(1) the challenged action is, in its duration, too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  Id. (quoting Spencer v. Kemna, 523 U.S. 1, 17 (1998)).  When there is a likelihood that "the acts complained of will be repeated, the substantive issues remain justiciable, and a declaratory judgment could be rendered to define the rights and obligations of the parties."  N.J. Tpk. Auth. v. Jersey Cent. Power & Light, 772 F.2d 25, 32 (3d Cir. 1985) (citations omitted).

For claims involving elections, courts have provided relief under the exception for conduct capable of repetition yet evading review even after elections have ended and a winner has been announced.  E.g., N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 18 (1st Cir. 1996) ("[E]lections are routinely too short in duration to be fully litigated, and there is a reasonable expectation that the same party would be subjected to the same action again.");  Merle, 351 F.3d at 95 (explaining that plaintiffs' claims were not moot even after election had ended because it was reasonable to assume that plaintiff would attempt to run for office again, and the same statute that caused plaintiff to file suit would again bar his candidacy for office);  De La Fuente v. Cortes, 1:16-cv-01696, 2017 WL 3586047, at *3-4 (M.D. Pa. Aug. 21, 2017) (concluding that plaintiff's claim that Pennsylvania election laws impeded his campaign efforts

were not moot because the election was over since they fell within the exception of claims "capable of repetition yet evading review"); Arons v. Donovan, 882 F. Supp. 379, 383 (D.N.J. 1995) (holding that claims were not moot merely because election was over because claims were likely to re-emerge in future electoral seasons); Branch v. F.C.C., 824 F.2d 37, 41 n.2 (D.C. Cir. 1987) ("Controversies that arise in election campaigns are unquestionably among those saved from mootness under the exception for matters 'capable of repetition, yet evading review.'").

Plaintiffs cite Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994), to illustrate that meaningful relief is not precluded by the certification of election results.  (No. 17-1562, Doc. No. 24. at 7.) In Marks, the Court dealt with allegations of electoral misconduct.  Id. at 886.  The Third Circuit affirmed the district court's conclusion that wrongdoing affected the election.  Id. at 887.  The Court affirmed the grant of injunctive relief, prohibiting Stinson, the winning candidate, from exercising the powers of the office after he was certified and sworn into office.  Id. at 884, 887. The Third Circuit stated that "where there is substantial wrongdoing in an election, the effects of which are not capable of quantification but which render the apparent result an unreliable indicium of the will of the electorate, courts have frequently declined to allow the apparent winner to exercise the delegated powers."  Id. at 887.

Here, Plaintiffs' claims are not moot because Defendants' conduct is capable of being repeated.  Like the cases mentioned above, it is reasonable to assume that Plaintiffs would attempt to run for office in future elections.  Furthermore, the present case is too short in duration to be fully litigated, and the same electoral misconduct is capable of repetition in future elections.  If warranted, relief can be granted by this Court to define the rights and obligations of all parties so that this type of conduct does not occur in future elections.  Thus, Plaintiffs' claims

meet the exception for conduct that is capable of repetition yet evades review.  See N.J. Tpk. Auth., 772 F.2d at 31.  For all these reasons, the claims are not moot.

### B.      Plaintiffs Were Not Required to Bring Their Claims in State Court First

Defendants Vazquez, the Democratic Committee, and Ward Leaders Carlos Matos, Elaine Tomlin, Jewell Williams, Dwayne Lilley, Shirley Gregory, and El-Amor Browne Ali ("Six Ward Leaders") assert that Plaintiffs were required to pursue first an election contest in state court before seeking relief in federal court.  (No. 17-1462, Doc. No. 37-1 at 16-17, Doc. No. 38 at 15-16, Doc. No. 41-2 at 4.)  The Court disagrees.

Plaintiffs were not required to file an election contest in state court as a condition precedent to having their constitutional claims heard in federal court.  "[A] person with a federal Civil Rights Act claim has no duty to exhaust state remedies before pursuing his or her claim in the federal courts."  Marks, 19 F.3d at 882 (citing Patsy v. Bd. of Regents, 457 U.S. 496, 516 (1982)).  Plaintiffs can proceed "in federal court without having resorted to the state's judicial process."  Id.

In certain circumstances, however, "circuit courts have deferred to ongoing state recount and review procedures where these appear to be adequate and the alleged misconduct is lacking in 'enormity.'"  Griffin v. Burns, 570 F.2d 1065, 1077 (1st Cir. 1978).  But "[i]t is no answer to the charges made here that state law could provide the relief sought."  Hennings v. Grafton, 523 F.2d 861, 864 (7th Cir. 1975) (citations omitted).  Therefore, Plaintiffs can bring their claims in federal court even though they did not file an election contest in state court first.

### C.      Eleventh Amendment Immunity

Defendants Secretary Cortés and the Pennsylvania Department of State contend that the Eleventh Amendment bars the state law claim that they violated the Pennsylvania Election Code. (No. 17-1462, Doc. No. 32 at 12.)  In response, the Little Plaintiffs argue that the claims against

Secretary Cortés and the Pennsylvania Department of State are not barred because Plaintiffs only seek injunctive relief. (17-1564, Doc. No. 24 at 4-5.)

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Under the Eleventh Amendment, a nonconsenting state is immune from suit in federal court. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99-100 (1984). This immunity extends to suits brought by a citizen against his own state, Lavia v. Pa., Dep't of Corr., 224 F.3d 190, 195 (3d Cir. 2000) (citations omitted), and "to state agencies and departments," MCI Telecomm. Corp. v. Bell Atl. Pa., 271 F.3d 491, 503 (3d Cir. 2001) (citing C.H., ex rel. Z.H. v. Olivia, 226 F.3d 198, 201 (3d Cir. 2000) (en banc)). However, "[s]tate officials sued in their individual capacities are 'persons' for purposes of § 1983." Walker v. Beard, 244 F. App'x 439, 440 (3d Cir. 2007) (per curiam) (citing Hafer v. Melo, 502 U.S. 21 (1991)). As such, "the Eleventh Amendment does not preclude a suit against a state official in his or her individual capacity." Id.

Eleventh Amendment immunity, however, is subject to three exceptions: "(1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law." Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 323 (3d Cir. 2002) (quoting MCI Telecomm. Corp., 271 F.3d at 503).

The first exception, congressional abrogation, does not apply in this case. Plaintiffs have brought suit under 42 U.S.C. § 1983. "Congress did not abrogate states' sovereign immunity when it enacted 42 U.S.C. § 1983." Walker, 244 F. App'x at 440 (per curiam) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989)). The second exception, state waiver, also

does not apply in this case. "[T]he Pennsylvania legislature has expressly declined to waive its sovereign immunity by statute." Walker, 224 F. App'x at 440 (citing Lavia, 224 F.3d at 195); see 42 Pa. Cons. Stat. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States.").

Therefore, only the third exception is at issue in this case. Pursuant to Ex parte Young, 209 U.S. 123 (1908), the Eleventh Amendment does not bar suits against state officials in their official capacity seeking injunctive relief to end ongoing violations of federal law. Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 178 (3d Cir. 2002) (citing Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985)). "[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" Will, 491 U.S. at 71 n.10 (citing Kentucky, 473 U.S. at 167 n.14).

"The relief sought must be prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages." MCI Telecomm. Corp., 271 F.3d at 506 (citing Pennhurst State Sch. & Hosp., 465 U.S. at 102). "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002) (alteration in original) (citation omitted).

The doctrine of Ex parte Young, however, does not apply to states or state agencies. Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993). Those suits are barred "regardless of the relief sought." Id.; accord Dickerson v. SCI Graterford, 453 F.

App'x 134, 137 (3d Cir. 2011) (explaining that Eleventh Amendment prevented suit against state agency for monetary or prospective injunctive relief); Walker, 244 F. App'x at 440 (same).

With respect to state law claims, the doctrine of Ex parte Young also does not apply to such claims against state officials, regardless of the relief sought.  In Pennhurst State Sch. & Hosp., the Supreme Court held that "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when . . . the relief sought and ordered has an impact directly on the State itself."  465 U.S. at 117.  As a result, "a claim that state officials violated state law in carrying out their official responsibilities is . . . protected by the Eleventh Amendment."  Id. at 122.  The Third Circuit has held that "state officials are immune from suit in federal court based on violations of state law, including suits for prospective injunctive relief under state law, unless the state waives sovereign immunity."  Balsam v. Sec'y of N.J., 607 F. App'x 177, 183 (3d Cir. 2015) (citing Pennhurst, 465 U.S. at 106).  And "the supplemental jurisdiction statute, 28 U.S.C. § 1367, does not authorize district courts to exercise jurisdiction over claims against non-consenting States."  Id.  Even when voters attempt to "tie their state law claims into their federal claims," the Eleventh Amendment bars the state law claims.  Id. at 183-84.

### 1.    The Eleventh Amendment Bars Suit Against the Pennsylvania Department of State on Constitutional and State Law Claims

As a state agency, Eleventh Amendment immunity extends to the Pennsylvania Department of State.  See Shine v. Merenda, 586 F. App'x 95, 97 (3d Cir. 2014) (extending Eleventh Amendment immunity to the Pennsylvania Department of State as part of the executive department (citing Lavia, 224 F.3d at 195)).  None of the three exceptions to immunity applies to the Pennsylvania Department of State.  First, Congress has not abrogated the Pennsylvania Department of State's sovereign immunity for § 1983 suits.  Walker, 244 F. App'x at 440 (3d Cir.

2007) (citing <u>Will</u>, 491 U.S. at 66).  Second, "the Pennsylvania legislature has expressly declined

to waive its sovereign immunity by statute."  <u>Id.</u> (citing <u>Lavia</u>, 224 F.3d at 195); <u>see also</u> 42 Pa.

Cons. Stat. § 8521(b).  Third, the doctrine of <u>Ex parte Young</u> does not apply to the Pennsylvania

Department of State, which is a state agency.  <u>Puerto Rico Aqueduct & Sewer Auth.</u>, 506 U.S. at

146.  Even though this suit is for prospective injunctive relief, the Eleventh Amendment bar still

applies.   Because none of the three exceptions to sovereign immunity apply, Plaintiffs'

constitutional claims under 42 U.S.C. § 1983 and state law claims for violations of the

Pennsylvania Election Code are barred by the Eleventh Amendment.  Accordingly, all claims

against the Pennsylvania Department of State will be dismissed with prejudice because this

Court does not have jurisdiction over them.  <u>See</u> <u>C.H. ex rel. Z.H.</u>, 226 F.3d at 201 (citing

<u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 63 (1996)).

### 2. The Eleventh Amendment Does Not Bar Suit Against Secretary Cortés on Constitutional Claims, But It Does Bar Suit on State Law Claims

As noted, a plaintiff can sue a state official under <u>Ex parte Young</u> for violations of federal

law for prospective injunctive and declaratory relief.  <u>MCI Telecomm. Corp.</u>, 271 F.3d at 506.

Here, the doctrine of <u>Ex parte Young</u> applies to Plaintiffs' constitutional claims for prospective

injunctive and declaratory relief, and therefore the First and Fourteenth Amendment claims are

not barred by the Eleventh Amendment.  Secretary Cortés, as an officer of the Pennsylvania

Department of State, may be sued in his individual and official capacities "for prospective

injunctive and declaratory relief to end continuing or ongoing violations of federal law."  <u>Id.</u>; <u>see</u>

<u>also</u> <u>Koslow</u>, 302 F.3d at 178 (citing <u>Kentucky</u>, 473 U.S. at 167 n.14).

Secretary Cortés argues, however, that he is not a proper Defendant under 42 U.S.C.

§ 1983 because he does not supervise elections and has no power over individual election

officials.  (No. 17-1462, Doc. No. 32 at 13-14.)  Instead, he argues that he is charged only with ministerial duties and "high-level oversights of the election."  (Id. at 13.)

In Constitution Party of Pennsylvania v. Cortes, the Third Circuit clarified the Ex parte Young exception for state officials as follows:

> "[I]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act."  [Ex parte Young, 209 U.S. 123, 157 (1908).]  That said, we have held that even "entirely ministerial" duties can be sufficient under Young, because "the inquiry is not into the nature of an official's duties but into the effect of the official's performance of his duties on the plaintiff's rights."  Finberg v. Sullivan, 634 F.2d 50, 54 (3d Cir. 1980).

824 F.3d 386, 396 (3d Cir. 2016).

Here, Plaintiffs allege that Secretary Cortés "had the express duties and responsibilities pursuant to Pennsylvania laws . . . to administer a special election according to the Pennsylvania Election Code and to ensure that there was no tampering of votes or with voters."  (No. 17-1462, Doc. No. 11 ¶ 10; No. 17-1562, Doc. No. 2 ¶ 18.)  Under 25 Pa. Stat. § 2621(f.1), policymaking authority to develop a poll worker training program was delegated to Secretary Cortés, as an official of the Pennsylvania Department of State.  Section 2621(f.1) provides that Secretary Cortés was required to "develop a voluntary professional certification and poll worker training program for county election officials in consultation with county board of elections." § 2621(f.1).  Therefore, at the motion to dismiss stage, the Court will assume that the Secretary Cortés set policy for election training.  Because the Ex parte Young exception applies, which allows a claim for prospective relief, the Eleventh Amendment does not automatically bar the constitutional claims against Cortés.  But as discussed below, however, Plaintiffs have failed to state plausible First and Fourteenth Amendment claims for relief against Cortés for other reasons.

35

In contrast, the doctrine of Ex parte Young does not apply to Plaintiffs' state law claim for violations of the Pennsylvania Election Code.  Thus, Plaintiffs' claim that Cortés violated the Pennsylvania Election Code while carrying out his official duties is protected by the Eleventh Amendment.  Pennhurst State Sch. & Hosp., 465 U.S. at 122.  This immunity still applies even though the relief sought is prospective injunctive relief, "unless the state waives sovereign immunity."  Balsam, 607 F. App'x at 183 (citing Pennhurst, 465 U.S. at 106).  As noted, Pennsylvania has not waived its sovereign immunity. See 42 Pa. Cons. Stat. § 8521(b).  Even though Plaintiffs may attempt to tie their Pennsylvania Election Code claims into their constitutional claims, the Eleventh Amendment still bars the state law claim as to Secretary Cortés.  Accordingly, the claim against Cortés for violating the Pennsylvania Election Code as a separate state law claim will be dismissed with prejudice.

### D.  Emilio Vazquez, the Democratic Committee, and the Six Ward Leaders Are Not State Actors and Cannot Be Subject to Liability Pursuant to 42 U.S.C. § 1983

Defendants Vazquez and the Democratic Committee assert that the claims against them should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim because Plaintiffs have failed to plausibly plead that they are state actors as required to state a colorable 42 U.S.C. § 1983 claim.  (No. 17-1462, Doc. Nos. 36-1, 38-1.)  They argue that they are private actors and therefore were not acting under color of state law.  (Id.)  Similarly, Defendant Six Ward Leaders contend that the claims against them in the Acosta action should be dismissed under Rule 12(b)(6) because they did not act under color of state law.  (Id., Doc. No. 41-2.)

To bring a plausible claim for a constitutional violation under § 1983, a plaintiff "must allege facts demonstrating, inter alia, that the misconduct complained of was [done] 'under color of state law.'"  Sprauve v. W. Indian Co. Ltd., 799 F.3d 226, 229 (3d Cir. 2016) (quoting Groman

v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995)).  As such, § 1983 "subjects to liability those who deprive persons of federal constitutional or statutory rights 'under color of any statute, ordinance, regulation, custom, or usage' of a state."  Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009) (quoting Leshko v. Servis, 423 F.3d 337, 339 (3d Cir. 2005)).  In contrast, "merely private conduct, no matter how discriminatory or wrongful" does not fall within the scope of § 1983.  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49 (1999) (quoting Blum v. Yaretsky, 457 U.S. 991, 1002 (1982)).

> In determining whether a defendant is a private actor or a state actor, three tests apply:
>
> (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.

Borrell v. Bloomsburg Univ., 870 F.3d 154, 160 (3d Cir. 2017) (quoting Kach, 589 F.3d at 646). The relevant question is whether there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  Id. (quoting Leshko, 423 F.3d at 339).  Determining whether defendants are state actors requires a fact-based analysis.  Max v. Republican Comm. of Lancaster Cty., 587 F.3d 198, 200 (3d Cir. 2009).  Therefore, the Court will address the status of each Defendant separately.

### 1.   Democratic Committee Is Not a State Actor

The Democratic Committee submits that its role is "clearly defined" as "separate from state actors," and that it was a private party during the special election.  (No. 17-1462, Doc. No. 38-1 at 12.)  As a private party, it asserts that it cannot be the held liable under § 1983.  (Id.)  The Court agrees.

In certain limited circumstances, a political party has been found to be a state actor.  In Smith v. Allwright, the Supreme Court held that the Democratic Party of Texas was a state actor.

321 U.S. 649, 664 (1944).  There, the Democratic Party had a policy that limited membership to white citizens, and membership in the party was an "essential qualification" for voting in the primary election.  Id. at 661, 664-65.  The Court held that where the privilege of membership is "the essential qualification for voting in a primary to select nominees for a general election, the state makes the action of the party the action of the state."  Id. at 664-65.  Similarly, a plurality in Terry v. Adams held that the "Jaybird Association," a private Democratic club, was a state actor during its primary election because the Jaybird primary was "an integral part, indeed the only effective part, of the elective process" that determined who would govern the county.  345 U.S. 461, 469-70 (1953).

Courts have declined to extend the holdings of these Supreme Court cases to the actions of political parties in other contexts.  In Max v. Republican Committee of Lancaster County, the Third Circuit held that the Republican Committee of Lancaster County ("RCLC") was not a state actor where it attempted to prevent plaintiff, a Republican committeewoman, from campaigning for an unendorsed Republican candidate.  587 F.3d at 199-200.  Plaintiff alleged that RCLC retaliated against her in violation of the First Amendment when it threatened to remove her from her position if she did not refrain from campaigning for the candidate.  Id.  Plaintiff argued that RCLC was a state actor under § 1983 because the Commonwealth delegated to the Republican Party the authority to decide which candidate would appear on the general election ballot.  Id. at 200.

The Third Circuit disagreed with plaintiff, explaining:

Max is correct that state action may be imputed to private groups who carry out functions that are "governmental in nature."  Evans v. Newton, 382 U.S. 296, 299, 86 S. Ct. 486, 15 L.Ed.2d 373 (1966) (establishing the "public function" test for state action).  However, her contention is unavailing.

As defendants note, Max conflates the role of the RCLC with that of the electorate.  That is, she argues that the RCLC, a designated political committee, performs the traditionally public function of choosing candidates for the general election but in fact Pennsylvania delegates such authority to the <u>registered voters</u> of the Republican Party.  Max's premise fails to distinguish between the RCLC, which endorses candidates in the primary, and the corpus of registered Republican voters who, by voting in the primary election, actually select the nominees for the general election.  <u>See</u> 25 P.S. §§ 2831, 2812.

\* \* \* \*

Moreover, the principal cases upon which Max relies are distinguishable from the one at hand.  For instance, Max's blanket assertion-that political parties are state actors during primary elections-derives from two Supreme Court cases from the Jim Crow era.  These cases, <u>Smith v. Allwright</u>, 321 U.S. 649, 64 S. Ct. 757, 88 L.Ed. 987 (1944), and <u>Terry v. Adams</u>, 345 U.S. 461, 73 S. Ct. 809, 97 L.Ed. 1152 (1953), involved two attempts by the Democratic Party of Texas to bar African-Americans from participating in primary elections.  In both instances, the Supreme Court sustained the claims under § 1983 because Texas left it up to private groups, i.e. political parties, to decide who could vote so as to intentionally circumvent the Fifteenth Amendment.  <u>See</u> <u>Terry</u>, 345 U.S. at 466, 73 S. Ct. 809 ("the . . . right to be free from racial discrimination in voting 'is not to be nullified by a state through casting its electoral process in a form which permits a private organization to practice racial discrimination . . . .'" (quoting <u>Smith</u>, 321 U.S. at 664, 64 S. Ct. 757)).

. . . "[W]hereas Texas and the Democratic Party were working in concert to deny African-American participation in primaries, nothing in the record here suggests that Pennsylvania delegated authority to defendants with the intention of violating the constitutional rights of Max or anyone else.  Max cannot plausibly assert that "the fingerprints of the state" are on the alleged infringement of her rights. <u>Leshko v. Servis</u>, 423 F.3d 337, 340 (3d Cir. 2005).

<u>Max</u>, 587 F.3d at 200-01 (second and third omissions in original).  For that reason, the Court held that RCLC was a private party and not subject to § 1983 liability.  <u>Id.</u> at 203; <u>see also</u> <u>Neuman v. Ocean Cty. Democratic Cty. Comm.</u>, Civ. A. No. 16-2701, 2017 WL 396443 (D.N.J. Jan. 30, 2017) (relying on <u>Max</u>, reasoning that Democratic County Committee's candidate selection process did not constitute state action); <u>Valenti v. Pa. Democratic State Comm.</u>, 844 F. Supp. 1015, 1016-18 (M.D. Pa. 1994) (granting motion to dismiss, and finding that Pennsylvania Democratic State Committee was not acting under color of state law where Committee

prohibited candidates for Democratic nomination from distributing literature because the conduct concerned internal party matters).

Courts also have found political parties to be private actors under circumstances not concerning internal party conduct. In <u>Schneller v. Phila. Newspapers, Inc</u>., plaintiff, an independent candidate in a congressional election, alleged that the Delaware County Republican Party, among other defendants, violated his constitutional rights by defaming him throughout his campaign. Civ. A. No. 11-5071, 2012 WL 3704758, at *1 (E.D. Pa. Aug. 28, 2012), <u>aff'd</u>, 577 F. App'x 139 (3d Cir. 2014) (per curiam). During the campaign, the Republican Party asserted that the Democratic Party had collected many of the signatures for the nomination papers plaintiff had submitted, alleged that plaintiff had colluded with the Democrats, and disseminated other negative information regarding Plaintiff. <u>Id.</u>

In filing suit under § 1983, Plaintiff contended that the Republican Party was a state actor because it had "complete and unified control of the populace, in unison with the government." <u>Id.</u> at *3. The court disagreed, however, and in granting defendants' motion to dismiss, explained:

> Here, Schneller fails to show that any of the Defendants is a state actor within the meaning of § 1983. Although a private entity that "is a willful participant in joint action with the State or its agents" acts "under color of state law" for purposes of § 1983, <u>see</u> <u>Dennis v. Sparks</u>, 449 U.S. 24, 27–28, 101 S. Ct. 183, 66 L.Ed.2d 185 (1980), there is no indication that the Commonwealth of Pennsylvania or one of its agents had any involvement in the actions alleged in the Complaint. Schneller has not demonstrated that "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 351, 95 S. Ct. 449, 42 L.Ed.2d 477 (1974).

<u>Id.</u> The court continued:

> [T]he role of advocate for a political candidate and the role of voters to elect an individual is not a traditional public function exclusively reserved for the State. Simply having to "adhere to the statutory directive of the Constitution of the

United States of America and acts of Congress and the Commonwealth of Pennsylvania" does not create a sufficient nexus with the state.

Id. at *4.

In Libertarian Party of Ohio v. Husted, the Sixth Circuit held that the Republican Party was not a state actor when it filed a protest against the certification of the Libertarian Party's candidate for the primary election.  831 F.3d 382, 392-95 (6th Cir. 2016).  The Court stated that the Republican Party had not been "'assigned an integral part of the election process' that is usually performed by the state."  Id. at 396 (quoting Banchy v. Republican Party of Hamilton Cty., 898 F.2d 1192, 1196 (6th Cir. 1990)).  "[A]ny private citizen with standing [was] authorized by Ohio law to file a protest against a candidate's nominating petition."  Id.

In the instant case, the Democratic Committee was acting as a private political party and not as a state actor.  The special election was not a primary election but included a Republican candidate, independent candidates, and write-in candidates registered with the Democratic and Green Parties.  Neither membership in the Democratic Party nor any other action taken by the Democratic Committee affected voters' "essential qualifications" for voting in this special election.  In fact, a Democratic candidate was not even on the ballot.  As such, any action allegedly taken by the Democratic Party during the special election was not action of the state.

Similar to the argument of the plaintiff in Max v. Republican Committee of Lancaster County, Plaintiffs in this case "conflate[] the role of the [Democratic Committee] with that of the electorate."  587 F.3d at 200.  Plaintiffs argue that Philadelphia "is a Democratic town" with "an 86% to 90% registration edge in the 197th Legislative District."  (No. 17-1562, Doc. No. 25 at 6.)  But the assertion that Philadelphia is a "Democratic town" does not mean that the "fingerprints of the state" were on the alleged actions of the Democratic Committee.  Max, 587 F.3d at 201.

In addition, Plaintiffs mistakenly argue that the Democratic Committee is a state actor because "it has been given a special role under the Pennsylvania Election Code" and must comply with that Code.  (No. 17-1562, Doc. No. 25 at 6.)  But, as the court noted in <u>Schneller v. Philadelphia Newspapers, Inc.</u>, "[s]imply having to 'adhere to the statutory directive of the Constitution of the United States of America and acts of Congress and the Commonwealth of Pennsylvania' does not create a sufficient nexus with the state."  2012 WL 3704758, at *4; <u>see also</u> <u>Valenti v. Pa. Democratic State Comm.</u>, 844 F. Supp. 1015, 1016-18 (M.D. Pa. 1994) (concluding that Democratic Party was not a state actor even though their role was defined by the Pennsylvania Election Code).

Here, Plaintiffs have failed to plausibly plead that the Democratic Committee participated in joint action with the state or exercised powers traditionally reserved to the state.  Any alleged conduct of the Democratic Committee at the polls was performed by the private political party and not the state.  The Democratic Committee did not have "complete and unified control" over the residents of the 197th District,  <u>Schneller</u>, 2012 WL 3704758, at *3, and it was not "assigned an integral part of the election process that is usually performed by the state," <u>Husted</u>, 831 F.3d at 396.  Although the Democratic Party's role is defined by the Pennsylvania Election Code, the state did not assign the Democratic Committee an integral role in the special election that is usually performed by the state.  As noted, the Democratic Committee did not even have a candidate on the ballot.  Instead, it was present at the special election as a private political party.  Because the Democratic Committee was a private organization and was not acting under color of state law, the claims against it will be dismissed.

### 2.        Six Ward Leaders Are Not State Actors

Defendant Six Ward Leaders submit that, as private actors, the claims against them should be dismissed because they were not granted any power by the state nor did they have the

authority to monitor the special election.  (No. 17-1462, Doc. No. 41-2 at 5-6.)  They argue that they were not acting under color of state law but instead were "individuals within a private political party."  (Id. at 6.)  The Court agrees that the Six Ward Leaders were private actors and thus cannot be held liable under § 1983.

As noted, a private actor engages in state action if it (1) exercises powers traditionally the exclusive prerogative of the state, (2) acts with the help of or in concert with state officials, or (3) has so insinuated itself with the acting party that it can be recognized as a joint participant with the state.  Borrell v. Bloomsburg Univ., 870 F.3d 154, 160 (3d Cir. 2017) (citation omitted).

In Moore v. Democratic County Executive Committee of Philadelphia, plaintiff was a Democratic ward committee member who ran for the position of ward leader for the 32nd Ward in Philadelphia.  Civ. A. No. 14-3847, 2014 WL 5780879, at *1 (E.D. Pa. Nov. 6, 2014). Plaintiff won the election for ward leader, but an election contest was filed challenging his election.  Id.  Defendant Democratic City Committee held a contest committee meeting, at which plaintiff was not permitted to cross-examine witnesses or hear testimony.  Id.  The contest committee voted to remove plaintiff from his position as ward leader and reinstate the incumbent ward leader.  Id.  Plaintiff then filed a complaint against the Democratic City Committee and two Democratic ward committee members, alleging that their actions during the election and the election contest violated his First and Fourteenth Amendment rights.  Id. at *2.

In dismissing the complaint, the court explained that the Democratic City Committee and the two Democratic ward committee members were not acting under color of state law when they filled the office of ward leader through intra-party elections and dispute resolution mechanisms.  Id. at *5-6.  The court held: "[F]illing a party office is 'not state action or action under color of state law' and so Moore's rights 'were not abridged or impaired by state action—

as opposed to the private action of party leaders conducting the internal affairs of their party.'" Id. at *5 (quoting McMenamin v. Phila. Cty. Democratic Exec. Comm., 405 F. Supp. 998, 1003 (E.D. Pa. 1975)).  Plaintiff's claims therefore were dismissed for failure to state a claim.  Id.; see also Barber v. Horsey, Civ. A. No. 91-4265, 1991 WL 258836, at *3 (E.D. Pa. Dec. 3, 1991) (finding that ward leader did not engage in state action when he refused to permit certain committee people from voting for ward officers because the internal affairs of a political party are not state action).

In contrast, the court in Marks v. Stinson held that members of a political campaign acted under color of state law when they engaged in a civil conspiracy to promote a Democratic candidate through illegal solicitation and processing of absentee votes.  No. Civ. A. 93-6157, 1994 WL 146113, at *30 (E.D. Pa. Apr. 26, 1994).  Plaintiffs alleged that the City Commissioners delivered absentee ballot packages to Democratic committee persons or campaign workers.  Id. at *7.  Democratic campaign workers then canvassed areas of Philadelphia, soliciting absentee ballot applications from voters.  Id. at *8.  As a result, "approximately 450 absentee ballots in favor of [the Democratic candidate] were returned" to the campaign, where they were delivered to the Board of Elections.  Id. at *9.

In Marks, the Democratic campaign acted under color of state law because it intentionally engaged in a conspiracy with the Commissioners to promote the Democratic candidate.  Id. at *30.  The court explained that a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act . . . the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another' and 'an overt act that results in damage.'"  Id. (quoting Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir. 1979), rev'd in part on other grounds, 446 U.S. 754 (1980)).  A plaintiff must show that "there was a single plan,

the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." Id. Marks met this burden of establishing that the members of the political party were colluding with state actors, the City Commissioners, and for this reason became state actors themselves.

Thus, a private party involved in a conspiracy can be held liable under § 1983. Id. For § 1983 liability, "it is enough that the actor is a willful participant in joint activity with the State or its agents." Id. (citing Adickes v. Fress & Co., 398 U.S. 144, 152 (1970)). As noted, in Marks, plaintiffs had plausibly alleged that the Commissioners and the Democratic campaign had engaged in numerous violations of law. Id. The Commissioners even took steps to conceal their participation in the conspiracy. Id. at *31. Because the Democratic campaign, a private party, had engaged in a conspiracy with a state actor, the court held that it could be held liable as a state actor under § 1983. Id. at *30.

In the instant case, Defendant Six Ward Leaders, as private political party actors, were not acting under color of state law during the special election. As previously noted, Ward Leaders are political party leaders, who serve as members of their party's committee. See Ward System 101, Comm. of Seventy, http://www.seventy.org/tools/ward-leaders-committeepeople/ward-system-101 (last visited Jan. 19, 2018). But here, the alleged conduct of the Six Ward Leaders does not fit within any of the three categories for which private conduct can be considered state conduct. They were not exercising powers that are traditionally the exclusive prerogative of the state. See Borrell, 870 F.3d at 160. And the state of Pennsylvania has not insinuated itself into a position of interdependence with the Ward Leaders. Id. Instead, the alleged actions of the Ward Leaders were private actions of members of the Democratic Party.

45

Thus, unlike in <u>Marks</u>, Plaintiffs Acosta and Lloyd have failed to plausibly allege that the Six Ward Leaders engaged in a conspiracy with a state actor, exposing them to § 1983 liability. In the Second Amended Complaint, Plaintiffs Acosta and Lloyd contend that the Ward Leaders engaged in various acts of voter intimidation and coercion.  (No. 17-1462, Doc. No. 11 ¶¶ 16(b), (d).)  They also allege that the Ward Leaders entered polling locations when they were not permitted to do so.  (<u>Id.</u> ¶¶ 18(e), 19(c).)  But Plaintiffs Acosta and Lloyd fail to plead facts to support their contention that the Ward Leaders engaged in these acts in conspiracy with a state actor to promote Defendant Vazquez's campaign.  And they do not allege that there was a single plan among the Ward Leaders and state actors to commit unconstitutional acts.

At best, Plaintiffs Acosta and Lloyd aver that Democratic workers and Ward Leaders were encouraged and allowed by Election Board Workers to hand out literature and go into polling booths.  (<u>Id.</u> ¶¶ 16(a)-(b).)  This sole allegation falls short of supporting a plausible claim that the Six Ward Leaders were "willful participant[s] in joint action with the State or its agents." <u>Marks</u>, 1994 WL 146113, at *30 (citation omitted).  Rather, like the Democratic Committee, the Ward Leaders were acting on behalf of the Democratic Party.  As a result, Plaintiffs Acosta and Lloyd's rights were not abridged by state action but rather were allegedly abridged by the actions of private individuals.  Because Defendant Ward Leaders were private actors and because Plaintiffs Acosta and Lloyd have failed to plausibly allege that they engaged in a conspiracy with a state actor, the claims against the Six Ward Leaders will be dismissed.

### 3.     Emilio Vazquez, as a Write-In Candidate, Is Not a State Actor

Defendant Vazquez asserts that the claims against him should be dismissed because he was at all times a private citizen.  (No. 17-1462, Doc. No. 36-1 at 13-14.)  He argues that he could only face § 1983 liability if Plaintiffs pled that he participated in joint activity with the state, conspired with the state, or was delegated state powers by them.  (<u>Id.</u>)  Vazquez contends

that Plaintiffs have failed to show with plausible facts that any of these actions occurred.  (Id. at

14.)  The Court agrees that because Plaintiffs have failed to plausibly plead that Vazquez was

participating in joint activity or in a conspiracy with the state, he cannot be held liable under

§ 1983.

In the absence of "action in conjunction with" a state actor, a private party is not acting

under color of state law.  Melo v. Hafer, 912 F.2d 628, 638 (3d Cir. 1990), aff'd, 502 U.S. 21

(1991) (citations omitted); see also Schneller, 2012 WL 3704758, at *3 (holding that defendants,

including opposing Republican candidate, were not state actors because they were not willful

participants in joint action with the state).

In Melo, the Third Circuit held that the alleged joint action of a political candidate and a

private individual was not state action because there was no state actor to "clothe[] the private

party with the 'under color of state law' vestment."  912 F.2d at 639.  Plaintiffs were former

employees of the Pennsylvania Auditor General's Office who filed suit under § 1983 alleging

that defendants conspired to violate their constitutional rights.  Id. at 630.  Defendant Hafer was

the Republican candidate for Auditor General, and defendant West was a registered Republican.

Id. at 631.  To assist Hafer in her campaign, West provided her with a list of names of employees

at the Auditor General's Office who he claimed had "bought their jobs."  Id.  Hafer used this list

throughout her campaign, promising that, if elected, she would fire those employees.  Id.  After

Hafer was elected, she fired certain employees on that list, including plaintiffs, without

conducting any investigation.  Id.  Plaintiffs alleged that Hafer and West conspired to deprive

them of their rights of due process and political association.  Id. at 632.

The Third Circuit held that, even assuming the alleged actions constituted "'concerted' or

'joint' action, sufficient to transmute West, a private actor, into one acting under color of state

law," this would be insufficient "because Hafer was not a state actor at the time of the alleged concerted and conspiratorial conduct." Id. at 638 (citations omitted).  Because neither Hafer, then a political candidate, nor West, a private citizen, were state officials when the alleged conspiracy occurred, "there [was] no state actor to supply even a colorable basis for investing the private actor with a state mantle, even if one of the parties later bec[ame] a state official." Id. at 639.  Accordingly, the Third Circuit affirmed the dismissal of the claims.  Id.

In Schneller, plaintiff failed to show that any of the defendants, including his opposing candidate in a congressional election, was a state actor.  Id.  As earlier noted, in Schneller, plaintiff alleged that his constitutional rights were violated when defendants, including an opposing Republican candidate, defamed him during his campaign.  Id. at *1.  The court held, however, that none of the defendants were acting under color of state law because plaintiff failed to allege that private entities were willful participants "in joint action with the State or its agents."  Id. at *3 (quoting Dennis v. Sparks, 449 U.S. 24 27-28 (1980)).  The court reasoned that plaintiff had not demonstrated "a sufficiently close nexus between the State and the challenged action of" defendants, including opposing Republican candidate.  Id. (quoting Jackson, 419 U.S. at 351).  The court further explained that "the role of advocate for a political candidate and the role of voters to elect an individual is not a traditional public function exclusively reserved for the State."  Id. at *4.  Plaintiff therefore failed to establish state action, and as such, a cognizable cause of action under § 1983.  Id.; see also Gonzales v. Madigan, No. 16 C 7915, 2017 WL 3978703, at *4-6 (N.D. Ill. Sept. 11, 2017) (declining to alter its judgment of dismissal as to two candidates in Democratic primary, explaining that they were not state actors and that plaintiff had not plausibly alleged a conspiracy with state actors).

Here, Plaintiffs have failed to plead a plausible § 1983 claim against Defendant Vazquez because he was not acting under color of state law.   As a political candidate, Defendant Vazquez's alleged conduct was "merely private conduct, no matter how discriminatory or wrongful," and therefore did not fall within the scope of § 1983.  Am. Mfrs. Mut. Ins. Co., 526 U.S. at 49 (quoting Blum, 457 U.S. at 1002).   Plaintiffs also fail to plausibly allege that Defendant Vazquez engaged in joint action or conspired with a state actor.   Plaintiffs Acosta and Lloyd's sole allegation of joint action is that Vazquez was seen inside polling places interacting with Election Board workers and voters when he was not permitted to do so.   (No. 17-1462, Doc. No. 11 ¶ 21.)   Similarly, the Little Plaintiffs' sole contention is that Vazquez sat and talked with the Election Board, even though he was a candidate.   (No. 17-1562, Doc. No. 2 ¶ 27(t).)   Without more, these allegations do not support a plausible claim that Vazquez engaged in joint action or conspired with state actors.   Because Plaintiffs have not met their burden of pleading that Defendant Vazquez acted under color of state law, the claims against him will be dismissed.

In sum, the claims against the Democratic Committee, the Six Ward Leaders, and Vazquez will be dismissed because they were not state actors and therefore cannot be held liable under 42 U.S.C. § 1983.   The remaining Defendants in this case—Speaker Turzai, Secretary Cortés, City Commissioners Anthony Clark, Lisa Deeley, and Al Schmidt ("Individual City Commissioners"), and the City Commissioners' Office and the Board of Elections (collectively, "City Commissioners' Office")—have not argued that they are not state actors.   Accordingly, the Court will now determine whether Plaintiffs have pled plausible constitutional claims against the remaining Defendants.

E.   **Speaker Turzai, Secretary Cortés, and the Individual City Commissioners Had No Personal Involvement in the Alleged Wrongful Conduct, and Plaintiffs Have Not Plausibly Pled a Claim for Failure to Train or Supervise by Cortés and the City Commissioners**

Speaker Turzai, Secretary Cortés, and the Individual City Commissioners allege that the claims against them should be dismissed because they had no personal involvement in the alleged wrongful conduct and cannot be held liable for failure to train or supervise subordinates.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Argueta v. U.S. Immigration & Customs Enf't, 643 F.3d 60, 71 (3d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). Because vicarious liability is inapplicable, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." Id. (quoting Iqbal, 556 U.S. at 676). The government official "must have had some sort of personal involvement in the alleged unconstitutional conduct" to be held liable. Id.

A government official can be held liable for acts of a subordinate in two ways. A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). First, "personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Argueta, 643 F.3d at 72 (quoting Rode v. Dellaciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). Supervisory liability can be established "by showing a supervisor tolerated past or ongoing misbehavior." Id. (quoting Baker v. Monroe Township, 50 F.3d 1186, 1191 n.3 (3d Cir. 1995)). To plead acquiescence, "the supervisor must contemporaneously know of the violation of a plaintiff's rights and fail to take action." Anderson v. City of Philadelphia, Civ. A. No. 16-5717, 2017 WL 550587, at *4 (E.D. Pa. Feb. 10, 2017) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997)). "Allegations of 'actual knowledge and acquiescence . . . must be made with appropriate particularity.'" Id. (omission in original) (quoting Rode, 845 F.2d

50

at 1207). And "[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (citing Baker, 50 F.3d at 1194).

Second, a supervisor can be liable under § 1983 if he "implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices is a cause of this unconstitutional conduct." Argueta, 643 F.3d at 72 (citing Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001)). Claims of failure to train or supervise are "generally considered a subcategory of policy or practice liability." Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014), rev'd on other grounds sub. nom Taylor v. Barkes, 135 S. Ct. 2042 (2015) (per curiam). To be held liable on a claim of failure to supervise:

> The plaintiff must identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

Id. at 317 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)). "[I]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." Brown, 269 F.3d at 216 (quoting Sample, 885 F.2d at 1118). Instead, "the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a 'relationship between the identified deficiency and the ultimate injury.'" Id. (quoting Sample, 885 F.2d at 1118).

1.     **Claims Against Speaker Turzai Will Be Dismissed Because He Had No Personal Involvement in the Alleged Wrongful Conduct**

Defendant Turzai contends that the claims against him in the Acosta action should be dismissed because the Second Amended Complaint does not include any factual misconduct on his part, and therefore Plaintiffs have failed to plausibly plead a claim for relief.  (No. 17-1462, Doc. No. 31-2 at 3-4.)

Plaintiffs Acosta and Lloyd do not allege any factual misconduct at all on the part of Turzai and therefore have failed to state a plausible claim against him.  As noted, because state actors cannot be held liable under a theory of respondeat superior, the state actor must have had personal involvement in the alleged misconduct.  Argueta, 643 F.3d at 71 (citing Iqbal, 556 U.S. at 676).  Allegations of personal involvement can be shown through actual knowledge and acquiescence, pled with particularity.  Anderson, 2017 WL 550587, at *4 (citation omitted). A supervisor also can be held liable if he "implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employee corrective practices is a cause of this unconstitutional conduct."  Argueta, 643 F.3d at 72 (citing Brown, 269 F.3d at 216).

Plaintiffs have failed to plausibly plead that Turzai had actual knowledge of and acquiesced in the conduct that occurred.  Argueta, 643 F.3d at 72 (quoting Rode, 845 F.2d at 1207).  And they have failed to plead that he implemented a policy or practice that created an unreasonable risk of a constitutional violation.  Id. (citing Brown, 269 F.3d at 216).  In fact, they allege no facts at all about Turzai.  Because Plaintiffs Acosta and Lloyd have not pled any factual misconduct on the part of Turzai other than his formal elected position and his mere request that the special election be held, they have failed to allege the requisite personal involvement, and for this reason, the Second Amended Complaint fails to state a claim against him.  See Smith v. City

of Philadelphia, Civ. A. No. 15-931, 2017 WL 277570, at *6 (E.D. Pa. Jan 19, 2017) (dismissing claims against defendants where complaint failed to include any facts showing personal involvement).  Consequently, the claims against Defendant Turzai will be dismissed.

### 2. Claims Against Secretary Cortés Will Be Dismissed Because He Had No Personal Involvement in the Alleged Wrongful Conduct and Because Plaintiffs Have Not Plausibly Pled a Claim for Failure to Train or Supervise

Defendant Cortés argues that the claims against him in his individual and official capacities fail because a supervisor's failure to train or supervise subordinates must amount to "deliberate indifference," and a supervisor cannot be held liable under a theory of respondeat superior.  (No. 17-1462, Doc. No. 32 at 15-16.)  He argues that election officials have a robust training program and that he has made all reasonable efforts to ensure proper conduct at the polls.  (Id. at 16.)  To hold him liable, Cortés argues that Plaintiffs were required to identify a policy or custom that caused the alleged conduct and that they have failed to do so.  (Id.)

Plaintiffs have not pled facts showing that Cortés was personally involved in the alleged wrongful conduct at the special election or that he can be held liable in a supervisory capacity. In the Complaints, Plaintiffs allege that Cortés had responsibility for overseeing elections and failed to ensure that the special election was run in accordance with the Pennsylvania Election Code and the Constitution.  (Id., Doc. No. 11 ¶ 11, No. 17-1562; Doc. No. 2 at ¶ 10.)  And they allege that Cortés failed to properly supervise the election. (No. 17-1462, Doc. No. 11 ¶ 17; No. 17-1562, Doc. No. 2 at ¶ 24(g).)  But the allegation that Cortés failed to oversee or supervise the election is a legal conclusion, which is not entitled to the assumption of truth.  See Argueta, 643 F.3d at 74 (stating that the court must identify "those allegations that, because they are no more than conclusions, are not entitled to any assumption of truth").  Beyond this legal conclusion, the

Complaints contain no factual allegations describing any conduct at all on the part of Cortés to support a claim that he was personally involved in the alleged wrongdoing.

Plaintiffs also fail to state a claim against Cortés for supervisory liability. First, the Complaints fail to include sufficient facts showing that Cortés either directed, or knew of and acquiesced in, the conduct that took place. Argueta, 643 F.3d at 72 (quoting Rode, 845 F.2d at 1207). And Plaintiffs have not shown that Cortés "tolerated past or ongoing misbehavior." Id. (quoting Baker, 50 F.3d at 1191 n.3). The Complaint alleges no facts describing what Cortés knew, acquiesced in, or tolerated.

Second, Plaintiffs have failed to point to a policy or practice that Cortés implemented that created a risk of constitutional violations. Id. (citing Brown, 269 F.3d at 216). They also have failed to plausibly allege that any policy or procedures in effect at the time of the special election created an unreasonable risk of constitutional violations. Barkes, 766 F.3d at 316 (citing Sample, 885 F.2d at 1118). And they have not plausibly alleged that the conduct was caused by a failure on the part of Cortés to implement a specific supervisory practice or procedure. Id. (citing Sample, 885 F.2d at 1118). Because Plaintiffs have pled no factual conduct at all on the part of Cortés and because he cannot be held liable for alleged actions of others on a theory of respondeat superior, Plaintiffs' claims against Cortés will be dismissed.

      **3.**      **Claims Against the Individual City Commissioners Will Be Dismissed Because They Had No Personal Involvement in the Alleged Wrongful Conduct and Because Plaintiffs Have Not Plausibly Pled a Claim for Failure to Train or Supervise**

The Individual City Commissioners argue that the claims against them should be dismissed because they were charged only with ministerial duties and cannot be held liable based on a theory of respondeat superior. (No. 17-1462, Doc. No. 33 at 7-9.)

54

Because Plaintiffs have not alleged that the Individual City Commissioners had any personal involvement in the alleged wrongful conduct during the special election, Plaintiffs fail to state any viable claims against them.[27]   Plaintiffs have failed to plead that the Individual City Commissioners either personally directed or had personal knowledge of and acquiesced in the alleged conduct.   Argueta, 643 F.3d at 72 (quoting Rode, 845 F.2d at 1207).   Plaintiffs also have failed to show that the Individual City Commissioners tolerated past or ongoing behavior.   Id. (quoting Baker, 50 F.3d at 1191 n.3).   And they have not pointed to a policy or practice that the Individual City Commissioners implemented that created a risk of a constitutional violation.   In fact, the Complaints are devoid of any allegations of specific conduct on the part of the

---

[27]   The Individual City Commissioners assert that the official capacity claims against them should be dismissed because they are equivalent to claims against the City of Philadelphia. (No. 17-1462, Doc. No. 33 at 6-7.)   Suits against state actors in their official capacity, in contrast to personal capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent."   Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).   Provided that "the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."   Id. at 166.   "It is not a suit against the official personally, for the real party in interest is the entity."   Id. (emphasis omitted); accord Hill v. Borough of Kutztown, 455 F.3d 225, 233 n.9 (3d Cir. 2006) (stating that official capacity claim against mayor was identical to claim against the borough, which was also a defendant).

Courts in the Third Circuit routinely dismiss claims brought against a state actor in his or her official capacity where a claim has also been brought against the municipal entity that employs them.   See, e.g., Fitzgerald v. Martin, Civ. A. No. 16-3377, 2017 WL 3310676, at *6 (E.D. Pa. Aug. 3, 2017) (dismissing claim against district attorney's office employees in their official capacity as duplicative of claims against the county); Strickland v. Mahoning Township, 647 F. Supp. 2d 422, 428 (M.D. Pa. 2009) (dismissing claims against defendants in their official capacity because claims were duplicative of claims against the municipality itself).

In the instant case, claims against the Individual City Commissioners in their official capacity are claims against the City Commissioners' Office, of which Individual City Commissioners are agents.   The City Commissioners' Office is a Defendant in this case and has received notice and an opportunity to respond.   Because the official capacity claims against the Individual City Commissioners are duplicative of the claims against the City Commissioners' Office, they will be dismissed for this additional reason.

Individual City Commissioners during the special election.  Id. (citing Brown, 269 F.3d at 216).

The Individual City Commissioners, at best, would be described as supervisors, and because

respondeat superior liability is not actionable under § 1983, the claims against them fail.

The Little Plaintiffs assert, however, that "the City Commissioners were well aware of

past misconduct in elections as highlighted by" Marks v. Stinson, 19 F.2d 873 (3d Cir. 1994).

(No. 17-1562, Doc. No. 23 at 7.)  Problems in Philadelphia elections have existed for years, the

Little Plaintiffs allege. (Id.)  Therefore, they contend that it was outrageous that the wrongful

conduct in the instant case was allowed to occur despite having Marks as an example.

Despite these general claims, Plaintiffs fail to plead with appropriate particularity that

Individual City Commissioners had actual knowledge of the conduct that occurred that day.

Anderson, 2017 WL 550587, at *4 (citing Rode, 845 F.2d at 1207).  Even if the Individual City

Commissioners were aware of Marks, knowledge of this one case would be insufficient to

support a claim of knowledge and acquiescence.  Instead, "to state a claim under § 1983 for

failure to supervise, a complaint must allege that the supervisor had 'contemporaneous

knowledge of the offending incident or knowledge of a prior pattern of similar incidents.'"

Doneker v. County of Berks, Civ. A. No. 13-1534, 2014 WL 2586968, at *7 (E.D. Pa. June 10,

2014) (quoting C.H. ex rel. Z.H. v. Olivia, 226 F.3d 198, 202 (3d Cir. 2000)).  The knowledge

required is actual knowledge of the conduct alleged in the instant case rather than constructive

knowledge.  Chavarriaga, 806 F.3d at 222 ("Although a court can infer that a defendant had

contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case,

the knowledge must be actual, not constructive." (citing Baker, 50 F.3d at 1194)).  Because

Plaintiffs have failed to plead personal involvement on the part of the Individual City

Commissioners, shown through actual knowledge and acquiescence, the claims against them will be dismissed.

> ### F.    Claims Against the City Commissioners' Office Will Be Dismissed Because Plaintiffs Have Not Plausibly Pled a Policy or Custom of Failure to Train or Supervise

The City Commissioners' Office, as a sub-unit of the City of Philadelphia, argues that the claims against it should be dismissed because it cannot be held liable under § 1983 based on a theory of failure to supervise.[28]   (No. 17-1462, Doc. No. 33 at 10-12.)   It alleges that the conclusory allegation of a failure to supervise is not actionable under Monell v. Department of Social Services, 436 U.S. 658 (1978).  (Id. at 11.)

In Monell, the Supreme Court held that municipal entities are subject to § 1983 liability in limited circumstances.  436 U.S. at 690.  A plaintiff may bring a suit against a local governing body "under § 1983 for monetary, declaratory, or injunctive relief where . . . that action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Id.  Local governments also may "be sued for constitutional deprivations visited pursuant to governmental 'custom' even

---

[28]   The City Commissioners' Office and the Philadelphia County Board of Elections also argue that they are not legal entities separate from the City of Philadelphia, and therefore the claims against them are claims against the City of Philadelphia.  (No. 17-1462, Doc. No. 33 at 10.)

The Court agrees that "a suit against a municipal agency should name the municipality itself."  Sorells v. Phila. Police Dep't, 652 F. App'x 81, 83 (3d Cir. 2016) (citing Bonenberger v. Plymouth Township, 132 F.3d 20, 25 n.4 (3d Cir. 1997)).  In cases where the municipality has not been named as a defendant, however, courts have construed § 1983 claims against municipal agencies as claims against the municipality itself.  See, e.g., id. at 83 (construing complaint against city agencies as against the City of Philadelphia, but finding that complaint failed on the merits); Lawrence v. Netzlof, Civ. A. No. 10-43, 2012 WL 4498834, at *3 n.10 (W.D. Pa. Sept. 28, 2012) (construing claim against police department as a claim against the city for purposes of summary judgment).  Here, Plaintiffs have not named the City of Philadelphia as a Defendant.  For purposes of the Motions to Dismiss, however, the Court will construe the claims against the City Commissioners' Office and the Board of Elections as claims against the City of Philadelphia.

though such a custom has not received formal approval" through official decision-making channels.  Id. at 690-91.

The municipality's policy or custom must have caused the constitutional tort.  Id. at 691. "[A] municipality cannot be held liable solely because it employs a tortfeasor" and thus "cannot be held liable under § 1983 on a respondeat superior theory."  Id. (emphasis in original).  Instead, it may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Id. at 694.  That is, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton v. Harris, 489 U.S. 378, 385 (1989).

In limited circumstances, § 1983 liability can be premised on "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights." Connick v. Thompson, 563 U.S. 51, 61 (2011).  This failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Id. (quoting City of Canton, 489 U.S. at 388).  Only then can a failure to train be considered a "policy or custom" actionable under § 1983.  Id.  (alteration in original) (citing City of Canton, 489 U.S. at 389).

Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action."  Id. (quoting Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 410 (1997)).  Accordingly, when "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  Id. (citing Brown, 520 U.S. at 407).  Therefore, a city's "policy

of inaction" when it has notice that the program will cause constitutional violations is functionally equivalent to the city deciding to violate the constitution.  Id. at 61-62.  And "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  Id. at 62 (quoting Brown, 520 U.S. at 409).  The Third Circuit has held that the "substantive elements" of a municipal failure-to-train theory are (1) a custom or policy of inadequate training, (2) deliberate indifference to the deficiency, and (3) a causal nexus between the indifference and the constitutional deprivation.  Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996).

Here, Plaintiffs have failed to plausibly plead a municipal liability claim for failure to train.  Plaintiffs allege that the City Commissioners' Office "failed to ensure that the election was being held fairly and in compliance with the Pennsylvania Election Code" and "either directly allowed or failed to properly supervise the election."  (No. 17-1462, Doc. No. 11 ¶ 24(h); No. 17-1562, Doc. No. 2 ¶ 17.)  Plaintiffs allege that as a result, their First and Fourteenth Amendment rights were violated.  (Id.)

Construing these claims as against the City of Philadelphia, Plaintiffs have failed to plausibly plead a claim of municipal liability.  Plaintiffs have not alleged facts that could support an inference that the City of Philadelphia failed to train or supervise election workers about their duty to avoid violating citizens' rights.  Plaintiffs plead the conclusory allegation that the City of Philadelphia failed to supervise the election but support this allegation with no factual conduct on the part of the City.  They fail to point to a specific supervisory practice that the City failed to employ.  MGJ v. Sch. Dist. of Phila., Civ. A. No. 17-318, 2017 WL 2277276, at *9 (E.D. Pa. May 25, 2017) (dismissing failure to train or supervise claim where plaintiff failed to point to a specific supervisory practice defendant failed to provide).  Plaintiffs' conclusory allegations are

simply insufficient to state a claim for § 1983 liability under Monell.  See Ostrowski v. D'Andrea, Civ. A. No. 14-00429, 2017 WL 4020435, at *9 (M.D. Pa. Aug. 10, 2017) (granting motion to dismiss and stating that congressional candidate failed to state a Monell claim against city where complaint contained conclusory allegation that police officer's actions in confiscating nomination petitions from campaign volunteer were taken pursuant to a policy or custom).

Plaintiffs also have failed to plausibly plead that any alleged failure to supervise on the part of the City of Philadelphia amounted to deliberate indifference.  In the Complaints, Plaintiffs do not allege facts showing that a municipal actor "disregarded a known or obvious consequence of its actions."  Connick, 563 U.S. at 61 (quoting Brown, 520 U.S. at 410).  Plaintiffs also fail to allege that the City of Philadelphia was on actual or constructive notice that a particular omission in their training caused violations of constitutional rights.  Id. (citing Brown, 520 U.S. at 407).

In its Response in Opposition, the Little Plaintiffs contend that City Commissioners were put on notice of past misconduct through the Third Circuit's ruling in Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994).  A single court ruling, however, handed down over 23 years ago, does not establish a "pattern of similar constitutional violations by untrained employees."  Connick, 563 U.S. at 62 (quoting Brown, 520 U.S. at 409); see also Wood v. Williams, 568 F. App'x 100, 105-106 (3d Cir. 2014) ("[P]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional [government] policy, which policy can be attributed to a . . . policymaker." (second alteration and omission in original) (quoting City of Okla. City v. Tuttle, 471 U.S. 808, 823-24 (1985))); Hunter v. Hamilton Cty. Bd. of Elections, 850 F. Supp. 2d 795, 845-46 (S.D. Ohio 2012) (finding that claim of failure to supervise poll workers failed because Board of Elections did not act with deliberate indifference where plaintiffs' proffered evidence

did not support a history of due process violations or that due process violations were likely to result absent better training).

Finally, Plaintiffs have failed to plead facts showing a causal nexus between the City's alleged failure to supervise and the alleged actions of the election board workers and government actors at the polls during the election.  Plaintiffs merely allege, without factual support, that all conduct occurred because the City Commissioners' Office failed to supervise the election.  (No. 17-1462, Doc. No. 11 ¶¶ 17, 23; No. 17-1562, Doc. No. 2 ¶¶ 24(g), 31.)  This sole conclusory allegation is insufficient.  See Wood, 569 F. App'x at 104 (dismissing Monell claim where Complaint made conclusory and general claims of failure to train and supervise).  Because Plaintiffs' allegations are not supported by facts that could raise the inference of a policy or custom of failure to train or supervise, the claims against the City Commissioners' Office will be dismissed.

### G.     Plaintiffs' Claims for Violations of Their First and Fourteenth Amendment Rights

Defendants contend that the allegations in the Complaints do not rise to the level of a constitutional violation but are "garden variety" infractions for which this Court should decline to intervene.  In response, Plaintiffs contend that similar to Court action taken in Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994), the Court should intervene and find that their constitutional rights were violated by the fraud that occurred during the special election.  (No. 17-1462, Doc. No. 44; No. 17-1562, Doc. Nos. 23 at 8-9, 25 at 7-9, 26 at 6-7.)

The Court has already held that based on the allegations in the Complaints, Defendants named in this action cannot be held liable for the alleged conduct that occurred at the special election and that the Complaints will be dismissed.  The Court will briefly discuss, however, the

merits of Plaintiffs' constitutional claims and the law applicable to them because leave is being granted to file amended Complaints.  In Reynolds v. Sims, the Supreme Court stated:

> Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections.  A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear.  It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, Ex parte Yarbrough, 110 U.S. 651, 4 S. Ct. 152, 28 L.Ed. 274, and to have their votes counted, United States v. Mosley, 238 U.S. 383, 35 S. Ct. 904, 59 L.Ed. 1355.

377 U.S. 533, 554 (1964).  In Marks v. Stinson, the Third Circuit explained: "These voting rights are potentially violated, however, whenever an individual is sworn in as an elected representative without a demonstration that he or she was the choice of a plurality of the electorate."  19 F.3d at 887.

But circuit courts have held that "garden variety election irregularities" are not actionable under § 1983.  E.g., Shannon v. Jacobowitz, 394 F.3d 90, 96 (2d Cir. 2005) (quoting Bennett v. Yoshina, 140 F.3d 1218, 1226 (9th Cir. 1998)); Curry v. Baker, 802 F.2d 1302, 1315 (11th Cir. 1986); Bodine v. Elkhart Cty. Election Bd., 788 F.2d 1270, 1272 (7th Cir. 1986) (citing Griffin v. Burns, 570 F.2d 1065, 1076 (1st Cir. 1978)).  In Shannon, the Second Circuit noted:

> Examples of such "garden variety" irregularities as identified by the federal courts include: malfunctioning of voting machines, Hennings, 523 F.2d at 864; human error resulting in miscounting of votes and delay in arrival of voting machines, Gold, 101 F.3d at 801-02; allegedly inadequate state response to illegal cross-over voting, Curry, 802 F.2d at 1316; mechanical and human error in counting votes, Bodine v. Elkhart County Election Bd., 788 F.2d 1270, 1272 (7th Cir. 1986); technical deficiencies in printing ballots, Hendon v. North Carolina State Bd. of Elections, 710 F.2d 177, 182 (4th Cir. 1983); mistakenly allowing non-party members to vote in a congressional primary, Powell, 436 F.2d at 85–86; and arbitrary rejection of ten ballots, Johnson v. Hood, 430 F.2d 610, 612–13 (5th Cir. 1970).

392 F.3d at 96.

Instead, circuit courts have held that § 1983 is implicated when willful conduct "undermines the organic process by which candidates are elected," Hennings v. Grafton, 523

F.2d 861, 864 (7th Cir. 1975), or where the government or its officials engage in intentional actions, Shannon, 394 F.3d at 96 (citing Smith v. Cherry, 489 F.2d 1098, 1102-03 (7th Cir. 1973)); accord, e.g., Minn. Voters All. v. Ritchie 720 F.3d 1029, 1032-33 (8th Cir. 2013) ("[Voters] alleged no discriminatory or other intentional, unlawful misconduct by Officials sufficient to implicate § 1983."); Gold v. Feinberg, 101 F.3d 796, 800-01 (2d Cir. 1996) (reversing grant of preliminary injunction, finding that there were no "substantiated allegations of any wrongful intent on the part of state officials"); Bodine, 788 F.2d at 1271-72 ("Significantly missing from the argument is any allegation that the computer control cards were somehow manipulated by the defendants to undermine the election."); Gamza v. Aguirre, 619 F.2d 449, 452-53 (5th Cir. 1980) ("In the absence of evidence that the alleged maladministration of the local election procedures was attended by the intention to discriminate against the affected voters . . . we cannot conclude that the error constituted a denial of equal protection of the laws."); Powell v. Power, 436 F.2d 84, 88 (2d Cir. 1970) ("Uneven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.").

Relief can be granted under § 1983 where "the election process itself reaches the point of patent and fundamental unfairness." Griffin, 570 F.2d at 1077; accord Marks, 19 F.3d at 888 (quoting Griffin, 570 F.2d at 1077); Curry, 802 F.2d at 1315 ("[C]ourts have followed the general rule that if the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order." (citation omitted)).

In Powell v. Power, six voters brought suit under § 1983 for state election officials' conduct in allowing unqualified individuals to vote in a Democratic primary. 436 F.3d 84, 85 (2d

Cir. 1970).  There, state officials neglected to remove non-Democratic registration cards from the polls, and voters alleged that their federal rights were violated by the inadvertent tallying of ballots cast by unauthorized voters.  Id. at 86.  The Second Circuit held that the due process clause did not "guarantee against errors in the administration of the election."  Id. at 88.  The court explained that although the due process clause "may outlaw purposeful tampering by state officials," it did not require "that elections be free of error."  Id.  The court therefore affirmed the district court's denial of voters' motion for a preliminary injunction.  Id.

Similarly, in Hennings v. Grafton, six voters filed suit under § 1983 against government officials in their individual and official capacities for inaccurate tabulation of votes "all stemming directly or indirectly from the malfunctioning of electronic voting devices" during a general election.  523 F.2d 861, 863 (7th Cir. 1975).  Voters alleged that mechanical difficulties with voting machines occurred, votes were not recorded properly, and election officials failed to provide substitute paper ballots.  Id.  Affirming the judgment of the district court after trial, the Seventh Circuit held that the actions of election officials failed to rise to the level of a constitutional violation.  Id. at 864.  The court stated that the record showed "at most irregularities caused by mechanical or human errors and lacking in invidious or fraudulent intent."  Id.  As the Seventh Circuit noted:

> Except for the overall supervision of the county clerk, or his counterpart, and appointed subordinates, the work of conducting elections in our society is typically carried on by volunteers and recruits for whom it is at most an avocation and whose experience and intelligence vary widely.  Given these conditions, errors and irregularities, including the kind of conduct proved here, are inevitable, and no constitutional guarantee exists to remedy them.

Id. at 865.  The court therefore affirmed the district court's finding that voters failed to state a claim under § 1983.  Id.; see also Shannon, 394 F.3d at 97 (reversing district court's grant of

summary judgment for plaintiffs where voting machines malfunctioned but there was no intentional discrimination or deprivation of the right to vote).

By contrast, in <u>Griffin v. Burns</u>, a class of absentee and shut-in voters brought suit under § 1983 alleging that their constitutional rights were violated when the state invalidated their ballots after a primary election.   570 F.2d 1065, 1068 (1st Cir. 1978).   When the primary occurred, state law did not specify whether absentee and shut-in voting was permitted for primary elections.   <u>Id.</u> at 1067.   Nonetheless, state officials advertised and issued such ballots for the primary.   <u>Id.</u>   As a result, almost ten percent of the votes cast in the primary were cast by absentee and shut-in voters.   <u>Id.</u>   Based only on machine votes, McCormick was the primary winner, but based on machine, absentee, and shut-in votes, Griffin was the winner.   <u>Id.</u>

McCormick questioned the authority of the Secretary of State under state law to count the absentee and shut-in ballots, filing a petition with the state supreme court to challenge the vote count.   <u>Id.</u> at 1067-68.   The state supreme court held that there was "no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election."   <u>Id.</u> at 1068.   The court then ordered that such ballots be invalidated, and certification of Griffin as the winning candidate was revoked.   <u>Id.</u>   Plaintiffs alleged that the state could not, constitutionally, invalidate absentee and shut-in ballots that state officials had offered to voters, where the effect was to induce voters to vote by that means rather than in person.   <u>Id.</u> at 1074.

Affirming the district court's grant of a permanent injunction and ordering of a new primary election, the First Circuit explained that this was one of the "exceptional cases" in which due process violations were implicated.   <u>Id.</u> at 1078-79.   The court stated that "[i]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated."   <u>Id.</u> at 1077.   Federal relief is warranted, the court explained,

"where broad-gauged unfairness permeates an election, even if derived from apparently neutral action." Id. Relief is warranted where "an officially-sponsored election procedure . . . in its basic aspect, [is] flawed." Id. at 1078. On this basis, the First Circuit affirmed. Id. at 1079.

In Marks v. Stinson, plaintiffs brought suit under § 1983 alleging that officials responsible for conducting a state senatorial election had conspired with Stinson, the winning candidate, to cause numerous illegally-obtained absentee ballots to be cast. 19 F.3d 873, 875-76 (3d Cir. 1994). Stinson campaign workers went into a division of the district with a high number of white voters to solicit registration and absentee ballot applications. Id. at 877. Many improper absentee ballots were solicited and then submitted to two City Commissioners. Id. Three weeks before the election, Stinson campaign workers saturated Hispanic and African-American areas of the district with absentee ballots using similar improper tactics. Id. Campaign workers were paid $1 for each application or ballot that they obtained. Id.

The ballot applications then were submitted to two City Commissioners, who provided the absentee ballots to the campaign. Id. Absentee ballots from unregistered voters that were rejected by the Board of Elections were returned to the City Commissioners, who returned them to the Stinson campaign. Id. The City Commissioners and the Board of Elections were aware of the absentee ballot campaign and assisted in it by delivering absentee ballots to the Stinson campaign rather than mailing them to the voters directly. Id. at 877-78. This assistance was designed to aid the Stinson campaign, while no assistance was given to the Marks campaign. Id. at 878.

Relying on Griffin, the Third Circuit in Marks affirmed the portion of the district court's opinion granting a preliminary injunction. Id. at 888-90. Quoting extensively from Griffin, the Court concluded that the alleged conduct warranted the district court's grant of a preliminary

injunction but not the certification of Marks as the winner.  Id. at 889-90.  The Court highlighted the importance of the right of voters to vote and to have their votes counted, and that the deprivation of the ability to cast a vote implicates federal due process concerns.  Id. at 889.  The Court then remanded the case explaining that "[i]f the district court finds a constitutional violation, it will have the authority to order a special election."  Id.

Here, Plaintiffs allege that willful conduct undermined the election process.  Among other examples, Plaintiffs allege that Election Board workers told voters to vote for Vazquez, and allowed and encouraged Democratic workers and Vazquez supporters to hand out literature and enter voting booths to help voters vote for Vazquez.  (No. 17-1462, Doc. No. 11 ¶ 16(a), (b); No. 17-1562, Doc. No. 2 ¶ 24(a), (b).)  Plaintiffs also allege that Election Board workers threatened or intimidated voters if it appeared that the voter was going to vote for a candidate other than Vazquez.  (No. 17-1462, Doc. No. 11 ¶ 16(d); No. 17-1562, Doc. No. 2 ¶ 24(d).)

If the actions alleged in the Complaints could have been attributed to the state actors and entities named in the Complaints, then Plaintiffs may have stated a plausible claim for relief.  The conduct alleged rises to the level of willful conduct that "undermine[d] the organic process by which candidates [were] elected."  Hennings, 523 F.2d at 864.  In Griffin, for example, the state had disseminated absentee ballots and then subsequently invalidated those absentee votes.  570 F.2d at 1068, 1074.  But here, Plaintiffs have alleged no affirmative action at all on the part of state actor Defendants.  Moreover, the allegations do not even rise to the level of negligent supervision.  See Gold v. Feinberg, 101 F.3d 796, 800 (2d Cir. 1996) ("[M]ore than negligent conduct by the state actor is needed in order for a cognizable § 1983 claim to exist based on violations of the due process clause." (quoting Daniels v. Williams, 474 U.S. 327, 328 (1986))).

Finally, in <u>Marks</u>, plaintiffs alleged that City Commissioners and election officials conspired with campaign workers to tip the election in favor of one candidate. 19 F.3d at 875-76, 878. Here, Plaintiffs have not alleged that the Individual City Commissioners or any other state actor Defendant conspired with Vazquez's campaign or engaged in similar intentional and affirmative conduct. For all the reasons noted, Plaintiffs have failed to state a claim against Defendants for violations of their constitutional rights.

At the motion to dismiss stage of this case, the Court does not make a final determination of whether wrongful or fraudulent conduct occurred at the special election that violated Plaintiffs' First and Fourteenth Amendment rights. Instead, it has to decide whether Plaintiffs plausibly have pled that the alleged wrongful conduct was attributable to the state actor Defendants or that the private party Defendants engaged in action that could transform their conduct into state action that became wrongful or fraudulent during the special election. Because they did not, the Complaints will be dismissed in their entirety.[29]

### H. Plaintiffs Acosta and Lloyd Have Not Plausibly Pled a Violation of the Voting Rights Act

In their Second Amended Complaint, Plaintiffs Acosta and Lloyd allege that "[j]urisdiction for this action is also based on violations to The Federal Voting Rights Act."[30] (No. 17-1462, Doc. No. 11 ¶ 8.) Beyond this sole reference, however, Plaintiffs Acosta and Lloyd make no further mention of the Voting Rights Act of 1965 nor do they include it in Counts I or II of the Second Amended Complaint. Defendants move to dismiss the Voting Rights Act

---

[29] Defendants Cortés and the Pennsylvania Department of State also argue that Plaintiffs have failed to meet their burden to obtain injunctive relief. (No. 17-1462, Doc. No. 32 at 19-25.) Because the Court has already determined that the Complaints will be dismissed for failure to state a claim, Defendants' Motion on this ground will be denied as moot.

[30] Liberally construing the Second Amended Complaint, the Court assumes that Plaintiffs Acosta and Lloyd are referring to the Voting Rights Act of 1965, 52 U.S.C. §§ 10301 <u>et seq.</u>

claim against them, arguing that Plaintiffs have failed to allege facts to support this allegation.[31] The Court agrees and for reasons that follow will dismiss the Voting Rights Act claim.

The Voting Rights Act was passed "to end discriminatory treatment of minorities who seek to exercise one of the most fundamental rights of our citizens: the right to vote." Bartlett v. Strickland, 556 U.S. 1, 10 (2009). Although Plaintiffs Acosta and Lloyd do not cite a specific section of the Voting Rights Act that was violated in their Second Amended Complaint, the Court will construe their claims liberally. Section 2 of the Voting Rights Act provides in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

52 U.S.C. § 10301(a).

Here, Plaintiffs Acosta and Lloyd have not alleged that they or other individuals were denied the right to vote on the basis of race or color. In fact, they have not pled any facts at all to support their lone reference to the Voting Rights Act. See Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quoting Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010))).

Consequently, the Court will dismiss Plaintiffs Acosta and Lloyd's Voting Rights Act claim. See Jones v. City of Phila. Voter Registration, 498 F. App'x 143, 144 n.1 (3d Cir. 2012) (holding that because plaintiff did not allege that he was denied the right to vote on the basis of race, the Court would analyze his claims as brought under 42 U.S.C. § 1983 rather than under the Voting Rights Act); Robinson v. Canterbury Vill., Inc., 848 F.2d 424, 431 n.10 (3d Cir. 1988)

---

[31] Vazquez, the Democratic Committee, Cortés, and the Pennsylvania Department of State move to dismiss this claim, and the Ward Leaders join in the Motions of Vazquez and the Democratic Committee. (No. 17-1652, Doc. No. 32 at 19, Doc. No. 37-1 at 16, Doc. No. 38-1 at 15, Doc. No. 41-2 at 4.)

(affirming dismissal and finding claim under Voting Rights Act "devoid of merit" because that statute "deals with interference on racial grounds with a person's right to vote, and we find no evidence of interference with voting rights, much less for racial reasons, on this record").

### I.   Election Board Workers and Election Officers Are Not Necessary or Indispensable Parties

Defendants Cortés and the Pennsylvania Department of State argue that election board workers and district election officers must be joined in this action as Defendants under Federal Rule of Civil Procedure 19(a).  (No. 17-1462, Doc. No. 32 at 25-26.)  In their Motion, however, Defendants fail to specify which individuals they contend should be included in the category of election board workers or which election officers they argue should be joined in this action.

Federal Rule of Civil Procedure 19 identifies circumstances under which the joinder of a particular party is compulsory.  Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007).  Rule 19 provides in part:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2) Joinder by Court Order. If a person has not been joined as required, the court must order that the person be made a party.  A person who refuses to

> join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.
>
> (3) Venue. If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.
>
> (b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. . . .

Fed. R. Civ. P. 19(a)-(b).

A Rule 19 analysis is twofold. Gen. Refractories Co., 500 F.3d at 312. Initially, a court must determine whether an absent party is "necessary" under Rule 19(a). Id. If the absent party is necessary, but joinder is not feasible, then the court must determine whether the absent party is "indispensable" under Rule 19(b). Id. If the absent party is not necessary under Rule 19(a), then the court need not decide whether it is indispensable under Rule 19(b). Id.

First, Defendants Cortés and the Pennsylvania Department of State argue that the Court would not be able to "accord complete relief" among the parties under Rule 19(a)(1)(A) if the members of the district election board were not joined in this action. (No. 17-1462, Doc. No. 32 at 25.) They argue that "the court would be limited in its ability to grant [an order compelling a new election] absent some ability to direct the performance of the district election boards." (Id. at 25-26.)

Under Rule 19(a)(1)(A), however, the court must limit its inquiry to whether it "can grant complete relief to persons already named as parties to the action; what effect a decision may have on absent parties is immaterial." Gen. Refractories Co., 500 F.3d at 313 (emphasis omitted) (citing Angst v. Royal Maccabees Life Ins. Co., 77 F.3d 701, 705 (3d Cir. 1996)). In § 1983 actions, courts have held that the potential that a party will be affected by the outcome of the litigation does not make the party necessary under Rule 19(a)(1)(A). See, e.g., N.J. Prot. &

71

<u>Advocacy, Inc. v. N.J. Dep't of Educ.</u>, 563 F. Supp. 2d 474, 492 (D.N.J. 2008) (concluding that school district defendants were not necessary parties under Rule 19(a) where plaintiffs requested that the court require New Jersey to comply with certain policies); <u>Oh v. Phila. Cty. Bd. of Elections</u>, Civ. A. No. 08-0081, 2008 WL 2779006, at *2 (E.D. Pa. Jul. 16, 2008) (finding that candidate in election was not necessary party under Rule 19(a)(1)(A) where plaintiff's attempt to remove him from office was "merely a potential effect" of the litigation).

Here, members of the district election boards are not necessary parties to this action. Assuming that facts can be pled sufficiently to withstand Rule 12(b)(6) motions, complete relief among the parties already named could be granted.  The effect of a new special election on members of the election board would not make them necessary parties.  The fact that members of election boards may be directed by parties to this action to perform a new election is merely a potential effect of the litigation.  For this reason, members of the district election boards need not be joined under Rule 19(a)(1)(A).

Second, Defendants argue that an adverse decision would "impair or impede" district election officers' "abilities to protect their entitlements to exercise the rights and privileges of their office" under Rule 19(a)(1)(B) if the members of the district election board were not joined in this action.  (No. 17-1462, Doc. No. 32 at 26.)

Under Rule 19(a)(1)(B), "the court must decide whether determination of the rights of those persons named as parties to the action would impair or impede an absent party's ability to protect its interest in the subject matter of the litigation."  <u>Gen. Refractories Co.</u>, 500 F.3d at 316 (citation omitted).   In § 1983 actions involving elections, courts have found that absent government and elected officials do not have a legally protected interest in the outcome of the litigation.  <u>See, e.g.</u>, <u>Oh</u>, 2008 WL 2779006, at *3 (stating that under Pennsylvania law, an

72

elected official does not have a statutory right to serve out their elected term and therefore has no legally protected interest in the action under Rule 19(a)(1)(B)); New All. Party v. N.Y. State Bd. of Elections, No. 90 Civ. 6226, 1990 WL 155590, *3 (S.D.N.Y. Oct. 9, 1990) ("The only interest the county boards of elections have in this action is that they may be asked to print new ballots. As long as the Board of Elections has the authority to order them to print new ballots, complete relief can be granted in this case without their being joined."); Griffin v. Burns, 431 F. Supp. 1361, 1364-65 (D.R.I. 1977) (declining to join Board of Elections under Rule 19(a), and explaining that its function during the voting process does not cause it to have an interest in the outcome).

Accordingly, district election officers do not have an interest in this litigation that would be impaired by an adverse decision. Their participation in a new special election will not impair any of their legally protected interests. In short, they are not necessary parties under Rule 19(a)(1)(B). Because election board workers and district election officials are not necessary parties under Rule 19(a), this Court need not make findings under Rule 19(b). Accordingly, they will not be joined in the action.

### J.        Pennsylvania Election Code Claims Will Be Dismissed Without Prejudice

To the extent that Plaintiffs have pled claims for violations of the Pennsylvania Election Code, the Court will decline to exercise supplemental jurisdiction over those claims because the Court has dismissed the underlying federal constitutional claims.

Supplemental jurisdiction over state law claims in federal court is governed by 28 U.S.C. § 1367. Section 1367 provides in relevant part that,

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

§ 1367.  In <u>Kach v. Hose</u>, 589 F.3d 626, 650 (3d Cir. 2009), the Third Circuit explained:

> The statute also permits a district court to decline the exercise of supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3); <u>see</u> <u>New Rock Asset Partners v. Preferred Entity Advancements, Inc.</u>, 101 F.3d 1492, 1507 n.11 (3d Cir. 1996).  The decision to retain or decline jurisdiction over state-law claims is discretionary.  <u>Annulli v. Panikkar</u>, 200 F.3d 189, 203 (3d Cir. 1999), <u>overruled on other grounds by</u> <u>Rotella v. Wood</u>, 528 U.S. 549, 120 S. Ct. 1075, 145 L.Ed.2d 1047 (2000).  That discretion, however, is not unbridled. Rather, the decision "should be based on considerations of 'judicial economy, convenience and fairness to the litigants.'"  <u>New Rock</u>, 101 F.3d at 1505 (quoting <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726–27, 86 S. Ct. 1130, 16 L.Ed.2d 218 (1966)).  If a district court decides not to exercise supplemental jurisdiction and therefore dismisses state-law claims, it should do so without prejudice, as there has been no adjudication on the merits.  <u>See</u> <u>Figueroa</u>, 188 F.3d at 182.

<u>Kach</u>, 589 F.3d at 650 (alteration in original) (footnote omitted).

Here, because the Court has dismissed the First and Fourteenth Amendment claims over which it has original jurisdiction, it will decline to exercise supplemental jurisdiction over the state law claims under the Pennsylvania Election Code.  Judicial economy, convenience, and fairness weigh against retaining supplemental jurisdiction and in favor of dismissal at this early stage in the litigation.  Judicial resources would not be wasted, and Plaintiffs would not be prejudiced by refiling their state law claims in state court.  <u>See</u> <u>Hedges v. Musco</u>, 204 F.3d 109, 123 (3d Cir. 2000) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court <u>must</u> decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." (emphasis in original) (quoting <u>Borough of W. Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995))).  Accordingly, the Court will dismiss the Pennsylvania Election Code claims without prejudice.

**K.      Claims Against the Committee of Seventy and Leslie Acosta Will Be Dismissed Without Prejudice**

Plaintiffs Acosta and Lloyd name the Committee of Seventy and Leslie Acosta in the caption of their Second Amended Complaint.  (No. 17-1462, Doc. No. 11 at 2, 4.)  With respect to the Committee of Seventy, it was not served with process in this case, and Plaintiffs' only reference to the Committee of Seventy is naming it in the caption of the Second Amended Complaint.  With respect to Leslie Acosta, the sole allegation in the Second Amended Complaint is that the special election occurred because she was not seated due to a prior felony conviction. (Id. ¶ 9.)   Beyond this allegation and naming Leslie Acosta in the caption of the Second Amended Complaint, Plaintiffs allege no further facts related to her.  Neither the Committee of Seventy nor Leslie Acosta has filed an Answer or a Motion to Dismiss the Second Amended Complaint.

The Court will sua sponte dismiss the claims against the Committee of Seventy and Leslie Acosta without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) because Plaintiffs have failed to state a claim on which relief may be granted.  For actions filed by plaintiffs proceeding in forma pauperis, § 1915(e)(2)(B)(ii) provides that "the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim upon which relief may be granted." § 1915(e)(2)(B)(ii).  The standard for failure to state a claim under § 1915(e)(2)(B)(ii) is the same as the standard under Federal Rule of Civil Procedure 12(b)(6).  Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000).  That is, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm S.A. France, 707 F.3d at 231 n.14 (quoting Sheridan, 609 F.3d at 262 n.27).  When dismissing a claim under § 1915(e)(2)(B)(ii) for failure to state a claim, however, plaintiffs "should receive leave to amend

unless amendment would be inequitable or futile."  Grayson v. Mayview State Hosp., 293 F.3d

103, 114 (3d Cir. 2002).

In the instant case, Plaintiffs Acosta and Lloyd filed their Second Amended Complaint

pro se and in forma pauperis.  (Doc. No. 11.)  In the Second Amended Complaint, Plaintiffs

include no factual allegations against the Committee of Seventy other than naming this entity in

the caption.  Because the Second Amended Complaint contains no factual matter regarding the

Committee of Seventy, the claims against it fail to state a plausible claim for relief.  As such, the

claims against the Committee of Seventy will be dismissed under § 1915(e)(2)(B)(ii).  Although

Plaintiffs have alleged no facts against the Committee of Seventy, the Court will grant leave to

amend because the Court cannot say with certainty at this stage that leave to amend would be

futile.[32]

Plaintiffs also have alleged no factual conduct on the part of Leslie Acosta other than

that she was not seated in the General Assembly due to the prior felony conviction.  Because the

Second Amended Complaint does not contain sufficient factual matter to state a claim for relief

against Leslie Acosta, the Court will dismiss the claims against her without prejudice pursuant to

§ 1915(e)(2)(B)(ii). [33]

---

[32]   Although the Court cannot say at this stage that amendment as to the Committee of Seventy
would be futile, the Court cautions Plaintiffs not to include this entity as a defendant in the
Amended Complaint without alleging sufficient facts against it or there will be another
dismissal by this Court.

[33]   On January 1, 2018, Plaintiff Orlando A. Acosta filed a Motion requesting that this Court
grant a default judgment against the Committee of Seventy and Leslie Acosta.  (Doc. No.
79.)  In support of the Motion, Plaintiff argues: "These two parties never responded to any of
the Court's requests to submit any documentation and they are listed in this case."  (Id.)

Entering default judgment requires a two-step process.  See Fed. R. Civ. P. 55(a), (b).  First,
"[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead
or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter

**L.      Plaintiffs Will Be Granted Leave to Amend the Complaints Against All Defendants Except Against the Pennsylvania Department of State**

Federal Rule of Civil Procedure 15 provides that "[a] party may amend the party's pleading once as a matter of course any time before a responsive pleading has been served." Fed. R. Civ. P. 15(a).  And a court should "freely give" leave to amend pleadings "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court must grant leave to amend absent "undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; prejudice to the opposing party; and futility."  <u>Mullin v. Balicki</u>, 875 F.3d 140, 149 (3d Cir. 2017) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).

---

the party's default."  Fed. R. Civ. P. 55(a).  Second, Federal Rule of Civil Procedure 55(b)(2) "provides for entry of a default judgment in favor of a plaintiff where a defendant has failed to plead or otherwise defend."  <u>Catanzaro v. Fischer</u>, 570 F. App'x 162, 165 (3d Cir. 2014) (per curiam) (citing Fed. R. Civ. P. 55(b)(2)).

> Three factors control whether a default judgment should be granted: (1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct.

<u>Chamberlain v. Giampapa</u>, 210 F.3d 154, 164 (3d Cir. 2000) (citing <u>United States v. $55,518.05 in U.S. Currency</u>, 728 F.2d 192, 195 (3d Cir. 1984)).  "The matter of whether to enter default judgment 'is left primarily to the discretion of the district court.'"  <u>Juan v. Sanchez</u>, 339 F. App'x 182, 187 (3d Cir. 2009) (quoting <u>Hritz v. Woma Corp.</u>, 732 F.2d 1178, 1180 (3d Cir. 1984)).  "However, a default cannot be entered if there has not been proper service."  <u>Cutler v. Green</u>, No. CV 17-984, 2017 WL 2957817, at *6 (E.D. Pa. July 11, 2017) (citation omitted).

With respect to the Committee of Seventy, it has not been served with process and therefore neither a default nor default judgment can be entered against it.  Moreover, each of the three factors weighs in favor of denying Plaintiff Acosta's request for an entry of default judgment against the Committee of Seventy and Leslie Acosta.  First, Plaintiff will not be prejudiced if default is denied because they will be given leave to file an Amended Complaint.  Second, both Defendants appear to have a litigable defense.  Because the Second Amended Complaint does not contain sufficient allegations against these Defendants, they would have prevailed had they filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Third, there is no indication that Defendants' delay is due to culpable conduct.  For these reasons, Plaintiff Acosta's Motion requesting entry of a default judgment (Doc. No. 79) will be denied.

"[T]he District Court's discretion, circumscribed by the Rule 15's directive in favor of amendment, must be 'exercised within the context of liberal pleading rules.'" Id. at 150 (quoting Berkshire Fashions, Inc. v. The M.V. Hakusan II, 954 F.2d 874, 886 (3d Cir. 1992)). And in the Third Circuit, "district courts must offer amendment [in civil rights cases]—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile" Id. at 151 (alteration in original) (quoting Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007)).

In this consolidated civil rights case, Plaintiffs Acosta and Lloyd and the Little Plaintiffs have not requested leave to amend the Second Amended Complaint and the Amended Complaint, respectively. The Court will, however, grant Plaintiffs leave to amend as to all Defendants, if warranted, except for the Pennsylvania Department of State because doing so would be futile. Plaintiffs' § 1983 claims were dismissed because they failed to plead facts sufficient to establish that a conspiracy existed between the political party actors and the state actors, or that the conduct that allegedly occurred at the special election could be attributed to the state actors. Plaintiffs will be given the opportunity to plead facts sufficient to support its § 1983 claims[34] that overcome the deficiencies discussed in this Opinion.[35]

---

[34] In amending the Complaints, however, the Court directs Plaintiffs to clearly allege each cause of action in a separate Count in accordance with Federal Rule of Civil Procedure 10(b). As noted, Rule 10(b) provides:

**(b) Paragraphs; Separate Statements.** A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).

Here, it is not clear from the Complaints whether Plaintiff is alleging a separate state law claim for a violation of the Pennsylvania Election Code or whether an alleged violation of the

As to the Pennsylvania Department of State, however, leave to amend will not be granted because it would be futile.  All claims against the Pennsylvania Department of State are barred by the Eleventh Amendment, and therefore the Court does not have jurisdiction over them.  Amending the Complaints would not cure this deficiency because any claim still would be barred by the Eleventh Amendment.  Alston v. Kean Univ., 549 F. App'x 86, 89 (3d Cir. 2013) (citing Capogrosso v. Supreme Court of N.J., 588 F.3d 180, 185 (3d Cir. 2009)) (affirming district court's denial of leave to amend where claims were barred by the Eleventh Amendment).  Accordingly, the Court will not grant leave to amend the Complaints as to the Pennsylvania Department of State.[36]

## V.    CONCLUSION

For the foregoing reasons, the Motions to Dismiss (No. 17-1462, Doc. Nos. 31, 32, 33, 37, 38, 41; No. 17-1562, Doc. Nos. 11, 13, 15, 16.) will be granted.  Plaintiffs will be granted leave to amend their complaints as to all Defendants except for the Pennsylvania Department of State.  An appropriate Order follows.

---

Code is part and parcel of the constitutional claims.  Therefore, in amending the Complaints, the Court directs Plaintiffs to clearly allege each cause of action in a separate Count.

[35]   Plaintiffs, whether represented by counsel or not, must allege sufficient facts in any amended complaint and not merely repeat what is contained in the dismissed complaints.  Just repeating the same allegations without more in accordance with this Opinion will only result in another dismissal by this Court.

[36]   On January 10, 2018, Plaintiff Orlando A. Acosta filed a Motion requesting that this Court convene a grand jury to investigate the misconduct that he alleges occurred in this case.  (Doc. No. 78.)  He argues that "even though this is a civil case, criminal activity occurred."  (Id. at 1.)

Plaintiff Acosta's argument is without merit.  "There is no federal right to require the government to initiate criminal proceedings."  Gimbi v. Fairbank Capital Corp., 207 F. App'x 143, 144 (3d Cir. 2006) (per curiam) (affirming district court's denial of plaintiff's motion to compel the court to convene a grand jury in a civil case).  For this reason, the Court will deny Plaintiff Acosta's Motion for a grand jury.  (Doc. No. 78.)