*they were convicted*

*Case Number*
*217-CV01462*

COMMONWEALTH OF PENNSYLVANIA

*Orlando vs*
*antonio*

v.

*Democratic city*
*committee*

Dolores Shaw, Calvin Mattox, Thurman George and Wallace Hill

**FILED**

**JUN 1 2 2018**

## AFFIDAVIT OF PROBABLE CAUSE

*By KATE BARKMAN, Clerk*
*Dep. Clerk*

Your Affiant, Special Agent Robert McHugh, Office of Attorney General, Bureau of

Criminal Investigations, Organized Crime Section being duly sworn, deposes and says:

On March 22, 2017, the Pennsylvania Office of Attorney General (OAG) received a

request from members of the Pennsylvania House of Representatives to investigate allegations of

"multiple violations of Pennsylvania's Election Code" during the March 21, 2017 Special

Election of the 197th Legislative District (hereinafter: "the Special Election").

The request cited specific examples of alleged violations, such as improperly marking up

sample ballots, maintaining and distributing stamps inside polling places to facilitate "write-in"

votes, and illegal electioneering.  This request was granted and the complaint was assigned to

your Affiant, Special Agent Robert McHugh, to conduct a joint investigation with the

Philadelphia District Attorney's Office as they had also received complaints involving the

Special Election.

The Pennsylvania Constitution and Election Code give citizens of this Commonwealth

the fundamental right to vote without fear, intimidation or fraud. Registered voters in

Pennsylvania are entitled to free and fair elections.

The following charges, unless otherwise noted, are filed against the individuals listed

below.  These persons represent the entire local election board of Ward 43- Division 7.

1) 25 P.S. § 3525 - Frauds by Election Officers;

2) 25 P.S. § 3527 - Interference with Primaries and Elections; Frauds, Conspiracy;

3) 25 P.S. §3547 -  Prohibiting Duress and Intimidation of Voters and Interference with the Free Exercise of Elective Franchise;

4) 25 P.S. §3535 -  Repeat Voting at Elections;

5) 25 P.S. §3548 -  Failure to Perform Duty;

6) 25 P.S. §3549 -  Hindering the Performance of Duty;

7) 18 Pa.C.S. §4911(A)(1) - Tampering with Public Records and Information;

8) 18 Pa.C.S. §901 – Attempt; and

9) 18 Pa.C.S. §903 – Criminal Conspiracy.

| NAME | ROLE |
|------|------|
| Dolores Shaw | Judge of Election |
| Calvin Mattox* | Minority Inspector |
| Thurman George | Machine Inspector |
| Wallace Hill | Bilingual Translator |

*Calvin Mattox is also charged with violations of 25 P.S. §2672 -"Qualifications of Election Officers."

The Pennsylvania Attorney General's Office has jurisdiction over this matter pursuant to 25 P.S. §3260b.

**197th Legislative District**

Pennsylvania's 197th Legislative District is located in North Philadelphia and consists of 75 voting divisions and approximately 64,000 registered voters.  The district includes parts of Feltonville, Hunting Park, Glenwood, Fairhill, Hartranft, Norris Square and Francisville

neighborhoods.  It encompasses all of the nineteenth and forty-third wards, as well as parts of the eleventh, sixteenth, thirty-seventh, forty-second and forty-ninth wards.

Many citizens of 197th Legislative District speak Spanish as their first language. Pursuant to the Pennsylvania Election Code, individuals with limited English proficiency are legally permitted to have a person of their choice assist them in voting.

**The March 21, 2017 Special Election Candidates**

Speaker of the Pennsylvania House of Representatives Mike Turzai ordered a special election to be held on March 21, 2017 to fill the vacancy in the 197th Pennsylvania State Representative office.

Initially, three individuals sought nomination in hopes of appearing on the ballot for the Special Election.  Those were: Democrat, Freddy Ramirez; Republican, Lucinda Little; and Cheri Honkala of the Green Party.

In late February 2017, Ramirez, who was endorsed by the Democratic Party leaders, was removed from the ballot by Commonwealth Court Judge Anne Covey for failing to meet the residency requirements for that office.  Democratic Party leaders then decided to have the leader of the 43rd Ward, Emilio Vazquez, mount a "write-in" campaign for the Special Election.

Honkala, who was endorsed by the Green Party, was not permitted to be on the ballot because her nomination paperwork was filed a day after the statutorily mandated filing deadline. As such, with support from the Green Party, Honkala decided to mount a "write-in" campaign for the Special Election.

Little, the Republican candidate, remained and was the only candidate on the ballot. Individuals wanting to vote for anyone other than Lucinda Little would have to utilize the "write-

in" feature on the voting machines to write or stamp the name of the person they wanted to cast their vote for in this election.[1]

On March 21, 2017, voters from the 75 Divisions of the 197th Legislative District cast their votes at various polling places throughout North Philadelphia.  Approximately 5% of registered voters cast their ballot in the Special Election.  According to information provided by the Philadelphia City Commissioner's Office, Vazquez won the Special Election with 1,966 votes.  Honkala finished second with 284 votes, and Little finished third with 201 votes.

**Local Election Boards**

As previously mentioned, there are 75 voting "divisions" within the 197th Legislative District.  Each division has its own local election board made-up of poll workers who oversee and facilitate the election process at their poll on Election Day.  According to the Pennsylvania Election Code, ideally each local election board should be staffed by a minimum of five election officials, namely: a Judge of Election; a Majority Inspector; a Minority Inspector; a Clerk; and at least one Machine Inspector (depending on the number of voting machines being used in a particular Division).  In order to hold the aforementioned positions, all of these individuals are required to take oaths promising to uphold and execute their duties faithfully and fairly.  The Philadelphia City Commissioners' also appoint bilingual translators to assist voters where needed on Election Day.  The Philadelphia City Commissioners' offer training for poll workers in advance of Election Day.   The above are paid by the City of Philadelphia for their public service.

---

[1] A voter can cast a "write-in" vote in a Philadelphia voting machine by either writing a person's name with a writing utensil or by impressing a small, hand-held ink stamp into a box designed for "write-in" votes.  Organized "write-in" campaigns sometimes have stamps made to simplify the process for voters.

The counties outside of Philadelphia utilize constables and deputy constables to maintain and preserve order within the polls.  However, the Office of Constable in the City of Philadelphia was abolished in 1970 so there are not any constables available to monitor activity transpiring at the polls in Philadelphia.  In Philadelphia, the duty to maintain and preserve order falls upon the Judge of Election.

Each election board worker is supposed to arrive at the polls by 6:30 A.M. to set-up for Election Day.  The Philadelphia City Commissioners' provide each poll with necessary supplies and equipment for the duration of the day.  Contained in those supplies is a handbook "Guide for Election Board Officials in Philadelphia County" (hereinafter: "handbook") to help assist the election board in the proper handling of issues or questions that arise throughout the day.

The Judge of Election (hereinafter: "JOE") oversees the entire election process at a particular poll.  The JOE is responsible for the poll workers and the voters while they are inside the poll.  The JOE is also responsible for ensuring that all of the requisite paperwork is appropriately completed, maintained and returned to the county board of elections.  Each JOE is obligated to operate his or her polling place in accordance with Federal and State election laws.

By law, a person can become the JOE at a poll by being: 1) elected by the voters to serve a four year term, 2) appointed by the Court of Common Pleas for the duration of the unexpired term, 3) appointed by the Philadelphia City Commissioners' to work one particular election, or 4) elected through a "curbside" election occurring at the polling place on the morning of the election if the scheduled Judge fails to show up for duty.

Additionally, the JOE must close the polls, sign the Officials' Certification of Results Tape, turn over that tape and the machine cartridge to the requisite Philadelphia City Commissioners' designee, and ensure that the other election supplies are appropriately returned.

In Philadelphia, the JOE is paid $100.00 for Election Day work. The JOEs can make an additional $30.00 if they attend the Philadelphia City Commissioner's Election Board Training Seminar. Dolores Shaw was the JOE at 43-7 during the Special Election.

The Majority Inspector is responsible assisting the JOE in overseeing the election process. An individual can be elected to serve as the Majority Inspector in any of the following ways: 1) being elected to serve a four year term, 2) being appointed by the Court of Common Pleas for the duration of the unexpired term, 3) being appointed by the Philadelphia City Commissioners' to work one particular election day, or 4) through a "curbside" election occurring at the polling place if the scheduled Majority Inspector fails to show up on Election Day.

The Majority Inspector helps enforce voting regulations and procedures. Additionally, the Majority Inspector must sign the Officials' Certification of Results Tape certifying that the results are true. In Philadelphia, the Majority Inspector is paid $95.00 for Election Day work. The Majority Inspectors can make an additional $30.00 if they attend the Philadelphia City Commissioner's Election Board Training Seminar. The Board of 43-7 did not employ a Majority Inspector for the Special Election.

Typically, the Majority and Minority Inspectors help by managing the poll books and sign-in sheets in addition to assisting the JOE oversee the election process. An individual can be elected to serve as the Minority Inspector by being: 1) elected to serve a four year term, 2) appointed by the Court of Common Pleas for the duration of the unexpired term, 3) appointed by the Philadelphia City Commissioners' to work one particular election day, or 4) elected at a "curbside" election occurring outside of the polling place if the Minority Inspector fails to show up on Election Day.

The Minority Inspector helps enforce voting regulations and procedures.  The Minority Inspector should also appoint a Clerk to work the election.  Additionally, the Minority Inspector must sign the Officials' Certification of Results tape.  In Philadelphia, the Minority Inspector is paid $95.00 for Election Day work.  The Minority Inspector can make an additional $30.00 if they attend the Philadelphia City Commissioner's Election Board Training Seminar.  Calvin Mattox was the Minority Inspector at 43-7.

The Pennsylvania Election Code requires the JOE and the two inspectors to reside within the "District" (in Philadelphia, the Division) where he or she is serving, unless they are appointed by the City Commissioners or are elected in a curbside election. Calvin Mattox, Minority Inspector lived in 43-25, not 43-7, at all times material hereto. Mattox was neither appointed by the City Commissioners, nor elected via curbside election on the morning of the Special Election.

A Clerk is appointed by a division's Minority Inspector.  The Clerk helps enforce voting regulations and procedures.  Additionally, the Clerk must sign the Officials' Certification of Results tape.  In Philadelphia, the Clerk is paid $95.00 for Election Day work.  Clerks can also make an additional $30.00 if they attend the Philadelphia City Commissioner's Election Board Training Seminar.  No one was appointed to work as a Clerk at 43-7 for the Special Election.

The Machine Inspector is responsible for setting up the voting machine and resetting the machine after each voter casts a vote.  Machine Inspectors are appointed to the position.   The Machine Inspector is permitted to instruct voters on how the voting machine works.  In Philadelphia, the Machine Inspector is paid $95.00 for Election Day work.  The Machine Inspector can make an additional $30.00 if they attend the Philadelphia City Commissioner's Election Board Training Seminar.  Thurman George was the Machine Inspector at 43-7.

The Bilingual Interpreters (hereinafter: "interpreter(s)") are appointed and assigned by the Office of the City Commissioners to provide translation services in polling locations where voters have limited proficiency in English. According to the "Guide for Election Board Officials in Philadelphia County," each Interpreter's skills are assessed and certified prior to being selected. Additionally, each interpreter is supposed to be trained by the City Commissioners' staff in their duties prior to working an election. The interpreters are each paid $75.00 for Election Day work. They are permitted to work more than one poll if the polls are housed in the same building. Additionally, the interpreters can make an additional $30.00 if they attend the Philadelphia City Commissioner's Election Board Training Seminar. Wallace Hill was appointed as the interpreter at 43-7 for this election.

**Voter Assistance**

The right to vote in free and fair elections is a core tenant of this Commonwealth. The Pennsylvania Constitution and Pennsylvania Election Code demand that this right be protected at all times. The safeguards outlined below have been instituted for that purpose.

Article VII, section 4 of Pennsylvania's Constitution provides that "[a]ll elections by the citizens shall be by ballot or by such other method as may be prescribed by law: *Provided, that secrecy in voting be preserved.*" However, there are a few enumerated exceptions set out in the Pennsylvania Election Code to ensure that qualifying individuals may receive assistance in voting *by a person* of *their choice*.

The permissible reasons for a voter needing and receiving assistance are that the voter has a disability, is unable to read or write English, or has limited English proficiency. The purpose of these enumerated exceptions is to ensure that all duly registered voters in this Commonwealth

have the opportunity to vote for the person of their choice without fear of intimidation or punishment.

Pennsylvania Election Code codified at 25 P.S. §3058 (a) states: "[n]o voter shall be permitted to receive any assistance in voting at any primary or election, unless there is recorded upon his registration card his declaration that, by reason of blindness, disability, or inability to read or write, he is unable to read the names on the ballot or on the voting machine labels, or that he has a physical disability which renders him unable to see or mark the ballot or operate the voting machine, or to enter the voting compartment or voting machine booth without assistance, the exact nature of such condition being recorded on such registration card, and unless the election officers are satisfied that he still suffers from the same condition."

Additionally, the Pennsylvania Election Code codified at 25 Pa.C.S. §1504(a)(4) explains that if an individual's condition is not recorded on their registration card and they meet one or more of the permissible reasons listed above, the voter is required to fill out a "Voter Assistance Declaration," in order to receive assistance. The "Voter Assistance Declaration," a copy of which is attached, requires the following information be completed: Name and Address of Voter; Reason for Assistance, Name and Address of Assister; Signature of Voter; Signature of Witness and Signature of the Judge of Election. The statutes require the JOE to maintain the completed "Voter Assistance Declarations" as well as a detailed log of all of those assisted. It further requires those records be returned to the county board of elections upon the conclusion of the election.

Without question, the person providing assistance is to be chosen solely by the voter. Specifically, 25 P.S. §3058(b) of the Pennsylvania Election Code says: "[a]ny elector who is entitled to receive assistance in voting under the provisions of this section shall be permitted by

9

the judge of election to select a person of the elector's choice to enter the voting compartment or voting machine booth with him to assist him in voting, such assistance to be rendered inside the voting compartment or voting machine booth…." The statute continues on to specifically disqualify certain individuals from potentially assisting voters to further ensure that each voter can vote as he or she chooses without incurring any negative consequences.

When it comes to the training of local election boards on the statutorily permissible reasons when a voter can request and be granted assistance, the Philadelphia City Commissioners' "election board training" materials and handbook provide confusing and inaccurate information.

The packet entitled "Election Board Training", which is presented at the poll worker trainings, states "if a voter requires assistance operating the voting machine or assistance with a language other than English" the voter can be given assistance, provided the requisite form is completed.

Additionally, the previously mentioned handbook states on one page that the election board shall not permit illegal assistance in voting. Yet, on the very next pages where it outlines the process for "Voter Assistance," it only advises that if a person is already identified in the poll book as being entitled to assistance, they can have help; and, if the poll book does not note that they are entitled to assistance, the voter should just complete the assistance paperwork before they can have help. Nowhere in those pages of the handbook does it articulate which voters are legally permitted to have assistance.

However, further in the handbook in the section entitled "Language Interpretation Services" it states: "[l]anguage assistance from a child, relative, friend, neighbor or another voter, [u]nder Federal and State law, a voter who is disabled or who cannot adequately read or

write English can select anyone the voter chooses, including the voter's minor children, to provide oral language assistance."

Additionally, your Affiant interviewed employees of the City Commissioner's Office and a City Commissioner.  Your Affiant was told on multiple occasions that **all** voters who ask for assistance will be given assistance, regardless of reason, because "there are no laws that specifically list acceptable reasons for needing assistance."  This is contrary to Pennsylvania law.

This approach to "Voter Assistance" by the Philadelphia City Commissioner's permitted voters to receive help outside of the scope of State and Federal law.  According to "Voter Assistance Declarations" submitted by voters of the 197th District, reasons for assistance included: "Write-in," "Didn't Understand," "It's New," "Don't know How," "New Voting Rules," "General Assistance," "Booth," "Stamp Vote" and "Help with Write-In." None of those reasons qualify for assistance under the Pennsylvania Election Code.

Of the 2,694 votes from the 197th Special Election, the Philadelphia City Commissioner's Office received approximately 617 Voter Assistance Declarations.   Nearly, one out of four voters received assistance, regardless of whether or not their reason for assistance met State and/or Federal law.  Of those who were recorded as receiving assistance, less than 20% percent of the reasons listed on the Voter Assistance Declarations were statutorily permissible.

**Ward 43 Division 7**

Your Affiant reviewed complaints and interviewed several witnesses about events that transpired at Ward 43 Division 7 (hereinafter: "43-7") poll.   Your Affiant's investigation uncovered a course of illegal conduct by the entire local election board at this poll.

As previously noted, the JOE at 43-7 was Dolores Shaw.  She is a Democratic Committeewoman.  She became the JOE after being elected through a "curbside" election for the position on the morning of the Special Election.  Calvin Mattox was the Minority Inspector.  The Machine Inspector for the Special Election was Thurman George.  Wallace Hill was the interpreter.

According to the official results posted by the Philadelphia City Commissioner's Office, 24 votes were cast in 43-7 during the Special Election.  A breakdown of the votes shows that Vazquez received 17 votes, Honkala received four (4) votes, and Little received one (1) vote.  Additionally, there were two (2) blank votes cast.[2]

Your Affiant interviewed various individuals who voted in 43-7 during the Special Election.  Your Affiant also interviewed people that provided assistance to voters at 43-7, poll watchers who were both inside and outside of the polling place, and voting machine mechanics stationed at the polling place and responsible for repairing any broken voting machines.  Your Affiant also interviewed or attempted to interview the poll workers from 43-7.  Your Affiant also reviewed numerous official documents relevant to the election.

Your Affiant interviewed the second individual to vote (hereinafter: "Voter #2") in 43-7 during the Special Election.  Voter #2 informed your Affiant that she was questioned by a member of the 43-7 election board regarding who she was going to vote for.  Specifically, she explained while waiting in line to vote, Voter #2 was asked "who are you voting for" by an individual standing near the voting machine.  Voter #2 was shown a lineup of photos and identified the individual as Machine Inspector, Thurman George.  Voter #2 stated that she told George who she was voting for was none of his business.  Voter #2 stated that she was not intimated by George during this exchange but felt insulted because he was "supposed to be non-partisan."  Voter #2

---

[2] A voter casts a "blank vote" when pushing the green "vote" button without identifying the name of an individual he or she wishes to vote for.

cast her vote. After she voted, she campaigned outside of the polling place on behalf of Honkala until the early afternoon. Thereafter, Voter #2 went home. She returned to the polling place later that day with some neighbors who wanted her to assist them in voting.

Your Affiant interviewed the 14th and 15th individuals who voted (hereinafter: "Voter #14" and "Voter #15") at 43-7 in the Special Election. Voter #14 and Voter #15 both informed your Affiant that they are registered Republicans and voted Republican during the Special Election. Records indicate that they previously qualified for assistance in voting. Both Voter #14 and Voter #15 have limited English proficiency; however, Voter #15 felt that he was capable of providing adequate assistance to Voter #14 in this election while she voted.

Prior to entering the voting machine, Voter #15 stated that he and Voter #14 were approached by a male who offered to assist them while they voted. Both Voter #14 and Voter #15 stated that they did not ask this individual for assistance; but rather the offer for assistance was unsolicited. Voter #15 informed this individual that they did not need his assistance as Voter #15 was going to assist Voter #14 (his wife) while she voted.

Voter #15 stated that he went into the voting machine with Voter #14 to help her. Voter #14 stated that she pushed the button for the Republican candidate and then pressed the "green vote button" to cast her vote. Voter #14 stated that the voting process was no different than usual with pressing buttons. Voter #14 stated that she did not use a stamp to vote and did not utilize a pen to write a name of the candidate. Voter #14 also indicated that she did not open or close the "write-in" window at the top right of the voting machine.[3] After Voter #14 was done voting, she exited the voting machine and was tendered a "Voter Assistance Declaration" by a poll worker

---

[3] In order to cast a "write-in" vote, a voter would have to: 1) push the "write-in" button on the ballot space; 2) look to the top right side of the voting machine for the small window; 3) therein insert the name of the person that the voter wanted to vote for by either writing out the name or using an ink stamp; and 4) push the "green vote button" at the bottom of the machine.

despite the fact that she was not required to complete the form.  Voter #14 was instructed to sign her name on the form.  Voter #14 was not aware of what the form was, but did as she was told and signed the document anyway.

After his wife left the booth, Voter #15 stated that he pushed the button for the Republican candidate and then pressed the "green vote button" to cast his vote.  Voter #15 stated that the voting process was no different than usual.  Voter #15 stated that he did not use a stamp to vote and did not utilize a pen to write the name of a candidate in order to vote.  Voter #15 also indicated that he did not open or close the "write-in" window at the top right of the voting machine.  After Voter #15 was done voting, he was tendered a "Voter Assistance Declaration" and told to sign his name on the form despite the fact that he was not required to sign the form.  Voter #15 was not aware of what the form was, but did as he was told and signed the document anyway.

Your Affiant showed Voter #14 and Voter #15 the two Voter Assistance Declarations containing their biographical information and signatures.  Both Voter #14 and Voter #15 confirmed their signatures on the separate declarations.  However, your Affiant showed them the "Reason for Assistance" and the name of the "Person Providing Assistance."  Voter #14 and Voter #15 both stated that they never asked anyone for assistance with translation, nor did they know who the Interpreter Wallace Hill was.  Also present on the Assistance Declarations for Voter #14 and Voter #15, were the signatures of Minority Inspector Mattox, as Witness, and Shaw as JOE.

Voter #14 and Voter #15 were under the assumption that their Republican votes were counted.  However, official results from 43-7 show that only one Republican vote was cast and counted.

Both Voter #14 and Voter #15 were adamant that they pressed the button for the Republican candidate, did not utilize the "write-in" window, and did press the "green vote button" to submit their vote. According to both Voter #14 and Voter #15, they voted one after the other with no delay. Including the time he spent assisting Voter #14, Voter #15 stated that he was inside of the voting booth for less than five minutes.

However, after reviewing the machine audit time stamps for votes, your Affiant observed that voter associated with the 14th vote was "enabled" (active) for approximately six minutes and thirty seconds.  After the 14th vote was cast, there was approximately a three minute delay before the voter associated with the 15th vote was enabled.  That voter remained active for fifty-one seconds.  Cumulatively, this would mean that Voter #15 was inside of the voting booth for approximately ten minutes (including three minutes where lights inside the booth were off), twice as long as he claimed to have been in there.

Your Affiant believes that after Voter #14 cast her vote, the Machine Inspector, Thurman George, failed to enable the machine for Voter #15 to cast his vote.  Voter #15, believing that the machine was enabled, "voted" and then left.  However, since the machine was not actually enabled, the second Republican vote was not counted.  If there was an issue with Voter #15's vote not going through when the machine was actually enabled, George would have recognized this immediately. This would have been evident because the machine's counter would not have moved forward one count, and the machine would not have registered the "chime" sound made after a vote is cast. George could have called back Voter #15 to rectify the situation.

George did not call back Voter #15, which means that there would have been an "under vote" of 24 voters signed-in with only 23 votes cast (missing the one Republican vote). However, there was not an "under vote" on the official results from 43-7.  According to the poll

book and the results tape, there were 24 voters signed-in and 24 votes cast when the poll was closed.

Your Affiant interviewed the twenty-third individual to vote (hereinafter: "Voter #23") in 43-7 during the Special Election. Voter #23 stated that he walked to the polling place with his neighbor, the aforementioned Voter #2. Voter #23 stated that he told Voter #2 that he wanted to vote for Honkala before they walked into the building. Voter #2 picked up a Honkala stamp outside of the poll for him to vote with. While Voter #23 was waiting in line to vote, Voter #2 was assisting another voter at a different division in the polling place.

Voter #23 stated he told the woman at the sign-in table that he wanted assistance and that he was going to have his neighbor, Voter #2, help him. Voter #23 informed your Affiant that as soon as he mentioned assistance, a well-dressed man turned and said: "you need help, I'll help you." Voter #23 reiterated that he already chosen someone else to provide assistance and that he wanted to wait for her. Voter #23 stated that the well-dressed man became aggressive and overbearing about providing assistance.

According to Voter #23, the man made comments like: "Who is she to you?" and "Why her? Is she your girlfriend?" Voter #23 stated that he was repeatedly questioned as to why he wanted Voter #2, a known Honkala supporter, to assist him. As Voter #2 approached the table she observed the end of that interaction. Voter #2 was shown a lineup and identified Interpreter Wallace Hill as the individual that was giving Voter #23 a difficult time. Eventually, Shaw told Hill to stop questioning Voter #23.

Voter #23 informed your Affiant that he was angry about the whole experience with Interpreter Hill. Voter #23 stated that Interpreter, Hill made him feel like he "didn't have a choice" and that his "choice was wrong." Your Affiant asked Voter #23 what choice he was

referring to and Voter #23 stated that Hill was questioning his choice of who he wanted to assist him and ultimately who he wanted to vote for, because the Election board members at 43-7 clearly knew which candidate Voter #2 was associated with. Voter #23 stated that Hill's constant questioning made him want to walk out and "never vote again." Voter #23 stated that Hill knew who he wanted to vote for and that Voter #23 thought that Hill's attempts to "assist" him were actually attempts to try and change his vote. Voter #23 stated that for the entire time he was inside of the polling place, he never saw Hill ask anyone else if they needed assistance.

Your Affiant interviewed the twenty-fourth individual to vote (hereinafter: "Voter #24") in 43-7 during the Special Election. Voter #24, who has limited English proficiency, stated that he initially signed-in to vote and left frustrated. Voter #24 stated that he showed the people working the sign-in table inside 43-7 a campaign leaflet containing the photograph of who he wanted to vote for. The image was of Honkala. Voter #24 stated that he was told by a poll worker "you need to hide that picture." However, this is contrary to the Pennsylvania Department of State's October 2016 advisory entitled "Guidance on Rules in Effect at Polling Place on Election Day," which indicates that it is permissible for voters to bring campaign literature into the poll and voting booth if it will assist them in voting.

Additionally, after showing the campaign leaflet containing the photograph of Honkala to a poll worker, he was told by a poll worker that the machine was broken. Your Affiant interviewed the two voting machine mechanics that were stationed at that polling place and also reviewed the voting machine cartridge audit results. Your Affiant determined that the voting machine used at 43-7 was never "broken" at any time that day. Moreover, a second voting machine was at that poll and operable, but remained unused for the entire day. Clearly, there was no legitimate reason that Voter # 24 was delayed or turned away from voting.

After being told to hide the campaign leaflet containing Honkala's photograph and that the machine on which he was going to vote was broken, Voter # 24 decided to leave the poll without voting.  However, once Voter #24 walked outside, he began to talk loudly to himself about how frustrated he was with the whole experience and that "they couldn't do that."  Some people standing outside the polling place heard Voter #24's exasperation.  They wanted him to be able to vote for the person of his choice.

While outside, a poll watcher, J.R., tried to explain to Voter #24 the different ways he could vote: whether it be to push the button for a Republican, or "write-in" his vote with a stamp or pen for someone else.  While explaining the various options to Voter #24, J.R. told your Affiant that Voter #24 wanted to vote "the easy way and just push a button."  The Machine Inspector of 43-7, Thurman George, heard this and apparently assumed that Voter #24 wanted to vote Republican by "just pushing the button."  George exclaimed: "Not on my machine, he's not."

An unrelated person who was about to go inside to vote, C.M., also heard Voter #24 say that the people inside "were trying to change my vote."  C.M. approached the man to see what was happening.  C.M. explained that while he was talking to Voter #24 about the situation, a man was standing on the other side of the voter.  Voter #24 identified that man as the one who was giving him a hard time about who he wanted to vote for.  C.M. was shown a lineup and identified Machine Inspector Thurman George as the individual who harassed Voter #24.

Video from outside of the polling place shows Voter #24 speaking to J.R. and C.M. Standing close by in the background is Machine Inspector George with his arms crossed, listening intently to the conversation between Voter #24, J.R. and C.M.  After C.M. offered to help Voter #24, and as he and Voter #24 were walking towards the door of the polling place, the

video shows Machine Inspector George loudly say "FUCK YOU" in the direction of Voter #24 and C.M.

According to C.M., Voter #24 asked him to go inside the booth and help him. C.M. stated that George told him that he was not allowed to go in the voting machine with the voter and that he needed to speak through the curtain of the voting booth if he wanted to give him help. C.M. explained that he attempted to aid Voter #24 through the curtain. The confusion continued, and ultimately, they were told that the machine was jammed and that it needed to be fixed. C.M. stated that Voter #24 was inside of the booth for a long time because of all of the confusion.

As a result of all of the confusion and being told to hide the campaign leaflet continaing Honkala photograph, Voter #24 decided to change his vote to the "Hispanic male." Voter #24 stated that he did not push the Republican button, but rather pushed what he thought was the Democratic button. After pushing the Democratic button, Voter #24 pushed the "green vote button" to submit his vote.

In reality, there was no Democrat on the ballot, and therefore, there was no Democratic button. The only other option outside of the Republican button was the "write-in" button. After pushing that button, the voter would have to enter the name of the individual he wanted to vote for in the "write-in" window at the top right of the voting machine. However, Voter #24 stated that he did not use a stamp to vote and did not utilize a pen to write the name of the candidate that he was voting for. Voter #24 also indicated that he did not open or close the "write-in" window at the top right of the voting machine. Unbeknownst to Voter #24, when he pushed the "green vote button" to cast his vote, he was not actually completing the voting process.

Therefore, when Voter #24 left the machine, since no vote was cast and no vote was cancelled the machine remained active and ready for a vote to be cast or reset.

After reviewing the time stamps for votes, your Affiant observed that voter associated with the 24th vote was "enabled" (active) for approximately 44 seconds.  However, both Voter #24 and a witness stated that due to confusion, Voter #24 remained in the booth for several minutes.  Your Affiant believes that the 24th vote cast, was not that of Voter #24, but rather another individual that had access to the machine after Voter #24 left - believing that he cast his vote.

The machine tape shows that right before the 24th vote, there was a "cancelled" vote.  A vote can only be cancelled from the control panel behind the machine.  According to the machine audit, the time stamp for that cancelled vote, the machine was "voter enabled" for approximately forty (40) minutes.  Your Affiant believes that this cancelled vote was actually Voter #24's "vote."  Since Voter #24 left the machine without completing the entire "write-in" process, someone else could have voted on that machine in place of Voter #24.  Since Voter #24 was the last voter of the evening, the machine could not have been closed down until the "active" voter either voted or was cancelled.

The Philadelphia City Commissioner's Office provided your Affiant a copy of the official tape of "write-in" results printed from the voting machines in 43-7.  According to information gathered from interviewing voters, the 23rd vote should be for Honkala and the final vote should be blank as the voter did not utilize a stamp or pen to complete the "write-in" process.  However, the official tape shows that the second to last recorded vote is a vote for Vazquez and the final vote recorded is also for Vazquez.  These results are in direct contradiction to statements that the voters made themselves.

**Conclusion**

The facts set forth in this affidavit reveal the 43-7 election board engaged in an illegal course of conduct during the March 21, 2017 Special Election.  The election board, responsible for the oversight and facilitation of the electoral process, took advantage of the voters' trust in a fair and honest process.  However, the election board betrayed them by falsifying records, unlawfully adding votes to the voting machine and interfering with voter intent.

The information above is based upon facts gathered during the course of this investigation, which your Affiant believes to be true and correct to the best of his knowledge, information, and belief. Your Affiant respectfully requests the issuance of warrants of arrest for the defendants Dolores Shaw, Calvin Mattox, Thurman George and Wallace Hill.

I, SPECIAL AGENT ROBERT MCHUGH #516, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____

Special Agent

Sworn to and subscribed before me this _____ day of _____ ,

_____ .

_____

Magisterial District Judge

21

My commission expires first Monday of January, _____

SEAL